UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRAND TRAVERSE BAND OF
OTTAWA AND CHIPPEWA INDIANS;
GRAND TRAVERSE BAY WATERSHED
INITIATIVE, INC.; and ELK-SKEGEMOG        Civil Action No. _____
LAKES ASSOCIATION,
                                          Hon. _____
                              Plaintiffs,

v.

BURNETTE FOODS, INCORPORATED

                              Defendant,

---

# EXHIBIT 5

# TO COMPLAINT

PERMIT NO. GW1810211

*STATE OF MICHIGAN*
*DEPARTMENT OF ENVIRONMENTAL QUALITY*

GROUNDWATER DISCHARGE PERMIT

In compliance with the provisions of Michigan's Natural Resources and Environmental Protection Act, 1994 P.A. 451, as amended (NREPA), Part 31, Water Resources Protection, and Part 41, Sewerage Systems,

Burnette Foods Incorporated
701 US 31
Elk Rapids, MI 49629

is authorized to discharge 425,000 gallons per day, 15,000,000 gallons per year of process wastewater from the Burnette Foods Inc-Elk Rapids located at

11100 Elk Lake Road
Elk Rapids, MI 49629

designated as **Burnette Foods Inc-Elk Rapids**

to the groundwater of the State of Michigan in accordance with effluent limitations, monitoring requirements and other conditions set forth in this permit.

Rule Authorization:          Rule 2218 Authorization
Wastewater Type:             Process wastewater
Wastewater Treatment Method: Impoundment
Wastewater Disposal Method:  Spray Irrigation

The issuance of this permit does not authorize violation of any federal, state or local laws or regulations, nor does it obviate the necessity of obtaining such permits, including any other Michigan Department of Environmental Quality (Department) permits, or approvals from other units of government as may be required by law.

This permit is based on an original application submitted on May 13, 2015 as amended through July 2, 2015.

This permit takes effect on June 1, 2017.  The provisions of this permit are severable.  After notice and opportunity for a hearing, this permit may be modified, suspended, or revoked in whole or in part during its term in accordance with applicable laws and rules.

This permit and the authorization to discharge shall expire at midnight, June 1, 2020.  In order to receive authorization to discharge beyond the date of expiration, the permittee shall submit an application which contains such information, forms, and fees as are required by the Department by December 3, 2019.

Issued ___June 1, 2017___.

_____
Rick D. Rusz, Supervisor
Groundwater Permits Unit
Permits Section, Water Resources Division

EXHIBIT 5
Page 1 of 17

**PERMIT FEE REQUIREMENTS**

In accordance with Section 324.3122 of the NREPA, the permittee shall make payment of an annual permit fee to the Department for each December 15th the permit is in effect regardless of occurrence of discharge. The permittee shall submit the fee in response to the Department's annual notice. The fee shall be postmarked by March 1st for notices mailed by January 15th. The fee is due no later than 45 days after receiving the notice for notices mailed after January 15th.

**CONTACT INFORMATION**

Unless specified otherwise, all contact with the Department required by this permit shall be made to the Gaylord District Office of the Water Resources Division. The Gaylord District Office is located at 2100 West M-32, Gaylord, MI, 49735-9282, Telephone: 989-731-4920, Fax: 989-731-6181.

**CONTESTED CASE INFORMATION**

Any person who is aggrieved by this permit may file a sworn petition with the Michigan Administrative Hearing System of the Michigan Department of Licensing and Regulatory Affairs, setting forth the conditions of the permit which are being challenged and specifying the grounds for the challenge. The Department of Licensing and Regulatory Affairs may reject any petition filed more than 60 days after issuance as being untimely.

**SPECIAL INSTRUCTIONS/NOTIFICATIONS**

This permit does not authorize or approve the construction or modification of any wastewater treatment system, physical structures or facilities. Approval for such construction must be as follows:

1. For a publicly owned treatment work (POTW), or a private system that is servicing the public, approval must be by permit issued under Part 41 of the NREPA.
2. For a mobile home park, approval shall be pursuant to MCL 125.2312.
3. For a campground or marina, approval shall be from the Office of Drinking Water and Municipal Assistance, Michigan Department of Environmental Quality.
4. For a hospital, nursing home or extended care facility, approval shall be from the Division of Health Facilities and Services, Michigan Department Consumer and Industry Services, upon request.

**EXHIBIT 5**
**Page 2 of 17**

# PART I

**1. Effluent Limitations**

During the period beginning on the effective date of this permit and lasting until the expiration date of this permit, the permittee is authorized to discharge a maximum of 425,000 gallons per day, 15,000,000 gallons per year, of process wastewater from the monitoring points listed below to the groundwater in the NW 1/4 of the SW 1/4, Section 28, T29N, R09W, Elk Rapids, Antrim County, Michigan. The discharge shall be limited and monitored by the permittee as specified below.

| Parameter | Minimum Daily Limit | Maximum Daily Limit | Units | Monitoring Frequency | Sample Type |
|---|---|---|---|---|---|
| **EFFLUENT** | | | | | |
| Monitoring Point EQ-1 | | | | | |
| Flow | | 425,000 | GPD | Daily | Direct Measurement |
| Flow | | 15,000,000 | GPY | Annually | Calculation |
| Total Inorganic Nitrogen | | 5.0 | mg/l | Twice Monthly* | Calculation |
| Ammonia Nitrogen | | (report) | mg/l | Twice Monthly* | Grab |
| Nitrate Nitrogen | | (report) | mg/l | Twice Monthly* | Grab |
| Nitrite Nitrogen | | (report) | mg/l | Twice Monthly* | Grab |
| pH | (report) | (report) | S.U. | Twice Monthly* | Grab |
| Biochemical Oxygen Demand (BOD5) | | (report) | mg/l | Twice Monthly* | Grab |
| Dissolved Oxygen | (report) | | mg/l | Twice Monthly* | Grab |
| Chloride | | 500 | mg/l | Twice Monthly* | Grab |
| Sodium | | 400 | mg/l | Twice Monthly* | Grab |
| Total Phosphorus | | 10 | mg/l | Twice Monthly* | Grab |

* During Discharge

| Parameter | Minimum Daily Limit | Maximum Daily Limit | Units | Monitoring Frequency | Sample Type |
|---|---|---|---|---|---|
| Monitoring Point EQ-2 (Surface water) | | | | | |
| Total Inorganic Nitrogen | | (report) | mg/l | Quarterly* | Calculation |
| Ammonia Nitrogen | | (report) | mg/l | Quarterly* | Grab |
| Nitrate Nitrogen | | (report) | mg/l | Quarterly* | Grab |
| Nitrite Nitrogen | | (report) | mg/l | Quarterly* | Grab |
| pH | (report) | (report) | S.U. | Quarterly* | Grab |
| Biochemical Oxygen Demand (BOD5) | | (report) | mg/l | Quarterly* | Grab |
| Dissolved Oxygen | (report) | | mg/l | Quarterly* | Grab |
| Chloride | | (report) | mg/l | Quarterly* | Grab |
| Sodium | | (report) | mg/l | Quarterly* | Grab |
| Total Phosphorus | | (report) | mg/l | Quarterly* | Grab |

*During Discharge.

**For months when samples are not taken, permittee shall enter *G on discharge monitoring report.**

EXHIBIT 5
Page 3 of 17

| Monitoring Points Parameter | Minimum Daily Limit | Maximum Daily Limit | Units | Monitoring Frequency | Sample Type |
|---|---|---|---|---|---|
| **Land Application (July 1- August 15) (Stage Code U)** | | | | | |
| North Site (IRR-38) | | | | | |
| Application Rate (daily) | | 0.68 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 4.0 | inches/week | Weekly | Calculation |
| South- East Site (IRR-36 SE) | | | | | |
| Application Rate (daily) | | 0.34 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 2.04 | inches/week | Weekly | Calculation |
| South- Center Site IRR-36 SC) | | | | | |
| Application Rate (daily) | | 0.34 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 2.04 | inches/week | Weekly | Calculation |
| South- West Site (IRR-36 SW) | | | | | |
| Application Rate (daily) | | 0.34 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 2.04 | inches/week | Weekly | Calculation |
| Field #37 (IRR-37) | | | | | |
| Application Rate (daily) | | 0.34 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 2.04 | inches/week | Weekly | Calculation |
| Field #39 (IRR-39) | | | | | |
| Application Rate (daily) | | 0.1 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 0.7 | inches/week | Weekly | Calculation |
| **Monitoring Points Land Application (August 16 - June 30) (Stage Code V)** | | | | | |
| North Site (IRR-38) | | | | | |
| Application Rate (daily) | | 1.96 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 4.0 | inches/week | Weekly | Calculation |
| Southeast Site (IRR-36 SE) | | | | | |
| Application Rate (daily) | | 0.34 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 0.34 | inches/week | Weekly | Calculation |
| South Center Site (IRR-36 SC) | | | | | |
| Application Rate (daily) | | 0.34 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 0.34 | inches/week | Weekly | Calculation |
| Southwest Site (IRR-36 SW) | | | | | |
| Application Rate (daily) | | 0.34 | inches/day | Daily | Calculation |
| Application Rate (weekly) | | 0.34 | inches/week | Weekly | Calculation |
| Soil * S-1 ( IRR-36 SC, IRR-36 SE, IRR-36 SW, IRR-37, IRR-38 and IRR-39) | | | | | |
| Bray P1 (available soil phosphorus) | | (report) | mg/kg | Annually | Composite |
| Sodium | | (report) | mg/kg | Annually | Composite |

EXHIBIT 5
Page 4 of 17

| Parameter | Minimum Daily Limit | Maximum Daily Limit | Units | Monitoring Frequency | Sample Type |
|---|---|---|---|---|---|
| pH | | (report) | S.U. | Annually | Composite |
| Cation Exchange Capacity | | (report) | meq/100 grams | Annually | Composite |

\* **NOTE: One soil sample shall be taken from each field labled IRR-37, IRR-38 and IRR-39. A composite sample shall be taken from IRR-36 SC, IRR-36 SW and IRR-36 SE.**

a) Total Inorganic Nitrogen
The daily maximum value for total inorganic nitrogen shall be reported as the sum of the daily maximum values for ammonia nitrogen, nitrate nitrogen, and nitrite nitrogen.

b) Sampling Locations
Influent and effluent flow shall be measured in accordance with the approved Sampling and Analysis Plan. The location and method of collecting and analyzing effluent samples shall be in accordance with the approved Sampling and Analysis Plan. The Department may approve alternate sampling locations which are demonstrated by the permittee to be representative.

c) Total Phosphorus - Bray P1 Soils Testing
Soils at land application sites shall be sampled a minimum of once every year to determine phosphorus levels and the results shall be used to determine land application rates. Sample soil using an 8 inch vertical core, and take 20 or more cores in a random pattern spread evenly over each uniform field area. A uniform field area shall be no greater than 20 acres or it can be up to 40 acres if that field has one soil map unit and has been managed as a single field for the last ten years. The 20 cores shall be composited into one sample and analyzed using the Bray P1 method. Alternate methods may be used upon approval of the Department. Additional information on soil sampling can be found in Michigan State University Extension Bulletins E2904 and E498.

**2. Groundwater Monitoring and Limitations (Upgradient)**
During the period beginning on the effective date of this permit and lasting until the expiration date of this permit, the permittee shall sample the groundwater from the hydraulically upgradient groundwater monitor wells MW-2 as described below:

| Parameter | Minimum Daily Limit | Maximum Daily Limit | Units | Monitoring Frequency | Sample Type |
|---|---|---|---|---|---|
| Static Water Elevation | | (report) | USGS-Ft | Quarterly | Measured |
| pH | (report) | (report) | S.U. | Quarterly | Grab |
| Specific Conductance | | (report) | umhos/cm | Quarterly | Grab |
| Total Inorganic Nitrogen | | (report) | mg/l | Quarterly | Calculation |
| Ammonia Nitrogen | | (report) | mg/l | Quarterly | Grab |
| Nitrate Nitrogen | | (report) | mg/l | Quarterly | Grab |
| Nitrite Nitrogen | | (report) | mg/l | Quarterly | Grab |
| Chloride | | (report) | mg/l | Quarterly | Grab |
| Sodium | | (report) | mg/l | Quarterly | Grab |
| Total Phosphorus | | (report) | mg/l | Quarterly | Grab |
| Calcium | | (report) | mg/l | Annually | Grab |
| Iron | | (report) | ug/l | Annually | Grab |
| Magnesium | | (report) | mg/l | Annually | Grab |
| Manganese | | (report) | ug/l | Annually | Grab |
| Potassium | | (report) | mg/l | Annually | Grab |
| Dissolved Oxygen | (report) | | mg/l | Annually | Grab |
| Bicarbonate | | (report) | mg/l | Annually | Grab |
| Sulfate | | (report) | mg/l | Annually | Grab |

a) Sampling Locations
Unless an alternative monitoring schedule is approved in the Sampling and Analysis Plan, quarterly sampling shall be in the months of February, May, August and November. The Department may approve alternate sampling locations which are demonstrated by the permittee to be representative.

b) Total Inorganic Nitrogen at Groundwater Monitoring Points
The value for total inorganic nitrogen shall be reported as the sum of the values for ammonia nitrogen, nitrate nitrogen, and nitrite nitrogen.

**3. Groundwater Monitoring and Limitations (Downgradient)**
During the period beginning on the effective date of this permit and lasting until the expiration date of this permit, the permittee shall sample the groundwater from hydraulically downgradient groundwater monitor wells. The discharge of treated wastewater shall not cause the groundwater in monitor wells MW-1, MW-3, MW-4, MW-5, MW-6, MW-7, MW-8, MW-9. MW-10, and MW-11 to exceed the limitations below.

EXHIBIT 5
Page 5 of 17

| Parameter | Minimum Daily Limit | Maximum Daily Limit | Units | Monitoring Frequency | Sample Type |
|---|---|---|---|---|---|
| Static Water Elevation | | (report) | USGS-Ft | Quarterly | Measured |
| pH | 6.5 | 9.0 | S.U. | Quarterly | Grab |
| Specific Conductance | | (report) | umhos/cm | Quarterly | Grab |
| Total Inorganic Nitrogen | | 5.0 | mg/l | Quarterly | Calculation |
| Ammonia Nitrogen | | (report) | mg/l | Quarterly | Grab |
| Nitrate Nitrogen | | (report) | mg/l | Quarterly | Grab |
| Nitrite Nitrogen | | 0.5 | mg/l | Quarterly | Grab |
| Chloride* | | (report) | mg/l | Quarterly | Grab |
| Sodium* | | (report) | mg/l | Quarterly | Grab |
| Total Phosphorus | | 1.0 | mg/l | Quarterly | Grab |
| Calcium | | (report) | mg/l | Annually | Grab |
| Iron | | (report) | ug/l | Annually | Grab |
| Magnesium | | (report) | mg/l | Annually | Grab |
| Manganese | | (report) | ug/l | Annually | Grab |
| Potassium | | (report) | mg/l | Annually | Grab |
| Dissolved Oxygen | (report) | | mg/l | Annually | Grab |
| Bicarbonate | | (report) | mg/l | Annually | Grab |
| Sulfate | | 250 | mg/l | Annually | Grab |

*The permittee shall comply with the conditions of Part I, Section 12(f) and (g), Compliance Requirements, of this permit if sodium and/or chloride exceeds the specified level.

a) Sampling Locations
Unless an alternative monitoring schedule is approved in the Sampling and Analysis Plan, quarterly sampling shall be in the months of February, May, August and November. Annual sampling shall be in August. The Department may approve alternate sampling locations which are demonstrated by the permittee to be representative.

b) Total Inorganic Nitrogen at Groundwater Monitoring Points
The daily maximum value for total inorganic nitrogen shall be reported as the sum of the daily maximum values for ammonia nitrogen, nitrate nitrogen, and nitrite nitrogen.

**4. Operation and Maintenance Manual**
The permittee is required to develop an Operation and Maintenance Manual. A guidance document is available via the internet at:
http://www.deq.state.mi.us/documents/deq-wmd-gwp-Part22GuidshtVI.pdf

**5. Operator Certification**
The permittee shall have the waste treatment facilities under direct supervision of an operator certified at the appropriate level for the facility certification by the Department, as required by Sections 3110 and 4104 of the NREPA.

**6. Submittal Requirements for Self-Monitoring Data**
Part 31 of Act 451 of 1994, as amended, specifically Section 324.3110(3) and Rule 323.2155(2) of Part 21 allows the department to specify the forms to be utilized for reporting the required self-monitoring data.

The permittee shall utilize the information provided on the MiWaters website at https://miwaters.deq.state.mi.us to access and submit the electronic forms. Both monthly summary and daily data shall be submitted to the department no later than the **20th day of the month** following each month of the authorized discharge period(s). The permittee may be allowed to submit the electronic forms after this date if the Department has granted an extension to the submittal date.

**7. Facility Operation and Maintenance**
During the period beginning on the effective date of this permit and lasting until the expiration date of this permit, the permittee shall comply with the inspection, operation and maintenance program requirements specified below.

| Location | Condition | Measurement Frequency | Sample Type |
|---|---|---|---|
| Lagoon | Freeboard -2 foot minimum | Weekly | Visual Observation |
| | Control Structures | Weekly | Visual Observation |
| | Dike Integrity | Weekly | Visual Observation |
| | Vegetation Control | Weekly | Visual Observation |
| | Nuisance Animals | Weekly | Visual Observation |

EXHIBIT 5
Page 6 of 17

| Location | Condition | Measurement Frequency | Sample Type |
|---|---|---|---|
| Irrigation Fields | Ponding | Daily During Discharge | Visual Observation |
| | Pooling | Daily During Discharge | Visual Observation |
| | Erosion | Daily During Discharge | Visual Observation |
| | Odors | Daily During Discharge | Olfactory Observation |
| | Piping | Daily During Discharge | Visual Observation |
| | Sprinkler Heads | Daily During Discharge | Visual Observation |

a) Lagoon Inspection
These inspections shall include:
(1) the lagoon dikes for vegetative growth, erosion, slumping, animal burrowing or breakthrough;
(2) the lagoon for growth of aquatic plants, offensive odors, insect infestations, scum, floating sludge, and septic conditions;
(3) the depth of the water in each cell and the freeboard with a minimum two (2) feet of freeboard being maintained at all times;
(4) the control structures and pump stations to assure that valves, gates and alarms are set correctly and properly functioning;
(5) the lagoon security fence and warning signs.

b) Facility Maintenance
The permittee shall implement a Facility Maintenance Program that incorporates the following management practices unless otherwise authorized by the Department.
(1) Vegetation shall be maintained at a height not more than six (6) inches above the ground on lagoon dikes.
(2) Not more than 10 percent of the water surface shall be covered by floating vegetation and not more than 10 percent of the water perimeter may have emergent rooted aquatic plants.
(3) Dike damage caused by erosion, slumping or animal burrowing shall be corrected immediately and steps taken to prevent occurrences in the future.
(4) The integrity of the lagoon liner shall be protected. Liner damages shall be corrected immediately and steps taken to prevent future occurrences.
(5) The occurrence of scum, floating sludge, offensive odors, insect infestations, and septic conditions shall be minimized.
(6) A schedule for the inspection and maintenance of the collection system, lift stations, mechanical and electrical systems, transfer stations, and control structures shall be developed and implemented.

c) Lagoon Drawdown Conditions
The permittee shall observe the following conditions when drawing down a cell for transfer or discharge unless otherwise authorized by the Department.
(1) Water discharged shall be removed from the surface two feet of the cell at a rate of less than one foot per day.
(2) The permittee shall maintain a minimum of two feet of freeboard in all cells at all times. Upon written notification, the Department may require a minimum of three feet of freeboard for larger systems.
(3) The permittee shall maintain a minimum of two feet of water in all cells at all times.

**8. General Conditions**
a) The discharge shall not be, or not be likely to become, injurious to the protected uses of the waters of the state.

b) The discharge shall not cause runoff to, ponding on, or flooding of adjacent property, shall not cause erosion, and shall not cause nuisance conditions.

c) The point of discharge shall be located not less than 100 feet inside the boundary of the property where the discharge occurs, unless a lesser distance is specifically authorized in writing by the Department.

d) The discharge shall not create a facility as defined in Part 201, Environmental Remediation, of the NREPA.

**9. Other Conditions**
a) **Basis of Design** - The discharge shall be treated in accordance with the approved basis of design pursuant to Rule 323.2218(2).

b) **Wastewater Characterization** - The wastewater being treated shall be of the same chemical, biological, and physical characteristics as described in the characterization required pursuant to Rule 323.2220.

**Land Application:**
**Slow Rate Land Application**
(1) A portion of the flow is expected to percolate to the groundwater while the remainder is utilized by plants or lost through evaporation.
(2) The wastewater loading volume shall be designed so that the wastewater will be absorbed and held within the effective rooting zone of the vegetative cover established on the site receiving the wastewater.
(3) The header ditch drainage and the grading of the furrows, where utilized, shall be tested for equal liquid distribution before seeding.
(4) The system shall be seeded with a mixture of perennial vegetative cover, which are grasses such as reed canary grass, tall fescue, and orchard grass, alone or in combination with legumes, such as clover, alfalfa, and birdsfoot trefoil, suited to the climate and the soil moisture conditions created

**EXHIBIT 5**
Page 7 of 17

as a result of the application of wastewater in accordance with the designed loading cycle. The Department may approve alternative vegetative cover on a case-by-case basis, but may impose restrictions based upon the characteristics of the proposed alternative.
(5) All furrow side slopes, where present, shall be designed and constructed to allow for periodic maintenance and or mechanical harvesting of vegetative cover.
(6) The depth of the furrows of a ridge and furrow system, when utilized, shall be adequate to contain the highest proposed furrow stream.
(7) The treatment system must have sufficient hydraulic capacity to treat organic or inorganic loading so that the discharge receives physical, chemical biological treatment or a combination of treatments to meet the standards of Rule 323.2222.
(8) Crops for human consumption grown on effluent irrigated fields shall be limited to crops requiring processing prior to consumption.
(9) Animals that produce milk for human consumption shall not be allowed to graze on any effluent irrigated fields until
30 days following the application of effluent.
(10) In no case shall nutrients provided by wastewater and supplemental fertilization exceed the nutrient requirements of the crop based on the yield goal for that crop.

**10. Discharge Management Plan (DMP)**
a) A land treatment system shall be designed, constructed, and operated as follows:
(1) The system shall be designed and constructed to prevent surface runoff from either entering or exiting the system.
(2) The system shall be designed and constructed to provide even distribution of wastewater during application. A header ditch, where used, shall be designed and constructed to allow for complete drainage after each wastewater loading or shall be lined to prevent seepage.
(3) If vegetative cover is utilized and is considered part of the overall treatment system, then the design and construction of the system shall allow for the mechanical harvesting of vegetative cover.
(4) The system shall be designed, constructed, and operated to allow an appropriate loading cycle. An appropriate loading cycle allows time between loadings for all of the following:
(a) Soil organisms to biologically decompose organic constituents in the wastewater.
(b) Organic solids on the soil surface to decompose.
(c) The soil to become aerated.
(d) Vegetative cover to utilize available nutrients provided through the application of the wastewater.
(e) Soil conditions to become unsaturated and aerobic.
(f) Harvesting operations to occur at appropriate times.

b) The design hydraulic loading or application rate, whether daily, monthly, or annual, shall not be more than one of the following:
(1) Three percent of the permeability of the most restrictive soil layer within the solum over the area of the discharge when determined by either the cylinder infiltration method or air entry permeameter test method.
(2) Seven percent of the permeability of the most restrictive soil layer within the solum over the area of the discharge as determined by the saturated hydraulic conductivity method.
(3) Twelve percent of the permeability of the most restrictive soil layer within the solum over the area of the discharge as determined by the basin infiltration method.
(4) If published information is utilized, the permittee shall determine the methodology used to measure the reported hydraulic conductivity. If the hydraulic conductivity is given as a range of expected values, then a permittee shall use the minimum value given the most restrictive soil layer within the solum when calculating the hydraulic loading or application rate.

c) The system shall be designed, constructed, and operated so as to prevent the development of sodic conditions within the solum of the discharge area. Sodic conditions are considered to exist in the solum when the exchangeable sodium percentage, which is the percentage of the cation exchange capacity of a soil occupied by sodium, is more than 15 percent.

d) If phosphorus adsorption within the solum or unsaturated soil column is part of the overall treatment process, then the system shall be designed as follows:
(1) The available phosphorus adsorptive capacity of the solum or unsaturated soil column from within the discharge area shall be sufficient to provide the necessary treatment to ensure that the applicable limit established in the permit is not exceeded for the duration of the permit.
(2) The loading cycle shall be designed so as to provide the necessary contact time within the solum or unsaturated soil column required for phosphorus to be removed from the applied wastewater through adsorption processes.
(3) The available phosphorus adsorptive capacity of the discharge area shall be determined through either of the following methods:
(a) By subtracting phosphorus levels of the unsaturated soil column, determined through on-site Bray-P1 analysis, from published phosphorus adsorption capacity data for the solum found within the discharge area.
(b) By subtracting phosphorus levels of the unsaturated soil column, as determined through on-site Bray-P1 analysis, from the phosphorus adsorption maximum as determined through Langmuir isotherm analysis of on site soils, after adjustments for the concentration of phosphorus in the effluent and fraction of utilization within the solum are made.

e) All of the following operation and maintenance requirements shall be met:
(1) Portions of the wastewater distribution system shall be capable of being taken out of service for maintenance and other operational activities and to provide rest to portions of the irrigation area without disrupting applications to other areas of the system.
(2) All areas within a system shall be accessible for maintenance equipment.
(3) For slow rate and overland flow treatment systems, the pH of the plow layer within the discharge area shall be maintained between 6.0 and 7.5

EXHIBIT 5
Page 8 of 17

standard units.

f) The discharge to a land treatment system shall be limited so that the discharge volume combined with the precipitation from a 10-year frequency, 24-hour duration rainfall event does not overflow the designed discharge area.

g) If any modifications are made to the management practices or specifications for the land application of wastewater, including but not limited to changes in crops grown, yield goal for those crops, or supplemental fertilization provided by the permittee or a third party, the permittee shall submit a revised DMP on or before November 30 of the year prior to making the proposed change. Based on this submittal, the Department may modify this permit in accordance with applicable rules and laws.

## 11. Compliance Requirements

Compliance with all applicable requirements set forth in Parts 31 and 41 of the NREPA, and related regulations and rules is required. All instances of noncompliance with concentration limitations of effluent or groundwater shall be reported as follows.

a) If the facility is in a wellhead protection area, within 48 hours from the time the permittee becomes aware of the noncompliance, the permittee shall report noncompliance to the public water supply manager.

b) Within seven (7) days from the time the permittee becomes aware of the noncompliance, the permittee shall report, in writing, all instances of noncompliance. Written reporting shall include all of the following: 1) the name of the substance(s) for which a limit was exceeded; 2) the concentration at which the substance was found; and 3) the location(s) at which the limit was exceeded.

c) Within 14 days from the time the permittee becomes aware of the noncompliance, the permittee shall resample the monitoring point at which the limit was exceeded for the substance for which a limit was exceeded.

d) Within 60 days from the time the permittee becomes aware of the noncompliance, the permittee shall submit a written report that shall include all of the following: 1) the results of the confirmation sampling; 2) an evaluation of the cause for the limit being exceeded and the impact of that event to the groundwater; and 3) a proposal detailing steps taken or to be taken to prevent recurrence.

e) In accordance with applicable rules, the Department may require additional activities including, but not limited, to the following:
(1) Change the monitoring program, including increasing the frequency of effluent monitoring or groundwater sampling, or both.
(2) Develop and implement a groundwater monitoring program if one is not in place.
(3) If the discharge is in a designated wellhead protection area, assess the effects of the discharge on the public water supply system.
(4) Review the operational or treatment procedures, or both, at the facility.
(5) Define the extent to which groundwater quality exceeds the applicable criteria that would designate the site as a facility under Part 201.
(6) Revise the operational procedures at the facility.
(7) Change the design or construction of the wastewater operations at the facility.
(8) Initiate an alternative method of waste treatment or disposal.
(9) Remediate contamination to comply with the terms of Part 201, if applicable.

f) The conditions set forth in subsection g, below shall apply if the discharge from the facility is otherwise in compliance with the sodium and chloride limitations specified in Section 324.3109e(1) of the NREPA and Part 1, Section 1, Effluent Limitations of this permit. In accordance with Section 324.3109e(4) of the NREPA, if the permittee complies with these conditions, the permittee shall not be subject to response activities under Part 201 with respect to the discharge of sodium and chloride.

g) If the permittee discharges sodium or chloride, or both, into groundwater that migrates off of the property on which the discharge was made and that discharge directly causes the groundwater concentration of sodium or chloride, or both, to exceed the levels of 230 mg/l and 250 mg/l, respectively, provided under Section 324.3109(e)(2) of the NREPA, the permittee shall do all of the following:
(1) Initiate a sampling program approved by the department to monitor downgradient water supply wells for the levels of sodium or chloride, or both, in the water supply.
(2) If the concentration of sodium in a downgradient water supply exceeds the level provided under Section 324.3109(e)(2), the permittee shall provide and maintain, for each affected downgradient water supply, free of charge, a point-of-use treatment system approved by the department that will remove sodium from the water supply so as to be in compliance with the level provided under Section 324.3109(e)(2).
(3) If the concentration of chloride in a downgradient water supply exceeds the level provided under Section 324.3109(e)(2), provide to each affected water supply owner a notice of aesthetic impact with respect to chloride levels.

h) If the Department determines there is a change in groundwater quality from a normal operating baseline that indicates the concentration of a substance in groundwater may exceed an applicable limit, then the discharger shall take the following actions if required by the Department:
(1) Change the monitoring program, including increasing the frequency of effluent sampling or groundwater sampling, or both.
(2) Review the operational or treatment procedures, or both, at the facility.

## 12. Request for Discharge of Water Treatment Additives

In the event a permittee proposes to discharge water treatment additives (WTAs) to groundwater, the permittee shall submit a request to discharge WTAs to the Department for approval. Such requests shall be sent to the Water Toxics Unit, Surface Water Assessment Section, Water Resources

EXHIBIT 5
Page 9 of 17

Division, Department of Environmental Quality, P.O. Box 30458, Lansing, Michigan 48909, with a copy to the Department contact listed on the cover page of this permit.  Written approval from the Department to discharge WTAs at specified levels shall be obtained prior to discharge by the permittee.  Failure to obtain approval prior to discharging any WTA is a violation of this permit.  Additional monitoring and reporting may be required as a condition for the approval to discharge the WTA.  WTAs include such chemicals as herbicides used to kill weeds and grasses as part of lagoon maintenance.

A request to discharge WTAs to groundwater shall include all of the following:
a)   product Information:
(1)  name of the product;
(2)  Material Safety Data Sheet;
(3)  product function (i.e. microbiocide, flocculants, etc.);
(4)  specific gravity if the product is a liquid; and
(5)  annual product use rate (liquids in gallons per year and solids in pounds per year);

b)   ingredient information:
(1)  name of each ingredient;
(2)  CAS number for each ingredient; and
(3)  fractional content by weight for each product;

c)   the monitoring point from which the WTA is to be discharged;

d)   the proposed WTA discharge concentration;

e)   the discharge frequency (i.e., number of hours per day and number of days per year);

f)   the type of removal treatment, if any, that the WTA receives prior to discharge;

g)   relevant mammalian toxicity studies for the product or all of its constituents (if product toxicity data are submitted, the applicant shall provide information showing that the product tested has the same composition as the product listed under Item "a" above.  Preferred studies are subchronic or chronic in duration, use the oral route of exposure, examine a wide array of endpoints and identify a no-observable-adverse-effect-level.  Applicants are strongly encouraged to provide the preferred data.  If preferred data are not available, then the minimum information needed is an oral rat LD50 study.  In addition, an environmental fate analysis that predicts the mobility of the product/ingredients and their potential to migrate to groundwater may be provided.

Prior to submitting the request, the permittee may contact the Surface Water Assessment Section Water Toxics Unit by telephone at 517-284-5523 to determine if the Department has the product toxicity data required by Item "g" above.  If the Department has the data, the permittee will not need to submit product toxicity data.

EXHIBIT 5
Page 10 of 17

## PART II

**Definitions**
This list of definitions may include terms not applicable to this permit.

**Annual Monitoring Frequency** refers to a calendar year beginning on January 1 and ending on December 31. When required by this permit, an analytical result, reading, value or observation must be reported for that period if a discharge occurs during that period.

**Biosolids** are the solid, semisolid, or liquid residues generated during the treatment of sanitary sewage or domestic sewage in a treatment works. This includes, but is not limited to, scum or solids removed in primary, secondary, or advanced wastewater treatment processes and a derivative of the removed scum or solids.

**Bulk Biosolids** means biosolids that are not sold or given away in a bag or other container for application to a lawn or home garden.

**By-Pass** means any diversion from or bypass of facilities necessary to maintain compliance with the terms and conditions of this permit.

**Class B Biosolids** refers to material that has met the Class B pathogen reduction requirements or equivalent treatment by a Process to Significantly Reduce Pathogens (PSRP) in accordance with the Part 24 Rules. Processes include aerobic digestion, composting, anaerobic digestion, lime stabilization and air drying.

**Daily Concentration** is the sum of the concentrations of the individual samples of a parameter divided by the number of samples taken during any calendar day. If the parameter concentration in any sample is less than the quantification limit, regard that value as zero when calculating the daily concentration.
For pH, report the maximum value of any individual sample taken during the month and the minimum value of any individual sample taken during the month.

**Department** means the Michigan Department of Environmental Quality.

**Detection Level** means the lowest concentration or amount of the target analyte that can be determined to be different from zero by a single measurement at a stated level of probability.

**Flow Proportioned sample** is a composite sample with the sample volume proportional to the effluent flow.

**Furrow Stream** is the volume, in gallons per unit time, usually per minute, of wastewater discharged into the furrow.

**GPD** means gallons per day.

**GPY** means gallons per year.

**Grab Sample** is a single sample taken at neither a set time nor flow.

**MGD** means million gallons per day.

**Mg/l** is a unit of measurement and means milligrams per liter.

**Monthly Monitoring Frequency** refers to a calendar month. When required by this permit, an analytical result, reading, value or observation must be reported for that period if a discharge occurs during that period.

**POTW** is a publicly owned treatment works.

**Quantification Level** means the measurement of the concentration of a contaminant obtained by using a specified laboratory procedure calculated at a specified concentration above the detection level. It is considered the lowest concentration at which a particular contaminant can be quantitatively measured using a specified laboratory procedure for monitoring of the contaminant.

**Quarterly Monitoring Frequency** refers to a three month period, defined as January through March, April through June, July through September, and October through December. When required by this permit, an analytical result, reading, value or observation must be reported for that period if a discharge occurs during that period.

**Report** means there is no limit associated with the individual substance for the medium that is being sampled, that the permittee must only report the result of the laboratory analysis.

**Weekly Monitoring Frequency** refers to a calendar week which begins on Sunday and ends on Saturday. When required by this permit, an analytical result, reading, value or observation must be reported for that period if a discharge occurs during that period.

**24-Hour Composite sample** is a flow proportioned composite sample consisting of hourly or more frequent portions that are taken over a 24-hour

EXHIBIT 5
Page 11 of 17

period.

**EXHIBIT 5**
**Page 12 of 17**

### 1. Start-up Notification
If the permittee will not discharge during the first 60 days following the effective date of this permit, the permittee shall notify the Department within 14 days following the effective date of this permit, and then 60 days prior to the commencement of the discharge.

### 2. Compliance Dates Notification
Within 14 days of every compliance date specified in this permit, the permittee shall submit a written notification to the Department indicating whether or not the particular requirement was accomplished. If the requirement was not accomplished, the notification shall include an explanation of the failure to accomplish the requirement, actions taken or planned by the permittee to correct the situation, and an estimate of when the requirement will be accomplished. If a written report is required to be submitted by a specified date and the permittee accomplishes this, a separate written notification is not required.

### 3. Notification of Changes in Discharge, Treatment or Facility Operations
If proposing to modify the quantity or effluent characteristics of the discharge or the treatment process for the discharge, the permittee shall notify the Department of the proposed modification prior to its occurrence. Significant modifications require the permittee to submit an application. A permit modification shall be processed in accordance with applicable rules and laws prior to implementation of the modification.

### 4. Transfer of Ownership or Control
In the event of any change in control or ownership of facilities from which the authorized discharge emanates, the permittee shall submit to the Department 30 days prior to the actual transfer of ownership or control a written agreement between the current permittee and the new permittee containing: 1) the legal name and address of the new owner; 2) a specific date for the effective transfer of permit responsibility, coverage and liability; and 3) a certification of the continuity of or any changes in operations, wastewater discharge, or wastewater treatment.

If the new permittee is proposing changes in operations, wastewater discharge, or wastewater treatment, the Department may propose modification of this permit in accordance with applicable laws and rules.

### 5. Electronic Reporting
Upon notice by the Department that electronic reporting tools are available for specific reports or notifications, the permittee shall submit all such reports or notifications as required by this permit, electronically.

### 6. Representative Samples
Samples and measurements taken as required herein shall be representative of the volume and nature of the monitored discharge. Guidance on how to collect representative samples is contained in Guidesheet III, "Characterization of Wastewater", which is available via the internet at http://www.deq.state.mi.us/documents/deq-wmd-gwp-P22GuidshtIII.pdf.

### 7. Test Procedures
Test procedures for the analysis of pollutants shall conform to regulations promulgated pursuant to either SW-846, 3rd edition, September 1986, "Test Methods for the Evaluation of Solid Waste, Physical-Chemical Methods", or Section 304(h) of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1251 et seq), 40 CFR Part 136 - Guidelines Establishing Test Procedures for the Analysis of Pollutants, unless specified otherwise in this permit. Requests to use test procedures not defined here shall be submitted to the Department for review and approval. The permittee shall periodically calibrate and perform maintenance procedures on all analytical instrumentation at intervals to ensure accuracy of measurements. The calibration and maintenance shall be performed as part of the permittee's laboratory Quality Control/Quality Assurance program.

### 8. Instrumentation
The permittee shall periodically calibrate and perform maintenance procedures on all monitoring instrumentation at intervals to ensure accuracy of measurements.

### 9. Recording Results
For each measurement or sample taken pursuant to the requirements of this permit, the permittee shall record the following information: 1) the exact place, date, and time of measurement or sampling; 2) the person(s) who performed the measurement or sample collection; 3) the dates the analyses were performed; 4) the person(s) who performed the analyses; 5) the analytical techniques or methods used; 6) the date of and person responsible for equipment calibration; and 7) the results of all required analyses.

EXHIBIT 5
Page 13 of 17

**10. Records Retention**
All records and information resulting from the monitoring activities required by this permit including all records of analyses performed and calibration and maintenance of instrumentation and recordings from continuous monitoring instrumentation shall be retained for a minimum of three (3) years, or longer if requested by the Department.

**11. Additional Monitoring by Permittee**
If the permittee monitors any pollutant at the location(s) designated herein more frequently than required by this permit, using approved analytical methods as specified above, the results of such monitoring shall be included in the calculation and reporting of the values required in the Compliance Monitoring Report. Such increased frequency shall also be indicated.

Monitoring required pursuant to Part 41 of the NREPA or Rule 35 of the Mobile Home Park Commission Act (1987 PA 96) for assurance of proper facility operation shall be submitted as required by the Department.

**12. Permit Monitoring Requirements**
Pursuant to Rule 323.2223(1), the Department may modify the effluent or groundwater monitoring parameters or frequency requirements of this permit. The permittee may request a modification of the parameters of frequency of monitoring of this permit with adequate supporting documentation.

**13. Spill Notification**
The permittee shall immediately report any release of any polluting material which occurs to the surface waters or groundwater of the state, unless the permittee has determined that the release is not in excess of the threshold reporting quantities specified in the Part 5 Rules (Rules 324.2001 through 324.2009 of the Michigan Administrative Code), by calling the Department at the number indicated on the first page of this permit, or if the notice is provided after regular working hours call the Department's 24-hour Pollution Emergency Alerting System telephone number, 1-800-292-4706 (calls from out-of-state dial 1-517-373-7660).

Within ten (10) days of the release, the permittee shall submit to the Department a full written explanation as to the cause of the release, the discovery of the release, response (clean-up and/or recovery) measures taken, and preventative measures taken or a schedule for completion of measures to be taken to prevent reoccurrence of similar releases.

**14. Upset Noncompliance Notification**
If a process "upset" (defined as an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee) has occurred, the permittee who wishes to establish the affirmative defense of upset, shall notify the Department by telephone within
24-hours of becoming aware of such conditions; and within five (5) days, provide in writing, the following information:

a) that an upset occurred and that the permittee can identify the specific cause(s) of the upset;

b) that the permitted wastewater treatment facility was, at the time, being properly operated; and

c) that the permittee has specified and taken action on all responsible steps to minimize or correct any adverse impact in the environment resulting from noncompliance with this permit.

In any enforcement proceedings, the permittee, seeking to establish the occurrence of an upset, has the burden of proof.

**15. Bypass Prohibition and Notification**
a) Bypass Prohibition - Bypass is prohibited unless:
(1) bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;
(2) there were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate backup equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass; and
(3) the permittee submitted notices as required under 15.b) or 15.c) below.

b) Notice of Anticipated Bypass - If the permittee knows in advance of the need for a bypass, it shall submit prior notice to the Department, if possible at least ten (10) days before the date of the bypass, and provide information about the anticipated bypass as required by the Department. The Department may approve an anticipated bypass, after considering its adverse effects, if it will meet the three (3) conditions listed in 15.a) above.

c) Notice of Unanticipated Bypass - The permittee shall submit notice to the Department of an unanticipated bypass by calling the Department at the number indicated on the first page of this permit (if the notice is provided after regular working hours, use the following number: 1-800-292-4706) as soon as possible, but no later than 24 hours from the time the permittee becomes aware of the circumstances.

d) Written Report of Bypass - A written submission shall be provided within five (5) working days of commencing any bypass to the Department, and at additional times as directed by the Department. The written submission shall contain a description of the bypass and its cause; the period of bypass, including exact dates and times, and if the bypass has not been corrected, the anticipated time it is expected to continue; steps taken or planned to reduce, eliminate, and prevent reoccurrence of the bypass; and other information as required by the Department.

EXHIBIT 5
Page 14 of 17

e) Bypass Not Exceeding Limitations - The permittee may allow any bypass to occur which does not cause effluent limitations to be exceeded, but only if it also is for essential maintenance to assure efficient operation. These bypasses are not subject to the provisions of 15.a), 15.b), 15.c), and 15.d), above. This provision does not relieve the permittee of any notification responsibilities under Part II, Section 13 of this permit.

f) Definitions
(1) Bypass means the intentional diversion of waste streams from any portion of a treatment facility.
(2) Severe property damage means substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass. Severe property damage does not mean economic loss caused by delays in production.

### 16. Facilities Operation
The permittee shall, at all times, properly operate and maintain all treatment or control facilities or systems installed or used by the permittee to achieve compliance with the terms and conditions of this permit. Proper operation and maintenance includes adequate laboratory controls and appropriate quality assurance procedures.

### 17. Power Failures
In order to maintain compliance with the effluent limitations of this permit and prevent unauthorized discharges, the permittee shall either:
a) provide an alternative power source sufficient to operate facilities utilized by the permittee to maintain compliance with the effluent limitations and conditions of this permit; or

b) upon the reduction, loss, or failure of one or more of the primary sources of power to facilities utilized by the permittee to maintain compliance with the effluent limitations and conditions of this permit, the permittee shall halt, reduce or otherwise control production and/or all discharge in order to maintain compliance with the effluent limitations and conditions of this permit.

### 18. Containment Facilities
The permittee shall provide facilities for containment of any accidental losses of polluting materials in accordance with the requirements of the Part 5 Rules (Rules 324.2001 through 324.2009 of the Michigan Administrative Code). For a Publicly Owned Treatment Work (POTW), these facilities shall be approved under Part 41 of the NREPA.

### 19. Waste Treatment Residues
Residuals (i.e. solids, sludges, biosolids, filter backwash, scrubber water, ash, grit or other pollutants) removed from or resulting from treatment or control of wastewaters, shall be disposed of in an environmentally compatible manner and according to applicable laws and rules. These laws may include, but are not limited to, the NREPA, Part 31, Water Resources Protection; Part 55, Air Pollution Control; Part 111, Hazardous Waste Management; Part 115, Solid Waste Management; Part 121, Liquid Industrial Wastes; Part 301, Inland Lakes and Streams; and Part 303, Wetland Protection. Such disposal shall not result in any unlawful pollution of the air, surface waters or groundwater of the state.

### 20. Treatment System Closure
a) In the event that discharges from a treatment system are planned to be eliminated, the permittee shall do the following:
(1) Eliminate all physical threats associated with discharge related facilities not later than five (5) days after use of the facility has ceased.
(2) Not less than 75 days before cessation of discharge related activities, characterize any wastewater, sediments and sludges related to the discharge, pursuant to Rule 323.2226(4)(a)(i-iii).

b) Within 30 days of completing the characterization, the discharger shall submit a closure plan to the Department for review and approval that describes how the wastewater, sediments and sludges associated with the discharge will be handled in accordance with Part 31, Part 115, Part 111, or Part 201, as appropriate.

c) Closure activities must be initiated within 30 days of Department approval of the Closure Plan, and must be completed within one (1) year of approval of the Closure Plan.

d) If the groundwater exceeds a standard established by the Department that would result in the site qualifying as a facility under Part 201, then the discharger shall comply with the requirements of Part 201, as applicable.

e) The Department may require post closure monitoring activities to evaluate the effectiveness of the closure activities. Any wastewater or residual disposal inconsistent with the approved plan shall be considered a violation of this permit. After proper closure of the treatment system, this permit may be terminated.

f) The discharger must certify completion of the approved closure plan. Certification shall be by a qualified person described as follows:
(1) An engineer licensed under Act No. 299 of the Public Acts of 1980, as amended, being §339.101 et seq. of the Michigan Compiled Laws, and known as the occupational code.
(2) A professional geologist certified by the American Institute of Professional Geologists, 7828 Vance Drive, Suite 103, Arvada, Colorado 80003.
(3) A professional hydrologist certified by the American Institute of Hydrology, 2499 Rice Street, Suite 135, St. Paul, Minnesota 55113.
(4) A groundwater professional certified by the National Ground Water Association, Association of Groundwater Scientists and Engineers Division, 601 Dempsey Road, Westerville, Ohio 43081.

EXHIBIT 5
Page 15 of 17

(5) Another groundwater professional certified by an organization approved by the Department.

### 21. Right of Entry

The permittee shall allow the Department or any agent appointed by the Department, upon the presentation of credentials:

a) to enter upon the permittee's premises where an effluent source is located or in which any records are required to be kept under the terms and conditions of this permit; and

b) at reasonable times to have access to and copy any records required to be kept under the terms and conditions of this permit; to inspect process facilities, treatment works, monitoring methods and equipment regulated or required under this permit; and to sample any effluent discharge, discharge of pollutants, and groundwater monitoring wells and soils associated with the discharge.

### 22. Untreated or Partially Treated Sewage Discharge Requirements

In accordance with Section 324.3112a of the Michigan Act, if untreated sewage, including sanitary sewer overflows (SSO) and combined sewer overflows (CSO), or partially treated sewage is directly or indirectly discharged from a sewer system onto land or into the waters of the state, the entity responsible for the sewer system shall immediately, but not more than 24 hours after the discharge begins, notify, by telephone, the Department, local health departments, a daily newspaper of general circulation in the county in which the permittee is located, and a daily newspaper of general circulation in the county or counties in which the municipalities whose waters may be affected by the discharge are located that the discharge is occurring.

At the conclusion of the discharge, written notification shall be submitted in accordance with and on the "CSO/SSO Reporting Form" available via the internet at: http://www.michigan.gov/deq/0,1607,7-135-3313_3682_3715---,00.html, or, alternatively for combined sewer overflow discharges, in accordance with notification procedures approved by the Department.

In addition, in accordance with Section 324.3112a of the Michigan Act, each time a discharge of untreated sewage or partially treated sewage occurs, the permittee shall test the affected waters for Escherichia coli to assess the risk to the public health as a result of the discharge and shall provide the test results to the affected local county health departments and to the Department. The testing shall be done at locations specified by each affected local county health department but shall not exceed 10 tests for each separate discharge event. The affected local county health department may waive this testing requirement, if it determines that such testing is not needed to assess the risk to the public health as a result of the discharge event. The results of this testing shall be submitted with the written notification required above, or, if the results are not yet available, submit them as soon as they become available. This testing is not required, if the testing has been waived by the local health department, or if the discharge(s) did not affect surface waters.

Permittees accepting sanitary or municipal sewage from other sewage collection systems are encouraged to notify the owners of those systems of the above reporting and testing requirements.

### 23. Availability of Reports

Except for data determined to be confidential under Rule 323.2128 of the Michigan Administrative Code, all reports prepared in accordance with the terms of this permit shall be available for public inspection at the offices of the Department. Effluent data shall not be considered confidential. Knowingly making any false statement on any such report may result in the imposition of criminal penalties as provided for in Sections 3112, 3115, 4106 and 4110 of the NREPA.

### 24. Construction Certification

On or before 30 days following completion of construction of any new wastewater treatment facilities after issuance of this permit, pursuant to Rule 323.2218(4)(a), the permittee shall submit a certification that a quality control and quality assurance program was utilized and the facilities constructed were built consistent with standard construction practices to comply with the permit and the NREPA. This certification shall be by an engineer licensed under Act 299 of the Public Acts of 1980.

### 25. Termination

This permit shall remain in full force and effect until terminated by a written Termination Notice (TN) issued by the Department. Prior to issuance of a written TN, the Permittee shall submit a written request to the Department for termination of this permit.

EXHIBIT 5
Page 16 of 17

**PART III**

**1. Discharge to the Surface Waters**
This permit does not authorize any discharge to the surface waters. The permittee is responsible for obtaining any permits required by federal or state laws or local ordinances.

**2. State Laws**
Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable state law or regulation.

**3. Property Rights**
The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize violation of any federal, state or local laws or regulations, nor does it obviate the necessity of obtaining such permits or approvals as may be required by law.

**4. Duty to Comply**
All discharges authorized herein shall be consistent with the terms and conditions of this permit. The discharge of any pollutant identified in this permit more frequently than or at a level in excess of that authorized shall constitute a violation of the permit.

It is the duty of the permittee to comply with all the terms and conditions of this permit. Any noncompliance with the Effluent Limitations, Conditions, or terms of this permit constitutes a violation of the NREPA and constitutes grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or denial of an application for permit renewal.

**5. Civil and Criminal Liability**
Nothing in this permit shall be construed to relieve the permittee from civil or criminal penalties for noncompliance, whether or not such noncompliance is due to factors beyond the permittee's control, such as accidents, equipment breakdowns, or labor disputes.

**EXHIBIT 5**
**Page 17 of 17**