UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRAND TRAVERSE BAND OF
OTTAWA AND CHIPPEWA INDIANS;
GRAND TRAVERSE BAY WATERSHED
INITIATIVE, INC.; and ELK-SKEGEMOG          Civil Action No. 1: 23-cv-00589
LAKES ASSOCIATION,

                    Plaintiffs,          Hon. Jane M. Beckering

v.

BURNETTE FOODS, INCORPORATED,

                    Defendant.

| | |
|---|---|
| Nicholas Leonard (P79283)<br>Scott Troia (P82986)<br>GREAT LAKES ENVIRONMENTAL<br>LAW CENTER<br>*Attorneys for Plaintiffs*<br>4444 Second Avenue<br>Detroit, MI 48201<br>(313) 782-3372<br>nicholas.leonard@glelc.org<br>scott.troia@glelc.org | Aaron M. Phelps (P64790)<br>Matthew B. Eugster (P63402)<br>Neil E. Youngdahl (P82452)<br>VARNUM LLP<br>*Attorneys for Defendant*<br>Bridgewater Place, P.O. Box 352<br>Grand Rapids, MI 49501-0352<br>(616) 336-6000<br>amphelps@varnumlaw.com<br>mbeugster@varnumlaw.com<br>neyoungdahl@varnumlaw.com |
| William Rastetter (P26170)<br>Rebecca Millican (P80869)<br>OLSON & HOWARD, PC<br>*Attorneys for Plaintiff Grand Traverse<br>Band of Ottawa and Chippewa Indians*<br>520 S. Union Street<br>Traverse City, MI 49684<br>(231) 946-0044<br>bill@envlaw.com<br>rebecca@envlaw.com | Tracy Jane Andrews (P67467)<br>LAW OFFICES OF TRACY JANE<br>ANDREWS, PLLC<br>*Attorneys for Plaintiff Grand Traverse Bay<br>Watershed Initiative, Inc.*<br>420 E. Front Street<br>Traverse City, MI 49686<br>(231) 714-9402<br>tja@tjandrews.com |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

** <u>ORAL ARGUMENT REQUESTED</u> **

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

<u>**ORAL ARGUMENT REQUESTED**</u>

Plaintiffs Grand Traverse Band of Ottawa and Chippewa Indians ("GTB"), Grand Traverse Bay Watershed Initiative, Inc. ("Watershed Center" or "Watershed"), and Elk-Skegemog Lakes Association ("ESLA") (collectively, "Plaintiffs"), by undersigned counsel, pursuant to Fed. R. Civ. P. 56, respectfully move this Court for summary judgment in its favor against Defendant Burnette Foods, Inc. ("Defendant" or "Burnette") on two claims. First, the Court should find that Burnette discharges pollutants from its Elk Rapids facility to waters of the United States from a point source without a proper permit, in violation of Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a). Second, the Court should find that Burnette has polluted and impaired groundwater beneath its spray fields and surface water connected to and downstream from its spray fields, in violation of Section 1701 of the Michigan Natural Resources and Environmental Protection Act (MEPA), MCL § 324.1701. Upon finding that Burnette is liable for the alleged violations, Plaintiffs request an opportunity to address the just and proper relief to which they are entitled.

In accordance with the *Information and Guidelines for Civil Practice before The Honorable Jane M. Beckering, United States District Judgment, United States District Court for the Western District of Michigan* (Revised August 2023), Plaintiffs and Defendant, by and through their undersigned counsel, conferred and filed their *Joint Statement of Material Facts*.

Plaintiffs rely on the attached brief and cited exhibits to support their motion.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................. 1

II.   LEGAL STANDARD ........................................................................................... 1

III.  BACKGROUND FACTS ...................................................................................... 2

    A.  Burnette sprays polluted wastewater onto spray fields adjoining wetlands upstream of Spencer Creek. ..................................................................................................... 2

    B.  ESLA detected elevated E.coli in Elk Lake, and unhealthy conditions in Spencer Creek, which it reasonably traced to Burnette's spraying. .................................................. 12

    C.  Burnette's unpermitted discharges and GWPD violations continue................................ 14

IV.   ARGUMENT ...................................................................................................... 16

    A.  Burnette discharges pollutants to waters of the United States from a point source without a proper permit in violation of the CWA. .............................................................. 16

        1.  *Statutory Framework for CWA Citizen Suit Claims*........................................ 16

        2.  *The creek and wetlands are WOTUS.* ............................................................... 18

            (a)  Spencer Creek is a tributary of Elk Lake. ............................................... 18

            (b)  The wetlands between the spray fields and Spencer Creek are WOTUS. ............ 21

        3.  *Burnette's polluted wastewater is an addition to WOTUS.*............................... 24

            (a)  Groundwater Addition ............................................................................ 26

            (b)  Surface Water Addition........................................................................... 32

            (c)  Corroborating evidence confirms the addition of pollutants to WOTUS. ............ 35

    B.  Plaintiffs are entitled to summary judgment on their MEPA claim. ................................. 38

        1.  *Burnette's repeated violations of pollution control standards in its GWDP establishes Plaintiffs' prima facie MEPA case, and Burnette has or is likely to pollute or impair state water resources.* ..................................................................................................... 39

        2.  *Burnette failed to rebut plaintiffs' prima facie case.*................................... 42

V.    CONCLUSION .................................................................................................. 43

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................2

*Baykeeper v City of Sunnyvale*,
   ___F Supp 3d___; 2023 U.S. Dist. LEXIS 220102 (ND Cal, Dec. 11, 2023)..........21

*Bennett v. City of Eastpointe*,
   410 F.3d 810 (6th Cir. 2005) ...................................................................................1

*City of Jackson v. Thompson-McCully Co, LLC*,
   239 Mich. App. 482; 608 N.W.2d 531 (2000) ........................................................41

*County of Maui v. Hawaii Wildlife Fund*,
   140 S.Ct. 1462 (2020)....................................................................................17, 28

*Dwyer v. Ann Arbor*,
   79 Mich. App. 113 (1977) ......................................................................................41

*Flint Riverkeeper, Inc. v. Southern Mills, Inc.*,
   276 F.Supp. 3d 1359 (M.D. Ga. 2017)..................................................................17

*Ford Motor Co. v. EPA*,
   567 F.2d 661 (6th Cir. 1977) .................................................................................16

*Great Northwest, Inc. v. U.S. Army Corps. Of Eng'rs.*,
   2010 U.S. LEXIS 89132 (D. Alaska June 8, 2010) ...............................................22

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
   484 U.S. 49 (1987)................................................................................................17

*Hawai'i Wildlife Fund v. Cnty. of Maui*,
   550 F. Supp. 3d 871 (D. Haw. 2021)......................................................................29

*Her Majesty the Queen in Right of Province of Ontario v. Detroit*,
   874 F.2d 332 (6th Cir. 1989)..................................................................................39

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*,
   278 F.Supp. 2d 654 (E.D.N.C. 2003).....................................................................22

*Nemeth v. Abonmarche Dev.*,
   457 Mich. 16; 576 N.W.2d 641 (1998) .....................................................38, 39, 40

*Peconic Baykeeper, Inc. v. Suffolk Cnty*,
   600 F.3d 180 (2nd Cir. 2010) ................................................................................17

*Preserve the Dunes, Inc. v. Mich. Dep't. of Envtl. Quality,*
    471 Mich. 508; 684 N.W.2d 847 (2004) ................................................................ 38

*Rapanos v. United States,*
    547 U.S. 715 (2006) ........................................................................... 20, 21, 22, 24

*Ray v. Mason Cnty. Drain Comm'r,*
    393 Mich. 294; 224 N.W.2d 883 (1975) ..................................................... 38, 40, 42

*Sackett v. EPA,* 598 U.S. 651 (2023) ........................................................................ 16

*Scott v. Harris,*
    550 U.S. 372 (2007) ........................................................................................... 1

*Sierra Club v. ICG Hazard, LLC*
    781 F.3d 281 (6th Cir. 2015) ....................................................................... 16, 17, 34

*Starlink Logistics, Inc., v. ACC, LLC.,*
    101 F.4th 431 (6th Cir. 2024) ............................................................................... 17

*Tennessee Clean Water Network v. Tennessee Valley Auth.,*
    905 F.3d 436 (6th Cir. 2018) ................................................................................ 17

*Tucker v. Tennessee,*
    539 F.3d 526 (6th Cir. 2008) .................................................................................. 1

*United States v. Moses,*
    496 F.3d 984, (9th Cir. 2007) ............................................................................... 20

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985) ........................................................................................... 22

*United States v. Vierstra,*
    492 Fed. Appx. 738 (9th Cir. 2012) ...................................................................... 21

**Constitution Provisions, Statutes, Rules**

MICH. CONST. of 1963. art. IV, § 52 ......................................................................... 38

33 U.S.C. § 1251(a) ............................................................................................... 16

33 U.S.C. § 1311(a) ................................................................................................. i

33 U.S.C. § 1316(b)(1)(A) ...................................................................................... 17

33 U.S.C. § 1362 ............................................................................................... 16, 17

33 U.S.C. § 1365 ................................................................................................... 17

33 U.S.C. §§ 1311 ............................................................................................. 16, 17

40 C.F.R. §§ 407.2-407.27, 407.6-407.67 ................................................................. 17

40 C.F.R. 120.2(a) ................................................................................................ 18, 20

Fed. R. Civ. P. 56 ....................................................................................................... 1

MCL § 324.1701 ............................................................................................. i, 38, 39

MCL § 324.1703(1) ................................................................................... 39, 42, 43

MCL § 324.20101 ...................................................................................................... 9

MCL § 324.3101(aa) .................................................................................. 39, 40, 41

MCL § 324.3106 ...................................................................................................... 39

MCL § 324.3109 ...................................................................................................... 40

MCL § 324.3112(3) ................................................................................................. 40

Mich. Admin. Code R, 323.2204(2) ...................................................................... 40

Mich. Admin. Code R. 323.2222 ............................................................................. 4

**Joint Exhibits List**

| JX # | Description | Bates |
|---|---|---|
| 1 | Groundwater Discharge Permit, June 1, 2017 | BFI00000923-941 |
| 2 | Discharge Management Plan (Rev C, March 2019) | BFI00005772-6043 |
| 3 | Operation and Maintenance Manual for Burnette Foods, Inc. Elk Rapids, Antrim County, Michigan, November 2019 | BFI00004190-4548 |
| 4 | EGLE Part 303 Permit, March 14, 2022 | BFI00002668-677 |
| 5 | ESLA 30(b)(6) (Ogle) Deposition Transcript 10/8/2024 | |
| 6 | WSC 30(b)(6) (Smith) Deposition Transcript 10/10/2024 | |
| 7 | GTB 30(b)(6) (Mays) Deposition Transcript 10/10/2024 | |
| 8 | Dennis Gretel Deposition Transcript 11/5/2024 | |
| 9 | Brian Taylor Deposition Transcript 11/7/2024 | |
| 10 | Stu Kogge Deposition Transcript 12/13/2024 | |
| 11 | Anthony Kendall Deposition Transcript 12/17/2024 | |
| 12 | Matthew MacGregor Deposition Transcript 2/18/2025 | |
| 13 | Richard Rediske Deposition Transcript 2/24/2025 | |
| 14 | Burnette 30(b)(6) (Kalchik) Deposition Transcript 3/13/2025 | |
| 15 | Michael Sklash Deposition Transcript 3/20/2025 | |
| 16 | Joel Gagnon Deposition Transcript 3/21/2025 | |
| 17 | EGLE 30(b)(6) (McAuliffe) Deposition Transcript 3/17/2025 | |
| 18 | Christine Crissman Deposition Transcript 3/25/2025 | |
| 19 | George Seifried Deposition Transcript 3/26/2025 | |
| 20 | Stuart Kogge Expert Report 11/15/2024 | |
| 21 | Expert Rebuttal Report, Stuart Kogge 2/14/2025 | |
| 22 | Initial Report on the Hydrology of the Burnette Foods Wastewater Application Fields, Anthony Kendall 11/15/2024 | |

| 23 | Rebuttal Report to the Expert Reports of Sklash and Gagnon, Anthony Kendall 2/14/2025 | |
| 24 | Expert Report of Joel E. Gagnon, Ph.D., C.P.G. 1/15/2025 | |
| 25 | Expert Report of Michael G. Sklash, Ph.D., P.Eng. 1/15/2025 | |
| 26 | Expert Report on Conditions and Status of Wetlands, Inland Lakes, Streams, and Other Waterbodies Near Burnette Foods' Spray Fields, Matthew MacGregor 1/15/2025 | |
| 27 | Report on the Microbiology and Chemistry of Spencer Creek and the Associated Wetlands bordering the Burnette Foods Irrigation Site, Richard R. Rediske, Ph.D. | |
| 28 | MET Site Status Report, Burnette Foods – Elk Rapids, Spray Irrigation Field, 12/05/2018 | BFI00007382-7411 |
| 29 | MET Site Status Report, Burnette Foods – Elk Rapids, Spray Irrigation Field, 12/04/2019 | BFI00007474-7503 |
| 30 | MET Site Status Report, Burnette Foods – Elk Rapids, Spray Irrigation Field, 12/04/2020 | BFI00007666-7698 |
| 31 | MET Site Status Report, Burnette Foods – Elk Rapids, Spray Irrigation Field, 12/01/2021 | BFI00007808-7838 |
| 32 | MET Site Status Report, Burnette Foods – Elk Rapids, Spray Irrigation Field, 12/08/2022 | BFI00007934-7961 |
| 33 | MET Site Status Report, Burnette Foods – Elk Rapids, Spray Irrigation Field, 12/01/2023 | BFI00008063-8092 |
| 34 | LEI, Groundwater Monitoring Report – 2024 Fourth Quarter for Burnette Foods – Elk Rapids, 11/2024 | BFI00020944-968 |
| 35 | LEI, Groundwater Monitoring Report – 2025 First Quarter for Burnette Foods – Elk Rapids, 2/2025 | BFI00020969-993 |
| 36 | LEI, Wetland Delineation Report, 11/2020 | BFI00004023-53 |
| 37 | LEI, Wetland Delineation Report, 5/2021 | BFI00003973-3996 |
| 38 | LEI, Wetland Delineation Report, 11/2022 | BFI00003997-4022 |
| 39 | MET Hydrogeological Report – BF Elk Rapids Spray Irrigation Field June 25, 2009 | BFI00004054-4170 |

| 40 | LEI, Information Packet for BFI Elk Rapids – WW Upgrades, 2/6/2020 | BFI00016316-333 |
|----|------------------------------------------------------------------|-----------------|
| 41 | Moore+Bruggink, Technical Memorandum, Burnette Foods, Inc. – Elk Rapids Facility Wastewater Treatment, 12/1/2022 | BFI00004173-184 |
| 42 | Moore+Bruggink, Technical Memorandum, Burnette Foods, Inc. – Elk Rapids Facility, Wastewater System Description, 6/27/2024 | BFI00002584-589 |
| 43 | Unnamed Creek – Western Shoreline of Spencer Creek, Elk Lake E. Coli Sampling – 2019 Elk-Skegemog Lakes Association | PLFS000006-19 |
| 44 | Spencer Creek – Elk Lake E. Coli Sampling – 2020 Elk-Skegemog Lakes Association | PLFS000028-39 |
| 45 | Spencer Creek – Elk Lake E. Coli Sampling – 2021 Elk-Skegemog Lakes Association | PLFS000048-70 |
| 46 | Spencer Creek – Elk Lake E. Coli Sampling – 2022 Elk-Skegemog Lakes Association | PLFS000101-133 |
| 47 | Spencer Creek – Elk Lake Creek Sampling – 2023 Elk-Skegemog Lakes Association | PLFS000152-178 |
| 48 | Spencer Creek – Elk Lake Creek Sampling – 2024 Elk-Skegemog Lakes Association | PLFS004492-4520 |
| 49 | EGLE, Violation Notice VN-009839, August 21, 2019 | BFI00000045-49 |
| 50 | EGLE, Second Violation Notice, November 6, 2020 | BFI00006776-742 |
| 51 | EGLE, Enforcement Notice, December 15, 2020 | BFI00000091-93 |
| 52 | EGLE, Violation Notice VN-012414, November 15, 2021 | BFI00004617-629 |
| 53 | EGLE, Violation Notice VN-014789, August 2, 2023 | BFI00004549-448 |
| 54 | Letter dated March 29, 2021 from EGLE to Burnette Foods | PLF-EGLE016524-16526 |
| 55 | Draft Administrative Consent Order | PLF-EGLE003518-3591 |
| 56 | Draft Administrative Consent Order | PLF-EGLE003592-3669 |
| 57 | Affidavit of William Sherman Sr. dated March 19, 2025 | |
| 58 | Waste-Water Tracking Spreadsheets (See Flash Drive) | BFI00018740-18746 |

| 59 | Number of Hay Bales 2022-2024 | BFI00020243, 20302, 20352 |
|---|---|---|
| 60 | Matthew MacGregor Declaration dated April 24, 2025 | |
| 61 | Video (See Flash Drive) | BFI00020192 |
| 62 | Photos--Spray Fields | |
| 63 | Photos-Wetlands | |
| 64 | Photos--Drainage Ditch | |
| 65 | Photos--Spencer Creek | |
| 66 | Photos--Misc. | |
| 67 | EGLE, Soil Review, Dec. 7, 2020 | PLF-EGLE14009-14015 |
| 68 | EGLE, Review of Potential Surface Water Impacts, Feb. 8, 11 2021 | PLF-EGLE006281-6296, PLF-EGLE 11561-11562 |
| 69 | EGLE, Geologist Recommendations Fact/Decision Sheet, April 9, 2024 | PLF-EGLE006297-6319 |
| 70 | Email from D. Walters to E. Chatterson, Aug. 7, 2019 | PLF-EGLE012400 |
| 71 | Email from T. Weatherwax to K. Kalchik, Dec. 9, 2020 | BFI 14780 |
| 72 | Email from M. Euster to N. Hamade, Oct. 3, 2023 | PLF-EGLE017088-092 |
| 73 | Email from P. Depetro to K. Rendon, Aug. 9, 2024 | PLF-EGLE 15662 |
| 74 | EGLE 2023 Stream Sampling - Spencer Creek Elk Lake | PLF-EGLE000250 |
| 75 | Resumes of S. Ogle, H. Smith, D. Mays | |
| 76 | S. Ogle, Spencer Creek Field Notes, 2020 | PLF 000020 |
| 77 | Burnette E. Coli Results, 2021, 2023 | BFI00012387, 18729, 7222-23, 7224, 7205-207 |
| 78 | EGLE, D. Walters Inspection Reports, 2020, 2021 | PLFS000926-28, PLF-EGLE004458-7 |

| 79 | Steuer Excavating, Inc. Invoice, June 7, 2021 | BFI 20395 |
| 80 | Summary of Surface Water Sampling Results | various |
| 81 | Summary of GWPD Violations, 2018-2025 | various |
| 82 | Photographs: Spencer Creek | various |
| 83 | Photographs: Spray Fields | various |
| 84 | Video: Elk Lake, July 30, 2021 | PLF 2445 |
| 85 | Video: Wetlands July 18, 2024 | PLFS004472-75 |
| 86 | Video: Spencer Creek, 2019-2024 | various |
| 87 | Unpublished Cases | |

x

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

## I.     INTRODUCTION

Plaintiffs move for summary judgment under Fed. R. Civ. P. 56 on Counts I and II of their First Amended Complaint on the basis there is no genuine issue of material fact that Burnette is liable for violations of the CWA and MEPA, so Plaintiffs are entitled to judgment as a matter of law on each claim.

## II.     LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show no genuine issue of material fact, including an absence of evidence supporting the opponent's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citation omitted).

Once the moving party carries its burden, the non-moving party must set forth specific facts supported by record evidence showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Tucker*, 539 F.3d at 531 (internal quotation omitted). "The mere existence of a scintilla of evidence" in support of the non-movant's position is insufficient. *Id*. (internal quotation omitted). When opposing parties tell two different stories, and one is blatantly contradicted by the record, the court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[T]he

1

mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986) (emphasis in original).

## III.    BACKGROUND FACTS

The Court is already familiar with relevant background facts. (ECF 26, PageID.3726-29). Discovery validated Plaintiffs' allegations and clarified some unknowns. This section provides additional context. Plaintiffs also reference the *Joint Statement of Material Fact*.

### A.    <u>Burnette sprays polluted wastewater onto spray fields adjoining wetlands upstream of Spencer Creek.</u>

Burnette discharges wastewater from its fruit processing facility via solid set sprayer heads to three spray fields south of the facility,[1] with exponentially higher discharges during peak cherry season in July and August:[2]

---

[1] A fourth Field 39 is unpiped and unused.

[2] **Ex 22** (Kendall p 18 Fig 12, "Figure 12: Cumulative volumes of applied wastewater to all fields (top) and daily applications (bottom), from 2018–2023. Note that 2017 and 2024 were excluded as these years had incomplete recorders available. For each plot, a dashed red line indicates the permitted maximum 425,000 gallons per day, and 15,000,00 gallons per year.")



Burnette's wastewater is polluted with fruit waste and more. Screens and hydro-sieves remove large particles but "cannot treat *dissolved* oxygen-demanding chemistry commonly known as BOD, a primary driver of wastewater regulation."[3] BOD, or biochemical oxygen demand, is the measure of oxygen required for bacteria to remove organic matter from water. In addition to "high concentrations of BOD and Total Suspended Solids (TSS)," Burnette's wastewater is contaminated with phosphorus, nitrogen, chloride, sodium, iron, manganese, and other constituents.[4]

---

[3] **Ex 41** (Technical Memorandum p 1) (emphasis in original).

[4] **Ex 41** (Technical Memorandum pp 1, 3); **Ex 40** (LEI Information Packet); **Ex 67** (Soil Review) (calculated average wastewater BOD 4,972 mg/L); **Ex 68** (Potential Surface Water Impacts p 18) (calculated maximum average effluent five-day BOD above 15,000 mg/L); **Ex 73** (DePetro email).

Burnette's Groundwater Discharge Permit ("GWDP") authorizes Burnette to spray-irrigate up to 15 million gallons annually of wastewater and a "slow-rate application land treatment system" to treat sprayed wastewater before it enters groundwater.[5] Spraying facilitates some evaporation; land application treatment allows the remaining wastewater to percolate through soil to the groundwater.[6] The GWDP requires sprayed wastewater to fully infiltrate the intended field and the fields to have sufficient hydraulic capacity to treat the load to meet state groundwater standards (Mich. Admin. Code R. 323.2222).[7] The GWDP authorizes spraying only according to daily and annual volumes and daily and weekly application depth limits to ensure proper treatment.[8] Ponding and surface runoff are prohibited.[9] Permit depth limitations are based upon the infiltration capacity of the receiving field for a given period of time. Surpassing the infiltration capacity of the field results in water collecting on the surface and running downhill.[10] The spray fields must be vegetated with a mix of grasses to hold wastewater in the root zone and support an appropriate loading cycle.[11] The crops are designed to remove more nitrogen and phosphorus than is spray-applied annually.[12] The GWDP also imposes limits on wastewater concentrations of nitrogen, chloride, sodium, and phosphorus, as well as limits on acidity (pH),

---

[5] **Ex 1** (GWDP Part 1 Secs 1, 9 Land Application).

[6] *Id.,* Part I Sec 9 Land Application (7).

[7] *Id.*

[8] *Id.,* Part I Sec 1.

[9] *Id.,* Part I Secs 8(b), 9 Land Application (2), 10(a); *see also* **Ex 2** (DMP Sec 4.0).

[10] **Ex 22** (Kendall p 27).

[11] **Ex 1** (GWDP Part I Sec 9 Land Application).

[12] **Ex 2** (DMP Secs 2.0, 6.1).

4

nitrogen, phosphorus, sodium, chloride, and sulfate in downgradient groundwater monitoring wells.[13]

Burnette's self-reported Discharge Monitoring Reports ("DMRs") document hundreds of violations of its GWDP, from application rates and volumes to constituent pollutant limits.[14] Between July 2017 and September 2024, according to its self-reported data, Burnette violated the daily depth limit for a field approximately 20% of the time (185 violations) and the weekly depth limit for a field approximately 50% of the time (348 violations).[15] Depth violations are most common during peak season. Burnette also violated the annual 15-million-gallon application limit in 2019, 2020, 2021, and 2022.[16] And Burnette's DMRs document about 78 violations of its permitted wastewater and groundwater limits since 2018.[17]

The DMRs severely undercalculate depth violations starting in mid-2020, after Burnette replaced "traveling" sprayers with a new "solid set" spray head system.[18] This modification – while facilitating easier operations for Burnette – significantly shrunk the area of actual spray discharge ("wetted acres"). Plaintiffs' hydrology expert Dr. Kendall calculated "wetted acres" reductions for each field to be between 45% and 62% --- with the three Field 36 sections reduced from the permitted 10 to only 5.4 "wetted acres" each:[19]

---

[13] **Ex 1** (GWDP Part I Secs 1-3, 11(g)).

[14] **Ex 81** (GWDP violations); **Exs 49, 50, 52, 53** (Violation Notices).

[15] **Ex 22** (Kendall p 14).

[16] **Ex 81** (GWDP violations); **Ex 22** (Kendall p 18 Fig 12).

[17] **Ex 81** (GWDP violations).

[18] **Ex 14** (Kalchik Dep pp 64-66, 149-51).

[19] **Ex 22** (Kendall pp 26-27; Fig. 21). *Figure 1* below shows the reduction of wetted acres of the permitted fields (yellow) compared to the new spray system (red).



**Figure 1**

Burnette's consultant estimated a similar reduction in Field 36 "wetted acres."[20] While Burnette acknowledged the new sprayers reduce "wetted acres," Burnette is still operating – and self-reporting sprayed wastewater depths – as if it were spraying the full permitted acreage.[21] By concentrating the same volume of sprayed wastewater to this smaller area, Burnette violates its permitted daily and weekly depth limits more often – and more severely – than its DMRs

---

[20] **Ex 40** (LEI Information Packet) (from 30 to 18.7 "proposed max. wetted" acres in Field 36).

[21] **Ex 14** (Kalchik Dep pp 149-51).

reflect.[22] This exacerbates the opportunity for ponding and runoff and reduces the opportunity for adequate percolation and treatment.

Acknowledging that its routine seasonal wastewater over-application overwhelms the (shrinking) discharge fields, and that the runoff flows naturally and consistently into protected wetlands to the north of Field 36 and west of Field 37, Burnette opted for cheap, ineffective fixes. Forever ago, they built a berm around the wetlands; over the years, the wetlands expanded until the berm itself and the area south of the berm also became protected wetlands.[23] That berm did not prevent Burnette's wastewater runoff from entering the wetlands.[24] So in early 2021, Burnette brought in an excavator and some fill sand to build a secondary "berm" in the emergent wetlands south of the "main" (wetland) berm, sans wetland fill permits.[25] The newer and original

---

[22] Burnette decreased "wetted acres" without first (or subsequently) revising its DMP – another GWDP violation. **Ex 1** (GWDP Part 1 Sec 10(g)); **Ex 2** (DMP Sec 5.0).

[23] **Ex 14** (Kalchik Dep pp 80-83); **Ex 36** (2020 Wetland Delineation pp 4, 5).

[24] ECF 16-9, PageID.1990 (Violation Notice 2008) ("The discharge to the south field was seeping through the dike and into the wetland."); **Exs 49, 50** (2019, 2020 Violation Notices) (documenting observations of wastewater entering wetlands from north of Field 36).

[25] **Ex 14** (Kalchik Dep pp 99-106); **Ex 79** (Steuer Excavating Invoice).

berms surround the triangular retention area situated between Fields 36, 37 and the larger wetland complex (see *Figure 2*):[26]



**Figure 2**

Particularly from Field 36, but also portions of Field 37, spray field oversaturation leads to surface runoff that ponds in the triangular area immediately adjacent to the wetlands, as is visible in *Figure 2*. Additional evidence of ponding in this retention area include: (1) ponded water observed during each state regulator inspection in 2019, 2020, and 2021;[27] (2) aerial images showing standing water in the retention basin in 6 of 7 site images;[28] (3) Burnette consultant's observations of surface water in this "Wetland A" area and noting "inundation

---

[26] **Ex 26** (MacGregor Fig 6b). The dark areas in the "retention basin" indicate ponded water.

[27] **Exs 49, 50, 52** (2019, 2020, 2021 Violation Notices).

[28] **Ex 23** (Kendall pp 19-24); **Ex 26** (MacGregor Fig. 4).

visible on aerial imagery" in the area;[29] and (4) photographs of ponding in this area.[30] The retention area holds wastewater runoff and while it may delay infiltration into the wetland, it does not prevent Burnette's wastewater from entering the wetlands – whether under, through, or over the berm.[31]

Burnette's GWDP also prohibits its discharge from creating a hazardous waste "facility"[32] under Part 201 of NREPA, MCL § 324.20101 *et seq.* Burnette's 2023 sampling reports arsenic at 25 ug/L and 13 ug/L in MWs-10  and 11 respectively, well above the 10 ug/L standard.[33] The Michigan Department of Environment, Great Lakes, and Energy ("EGLE") cited Burnette for violating Part 201 levels for arsenic and manganese, supported by EGLE's 2023 sampling in Burnette's downstream groundwater monitoring wells.[34] And EGLE's compilation of historic[35] data from downgradient Field 36 monitoring wells show three out of four wells consistently exceeded Part 201 arsenic levels.[36] EGLE's analysis shows iron and manganese levels similarly exceed Part 201 standards.[37]

---

[29] **Ex 36** (2020 Wetland Delineation pp 5, 6).

[30] **Ex 82** (EGLE, Burnette photographs of ponding in/around retention basin, channelization in Field 36).

[31] **Ex 52** (EGLE 2021 Violation Notice Par 5); **Ex 78** (2021 Site Inspection Report pp 6); **Ex 22** (Kendal pp 30-32); **Ex 20** (Kogge p 5; Appendix C).

[32] MCL § 324.20101(s) ("'Facility' means any area, place, parcel or parcels of property, or portion of a parcel of property where a hazardous substance in excess of the concentrations that satisfy the cleanup criteria for unrestricted residential use has been released, deposited, disposed of, or otherwise comes to be located.").

[33] **Ex 33** (2023 Site Status Report p 16 Table 2). Part 201 GSI criteria for arsenic in groundwater is 10 µg/l. Mich. Admin. R. 299.44 Table 1.

[34] **Ex 53** (2023 Violation Notice Par 2); **Ex 69** (EGLE Geologist Recommendations pp 22-23). EGLE's 2023 sampling also documented elevated levels of arsenic, iron, and manganese in the wetlands. **Ex 53**.

[35] Burnette stopped routinely sampling monitoring wells for arsenic in 2018.

[36] **Ex 69** (EGLE Geologist Recommendations Fact/Decision Sheet Fig. 16).

[37] *Id.* at Fig. 11-15.

Burnette's spray fields adjoin wetlands that drain to a creek that discharges into Elk Lake. The images below show: Burnette's spray fields relative to its processing plant and the wetlands, including groundwater flow patterns toward the wetlands (*Figure 3*);[38] the wetlands between Burnette's spray fields and Elk Lake's Spencer Bay (*Figure 4*);[39] and the ~800 feet path the creek follows from within the north end of the wetlands to Elk Lake (*Figure 5*):[40]



**Figure 3**

---

[38] **Exs 28-33** (2018-2023 Site Status Reports).

[39] **Ex 26** (MacGregor Report Fig 2).

[40] Mr. MacGregor drew the stream headwaters shown in *Figure 5* within the green hatched wetland area using a blue marker in deposition. **Ex 12** (MacGregor Dep pp 210-11). Distance measured by scale. *See also id.* pp 129-30.

10



Figure 4



**Figure 5**

**B.  ESLA detected elevated E.coli in Elk Lake, and unhealthy conditions in Spencer Creek, which it reasonably traced to Burnette's spraying.**

In 2019, an ESLA intern sampling the Elk Lake shoreline discovered E.coli at the outlet of Spencer Creek.[41] Further sampling detected E.coli consistently from Spencer Creek's outlet in Elk Lake upstream to where Spencer Creek forms out of the wetlands, indicating an upstream source.[42] The intern also observed atypical conditions in Spencer Creek – unnatural foam, discoloration, and more.[43] People staying or living along Spencer Creek shared similar observations of bad smells, discoloration, and unusual stream conditions.[44]

ESLA notified EGLE about its sampling and observations, which led EGLE to inspect the site, review Burnette's records, and cite Burnette for scores of violations.[45] While Burnette had no permit obligation to sample its wastewater for E.coli, EGLE directed Burnette to develop a sampling plan to assess whether E.coli, foam, and discoloration in Spencer Creek may be coming from its facility.[46] Dave Walters, EGLE site inspector, described the situation like this:

> We are trying to develop a sampling plan for Burnette's to do sampling of their effluent for E coli, [Monitoring Well] MW-11 next to the wetland for BOD, and BOD and E coli in the wetland to help determine if the water quality is being impacted by Burnette's discharge. We are wondering if high levels of BOD in Burnette's discharge is providing a food source for naturally occurring E coli in the wetland to increase and cause the higher levels downstream.[47]

---

[41] **Ex 5** (Ogle Dep pp 53-58); **Ex 43** (ESLA 2019 Report).

[42] *Id.*

[43] **Ex 43** (ESLA 2019 Report p 3); **Ex 86** (Spencer Creek videos).

[44] **Ex 5** (Ogle Dep pp 20-21, 139, 145); **Ex 43** (ESLA 2019 Report p 3); ECF 16-8 (1990 complaint); ECF 16-9 (2009 Violation Notice).

[45] **Ex 49** (EGLE 2019 Violation Notice).

[46] *Id.,* p. 5.

[47] **Ex 70** (Walters email to Chatterson).

Burnette refused to undertake the diagnostic sampling.[48] In July 2021, after Burnette consistently refused, EGLE tested Burnette's wastewater and confirmed high E.coli levels (1,000 CFU/100 ml),[49] with consistent results in May 2023.[50] Unbeknownst to Plaintiffs until litigation discovery, Burnette sampled its wastewater for E.coli in August and September 2021, which documented levels in excess of 24,000 colonies/100 ml.[51] While Burnette asserted its wastewater could not possibly be the E.coli source, in deposition, Burnette revealed it discovered Village of Elk Rapids sewer piping under Burnette's building leaking into adjacent Burnette wastewater pipes, which it re-cased in the fall of 2023.[52]

Meanwhile, ESLA continued sampling Spencer Creek, observing unhealthy conditions in the creek, and reviewing public data related to Burnette's discharges. This assessment indicated atypical and unhealthy levels of E.coli, BOD, sodium, conductivity, phosphorus, Dissolved Oxygen ("DO"), and other conditions in Spencer Creek.[53] ESLA recruited local water quality specialists at Watershed and GTB to review its results and public records and to assist with additional sampling and water quality studies in Spencer Creek. Beginning in 2021, Plaintiffs conducted twice-yearly sampling of the aquatic macroinvertebrate species in Spencer Creek, which helps assess a stream's health by collecting and analyzing specimens for pollutant tolerances.[54] Heather Smith, WATERKEEPER® for the Watershed, is responsible for monitoring

---

[48] ECF 16-17 (Burnette response to 2019 Violation); LEI response to EGLE, Nov. 27, 2019 (BFI0000050-72); **Ex 50** (2020 Violation Notice p 6); **Ex 51** (Enforcement Notice).

[49] E.coli total body contact maximum for recreation is 300 colonies per 100 mL. Mich. Admin. Code R. 323.1062(1).

[50] **Ex 52** (2021 Violation Notice p 9); **Ex 53** (2023 Violation Notice p 7).

[51] **Ex 77** (Burnette E.coli results).

[52] **Ex 14** (Kalchik Dep pp 200-03); **Ex 72** (Euster email to Hamade).

[53] **Ex 80** (Surface Water Sampling Results); **Exs 43-48** (ESLA 2020-2024 reports).

[54] **Ex 45** (ESLA 2021 Report).

surface water quality throughout the 1,000-square acre Grand Traverse Bay watershed and testified Spencer Creek has some of the poorest water quality she has observed compared to scores of other area streams.[55] Dan Mays, GTB aquatic biologist, testified that he has monitored 200+ area streams and Spencer Creek has the highest conductivity[56] scores he has seen.[57]

ESLA, Watershed, and GTB staff reasonably deduced Burnette's wastewater was the most likely source of unhealthy levels of pollution and unnatural observed conditions in Spencer Creek based on the massive volume of contaminated wastewater spray-irrigated by Burnette, thousands of self-reported permit violations,[58] documented observations by EGLE staff of wastewater ponding in adjacent wetlands and areas surrounding Burnette's spray fields, the stream's close proximity to the spray fields, the self-evident area hydrology, neighbors' complaints, correlations to Burnette's peak discharge season, their own extensive field work with local water quality issues, and the lack of reasonable alternative explanations for the unusual conditions in this small subwatershed.[59] Details learned and analysis developed in litigation only bolster this irrefutable conclusion.[60]

### C.  Burnette's unpermitted discharges and GWPD violations continue.

Burnette retained litigation experts – who were not provided most of the documents and materials discussed above – quibble about minutia, such as whether Plaintiffs' experts could have

---

[55] **Ex 75** (Smith Resume); **Ex 6** (Smith Dep p 15).

[56] Conductivity is a measure of electricity passing through water and a common parameter indicating impairment. EPA, *Water: Monitoring & Assessment, 5.9 Conductivity*, available at: 5.9 Conductivity | Monitoring & Assessment | US EPA, last visited April 25, 2025.

[57] **Ex 75** (Mays Resume); **Ex 7** (Mays Dep pp 24-25).

[58] **Ex 81** (GWDP violations); ECF 16-1, PageID.1653 (Plaintiffs' Notice of Intent, asserting that public documents on EGLE MiEnviro Portal attributed 2,583 violations to the Burnette facility since 2015).

[59] **Ex 6** (Smith Dep pp 63-69); **Ex 7** (Mays Dep pp 46-47); **Ex 5** (Ogle Dep pp 20, 27-28, 66-69).

[60] **Exs 22, 23** (Kendall, Rebuttal); **Exs 20, 21** (Kogge, Rebuttal).

used alternative methods to assess how long it takes contaminated wastewater to flow to the adjacent wetlands and speculating wildly about theoretical E.coli sources in Spencer Creek. That is insufficient to create material fact issues. Burnette does not dispute that its wastewater is characterized by high levels of BOD and contains sodium, chloride, solids, and other pollutants. Burnette does not dispute it has routinely overapplied wastewater to the spray fields adjacent to the wetlands. Burnette does not dispute that sprayed wastewater percolates into groundwater that largely drains to the wetlands that drain to Spencer Creek, which outlets to Elk Lake. Burnette does not assert Spencer Creek is healthy, and Burnette has offered no credible alternative explanations for the documented low DO, high conductivity, elevated sodium, and other indications of unhealthy conditions in Spencer Creek.

Burnette consultants repeatedly advised that this discharge system is inadequate. In February 2020, Burnette's consultant recommended Burnette evaluate additional treatment for solids and other pH options to reduce sodium in the wastewater, construct a lagoon to treat BOD, and more.[61] In December 2022, another consultant confirmed the current system's inability to treat BOD, found the "discharge fields are nearing both hydraulic and nutrient capacity," and advised it is "highly likely" the state would "provide a more restrictive permit soon, resulting in a required decrease in discharge without prior improvements."[62] That evaluation noted that a "continue with no change" path could lead to more violations, then recommended a pretreatment system with a lagoon and additional treatment infrastructure.[63] And indeed, since its consultants' improvement recommendations, EGLE has issued additional citations to Burnette for permit

---

[61] **Ex 35** (LEI Information Packet).

[62] **Ex 41** (Technical Memorandum) (emphasis in original).

[63] *Id.*

violations and more.[64] Notwithstanding those recommendations and citations, Burnette continues spraying its wastewater to the fields without additional treatment.

Luckily, Plaintiffs are not without legal recourse. Both federal and state legislators anticipated these circumstances and enacted the CWA and MEPA precisely to provide legal remedies to citizens frustrated by a serial violator, impaired water resources, and dilatory regulatory proceedings. The sections that follow address Plaintiffs' entitlement to summary judgment on their CWA and MEPA claims.

## IV.    ARGUMENT

### A.    Burnette discharges pollutants to waters of the United States from a point source without a proper permit in violation of the CWA.

#### 1.    Statutory Framework for CWA Citizen Suit Claims

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits "the discharge of any pollutant by any person" except as provided by the Act. 33 U.S.C. §§ 1311(a), 1362(12). A discharge is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "Navigable waters" means "waters of the United States" ("WOTUS"). 33 U.S.C. § 1362(7); *Sackett v. EPA,* 598 U.S. 651, 661 (2023). The main exception is the issuance of a National Pollutant Discharge Elimination System ("NPDES") permit allowing the discharge of pollutants within prescribed limits. *Sierra Club v. ICG Hazard, LLC* 781 F.3d 281, 284 (6th Cir. 2015) (citations omitted); *see also Ford Motor Co. v. EPA*, 567 F.2d 661, 664 (6th Cir. 1977). The CWA is enforced through "a default regime of strict liability."

---

[64] **Exs 50, 52, 53** (2020, 2021, 2023 Violation Notices).

*Sierra Club,* 781 F. 3d at 284. A key enforcement tool in the CWA is its citizen suit provision, which ensures "vigorous enforcement" when "the government cannot or will not command compliance." 33 U.S.C. § 1365; *Starlink Logistics, Inc., v. ACC, LLC.,* 101 F.4th 431, 447 (6th Cir. 2024); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987).

A CWA claim has the following elements: (1) any addition (2) of any pollutant (3) to navigable waters (WOTUS) (4) from any point source (5) without an appropriate permit. 33 U.S.C. §§ 1311, 1362(12)(A); *County of Maui v. Hawaii Wildlife Fund,* 140 S.Ct. 1462 (2020); *Tennessee Clean Water Network v. Tennessee Valley Auth.*, 905 F.3d 436, 439 (6th Cir. 2018). It is undisputed that Burnette lacks a NPDES permit. It is also undisputed that Burnette's wastewater contains "pollutants," which include biological materials and industrial and agricultural waste.[65] 33 U.S.C. § 1362(6). Fruit processing wastewater is an industrial waste pollutant. 33 U.S.C. § 1316(b)(1)(A); 40 C.F.R. §§ 407.2-407.27, 407.6-407.67. And it is undisputed that Burnette discharges its wastewater through spray heads, which is each a "point source" – a "discernible, confined, and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *Peconic Baykeeper, Inc. v. Suffolk Cnty,* 600 F.3d 180, 188-89 (2nd Cir. 2010) (spray applicators are point source); *Flint Riverkeeper, Inc. v. Southern Mills, Inc.,* 276 F.Supp. 3d 1359, 1367-68 (M.D. Ga. 2017) (land application system and spray apparatus are point sources). Plaintiffs address these remaining elements – WOTUS and additions – in reverse order.

---

[65] Burnette's wastewater pollutants including BOD, TSS, phosphorous, nitrogen, ammonia, pH, chloride, sodium, and E.coli. **Ex 68** (Potential Surface Water Impacts pp 1-2); **Ex 81** (GWDP violations); ECF 16-19 (DMRs).

## 2. *The creek and wetlands are WOTUS.*

Burnette's spray fields are adjacent to a wetland complex that drains into Spencer Creek, which flows into Elk Lake. Elk Lake is WOTUS. 40 C.F.R. 120.2(a). Spencer Creek is a tributary of Elk Lake, and the wetlands adjoining Burnette's spray fields connect to Elk Lake through Spencer Creek. Both Spencer Creek and the wetlands are WOTUS subject to the CWA.[66]

### (a) Spencer Creek is a tributary of Elk Lake.

Burnette reports consistently reflect that the groundwater beneath the spray fields flows to the wetlands, which flow northerly to "surface water drainage" – *i.e.*, to Spencer Creek (see *Figure 3* above). Spencer Creek is a tributary to Elk Lake that carries surface waters from the wetlands to Elk Lake.[67] Spencer Creek forms at some undefined point in the northern reaches of the wetlands east of Elk Lake Road (see *Figure 5* above),[68] flows under Elk Lake Road through a culvert, then through a ravine until discharging into Elk Lake through a culvert under an old railroad grade[69] – a distance of about 800 feet from the wetlands to the lake.

Streams are defined as having banks, a bed, and visible evidence of continued flow or continued occurrence of water, and both parties' experts observed such conditions in the creek's upper stretches.[70] Burnette, EGLE, and ESLA sampled Spencer Creek at EQ-2 or C-9[71]

---

[66] Even if Spencer Creek and the wetlands were not WOTUS (which Plaintiffs firmly dispute), Burnette's wastewater flows through them to Elk Lake, so Burnette's unpermitted discharges remain subject to the CWA for the reasons discussed below. *See* ECF 26, PageID.3742-46; *see also Rapanos* 547 U.S. at 743; *Maui, supra*.

[67] **Ex 20** (Kogge p 12); *see also* **Ex 13** (MacGregor Dep p 111 ("Water does flow through the base of the ravine.").

[68] **Ex 20** (Kogge p 11); **Ex 5** (Ogle Dep p 220); **Ex 85** (Wetlands Video).

[69] **Ex 20** (Kogge p 12); **Ex 8** (Gretel Dep pp 14-18).

[70] **Ex 20** (Kogge pp 11-12); **Ex 26** (MacGregor pp 2, 6); **Ex 12** (MacGregor Dep pp 193-6, 199-200).

[71] "EQ-2" and "C-9" designate the same Spencer Creek location; EGLE and Burnette use "EQ-2"; ESLA uses "C-9".

– west of Elk Lake Road as it leaves the wetlands – scores of times without suggesting it is *not* a stream.[72] EGLE treats Spencer Creek as a regulated stream.[73]

Spencer Creek typically flows most months of the year, though parts of the creek dry up seasonally (usually around July and August) in some years (including 2024). Starting in 2019, ESLA regularly samples Spencer Creek; initially it was in June and July, then it expanded to more months, and now it samples the creek nearly year-round. Irrefutable evidence gathered during ESLA site visits confirm Spencer Creek is permanent and flowing throughout the year except in the driest months.[74] Photographs and video of different stretches of the creek through the years clearly depict continuous water flowing.[75] Field observations and records during ESLA sampling further support the continual presence of water through the creek.[76] Weekly flow measurements were taken between July 14 and October 7, 2021, and continuous flow was observed for every date.[77] Local residents confirm Spencer Creek has continual flow most months of the year except during the driest months like July and August.[78] Thus, Spencer Creek generally maintains consistent flow for about 10 months annually and in some years, like 2021, it flows continuously, even throughout the summer.[79] Burnette's witness, Mr. MacGregor, spent

---

[72] **Ex 80** (Surface Water Sampling Results); **Exs 30-34** (2020-2024 Site Status Reports); **Exs 52, 53** (2021, 2023 Violation Notices); **Ex 74** (EGLE 2023 Spencer Creek sampling).

[73] **Ex 68** (Potential Surface Water Impacts, pp 1, 18, "the wetland and Gretel Creek are protected for warmwater fish species"); **Ex 69** (EGLE Geologist Recommendation p 18, identifying three surface water bodies ("wetland connected to Spencer Creek, Elk Lake") with potential to be affected by groundwater impacted by Burnette discharge); *see also* ECF 16-9, PageID.1989 (2008 Violation Notice); **Ex 52** (Violation Notice).

[74] **Ex 5** (Ogle Dep pp 29, 127, 129-30, 224-6).

[75] **Exs 82, 86** (Spencer Creek photos, video).

[76] **Ex 43-48** (2019-2024 ESLA Reports); **Ex 76** (Ogle 2020 Field Notes).

[77] **Ex 45** (2021 ESLA Report).

[78] **Ex 9** (Taylor Dep p 36); **Ex 8** (Gretel Dep pp 22, 26).

[79] **Ex 82, 86** (Spencer Creek photos, video); **Ex 45** (ESLA 2021 Report).

19

only a few hours, once, at Spencer Creek east of Elk Lake Road on October 29, 2024 – at the end of a four-month extreme dry spell – when the creek was dry.[80] Any opinions Burnette may offer from him are insufficient to create a material issue of fact on whether Spencer Creek flows from the wetlands to the lake for much of the year.

WOTUS include tributaries that are relatively permanent, standing, or continuously flowing water bodies that flow into traditionally navigable waters connected to an interstate water. 40 C.F.R. 120.2(a)(3); *Rapanos v. United States,* 547 U.S. 715, 739 (2006). While the *Rapanos* plurality noted WOTUS excludes "channels containing merely intermittent or ephemeral flow," it also clarified those terms by stating WOTUS such as rivers, streams, lakes, and oceans "connote continuously present, fixed bodies of water, as opposed to *ordinarily dry channels through which water occasionally or intermittently flows.* None of these terms encompasses transitory puddles or ephemeral flows of water." *Id* at 733 (emphasis added). Further, the plurality explicitly noted the "relatively permanent" standard does not exclude streams "that might dry up in extraordinary circumstances, such as drought. . . *[nor] seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months*." *Id.* (emphasis added). Thus, *Rapanos* does not exclude from WOTUS streams with continuous flow some months that regularly dry up during dry months.

Consistent with *Rapanos,* waters with regular, continuous flow for some months every year satisfy the relatively permanent standard. *See United States v. Moses*, 496 F.3d 984, 989 (9th Cir. 2007), cert. denied, 554 U.S. 918, (2008) ("seasonally intermittent stream which ultimately empties into a river that is a [WOTUS] can, itself, be a [WOTUS].)"; *United States v.*

---

[80] Precipitation in July through October preceding that visit was 37% of the region's normal precipitation; September and October combined precipitation was 24% of normal. **Ex 21** (Kogge Rebuttal pp 3-4).

*Vierstra,* 492 Fed. Appx. 738, 740 (9th Cir. 2012) (upholding jury decision finding canal WOTUS where "[f]or six to eight months a year, the Low Line Canal flows continuously and directly into a tributary of the Snake River, a traditionally navigable water."); *Baykeeper v City of Sunnyvale*, ___F Supp 3d___; 2023 U.S. Dist. LEXIS 220102, at *12 (ND Cal, Dec. 11, 2023) ("it is clear that the creeks here flow intermittently in the sense that they flow seasonally, whereby they contain a continuous flow during some months and no flow during dry months"). *See also* EPA, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States,*" (Dec. 2, 2008) at 7 (interpreting *Rapanos* plurality to require tributaries to have "continuous flow at least seasonally (e.g., typically three months) that is not solely in response to precipitation.").

Based on years of observations, Spencer Creek is plainly a relatively permanent waterbody. It is not an "ordinarily dry channel." It typically maintains continuous flow 10 months annually and year-round flow some years. Spencer Creek is a tributary of Elk Lake that constitutes WOTUS.

### (b)  The wetlands between the spray fields and Spencer Creek are WOTUS.

The wetlands adjacent to Burnette's spray fields are WOTUS under the two-part adjacency test established in *Sacket v. EPA:*

> First, the adjacent body of water constitutes 'waters of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins.

143 S. Ct. at 1341 (cleaned up quoting *Rapanos*, 547 U.S. at 742.)

Spencer Creek – a relatively permanent tributary of Elk Lake – meets the first part. The wetlands satisfy the second because Spencer Creek forms directly out of the wetlands at an indistinguishable point west of Elk Lake Road (see *Figure 5* above).[81] Burnette's consultant concluded the wetland area in the northern stretches just upstream of Spencer Creek "is part of a larger wetland connected through a culvert to Elk Lake."[82]

Wetlands do not need to be constantly inundated with water at the surface to maintain CWA jurisdiction. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121 (1985); *Rapanos,* 715 at 751 n. 13 (noting *Bayview's* position about wetland inundation and affirming adjacency is a "physical-connection requirement.") The reason is obvious: wetlands by definition "are not required to express water at the surface. . . [and] may never have surface water, may only have surface water during or immediately after precipitation events or may only have water at the surface seasonally." EPA, "Technical Support Document for the Final 'Revised Definition of Waters of the United States' Rule" at 169-170 (December 2022), referencing Army Corps 1987 Wetlands Delineation Manual. In general, courts consider wetlands within a hydrologically connected network to be a single wetland. See, *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC,* 278 F.Supp. 2d 654, 674 (E.D.N.C. 2003) (finding all wetlands forming a continuous hydrological network to be WOTUS); *Great Northwest, Inc. v. U.S. Army Corps. Of Eng'rs.,* 2010 U.S. LEXIS 89132 (D. Alaska June 8, 2010) (wetlands are continuous and part of single wetland if there is a surface water connection). Likewise, EPA has applied jurisdiction to connected wetlands after a determination they are acting as one wetland system.[83]

---

[81] **Ex 20** (Kogge p 11); **Ex 5** (Ogle Dep p 220); **Ex 85** (Wetlands Video).

[82] **Ex 32** (2022 Wetland Delineation p 1).

[83] EPA "Memorandum on LRB-2021-01386" (Feb. 16, 2024), available at

The wetlands adjoining Burnette's spray fields consist of two main areas bisected by a farm road with two equalization culverts underneath it that ensure drainage between the south and north areas (see *Figure 6* below).[84] Burnette's consultant recognized that the wetlands on either side of the road are two parts of one larger wetland complex "with a surface water connection through culvert[s]."[85] The equalization culverts maintain a physical connection at the surface allowing the two wetland areas *to act as one system* where surface water is "equalized" and for "the free flow of surface water or the movement of organisms between portions of a wetland system."[86]

---

https://www.epa.gov/system/files/documents/2024-02/lrb-2021-01386-joint-decision-memo_final_508c.pdf, last visited April 25, 2025.

[84] **Ex 4** (Culvert Permit). EGLE explicitly *rejected* Burnette's request to install two wetland equalization culverts under the Farm Road, finding "the addition of the second culvert increases the risk associated with the applicant's groundwater discharge system." (K. Kent, EGLE WRD, email to K. Kalchik, Feb. 18, 2022 (BFI00012475)). But Burnette built two culverts anyway.

[85] **Ex 37** (2021 Wetland Delineation p 2).

[86] **Ex 4** (Culvert Permit p 5 ⁋ 7) (emphasis added).



**Figure 6**

The wetland complex is one wetland system with a continuous connection at the surface through two equalization culverts, and Spencer Creek forms at an indistinguishable point in the northern portion of the wetlands, so the entire wetland complex is WOTUS.

### 3. *Burnette's polluted wastewater is an addition to WOTUS.*

Burnette's wastewater pollutants reach the wetlands commonly through groundwater discharges and occasionally through surface runoff. Polluters are liable for CWA violations when pollutants reach WOTUS through indirect or direct discharges. *Rapanos.* 547 U.S. at 743 ("from the time of the CWA's enactment, lower courts have held that the discharge into intermittent

24

channels of any pollutant *that naturally washes downstream* likely violates Section 1311(a), even if the pollutants discharged from a point source do not emit 'directly into' covered waters.") (emphasis in original). The rational is that "[t]he Act does not forbid the 'addition of any pollutant directly to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" *Id.* (quoting 33 U.S.C. § 1362(12)(A)) (emphasis added).

Burnette has a surface runoff problem that facilitates the surface overflow and groundwater migration additions of polluted wastewater to WOTUS. Applying the same amount of wastewater to fewer "wetted acres" results in less infiltration capacity and more runoff. Burnette conceded that the surface runoff observed during EGLE inspections is a serious problem and contributed to retaining consultants to advise on alternative wastewater treatment plans.[87] Burnette also constructed the "secondary berm" in spring of 2021 in an attempt to limit the runoff.[88] However, the new berm does not prevent runoff and the retention basin continues to exhibit ponding post-berm construction.[89] Burnette never developed construction plans or specifications (*i.e.*, height, slope, width etc.) for the berm and constructed the new berm out of "fill sand."[90] Finally, berm construction does not remedy Burnette's consistent seasonal overapplication of wastewater, which overwhelms the land application system, resulting in wastewater migrating off the fields untreated, collecting, and infiltrating the wetlands.

---

[87] **Ex 14** (Kalchik Dep pp 144-6, 183-4).

[88] It appears Burnette constructed the new berm without a wetland fill permit, even after their consultant advised a permit was likely required. **Ex 71** (Weatherwax email to Kalchik); **Ex 14** (Kalchik Dep pp 103-5).

[89] **Ex 78** (2021 Site Inspection p 6); **Ex 22** (Kendall p 26_Fig 21); **Ex 20** (Kogge Appendix C); **Ex 12** (MacGregor Fig 4).

[90] **Ex 14** (Kalchik Dep pp 100-102, 105-106); **Ex 79** (Steuer Invoice).

(a) <u>Groundwater Addition</u>

The groundwater underlying Burnette's spray fields and retention basin adds the wastewater pollutants to WOTUS because the groundwater is a water recharge source for the adjacent wetland complex. Dr. Kendall provides clear evidence that the wetland is fed by groundwater containing Burnette's wastewater. First, the groundwater flows toward the wetlands from the spray fields.[91] Second, groundwater levels in the spray fields near the wetlands' edges are higher than the ground surface level of the nearby wetlands a vast majority of the time, which makes the flow into the wetlands the natural pathway.[92] Third, Dr. Kendall's calculations show the wetlands require almost the entire monthly groundwater recharge for the whole watershed (including the spray fields) to make up for water lost from evaporation and transpiration.[93] Fourth, surface water runoff from other properties surrounding the wetlands is highly unlikely to be a meaningful recharge source since the infiltration rates for those soils are so high that precipitation would not cause runoff.[94] Fifth, groundwater nearest the wetlands enters the wetlands first, and Burnette's spray fields are immediately adjacent to the wetlands (see *Figure 7* below).[95] Finally, a clay layer below a significant portion of the spray fields (particularly Field 36) at a depth of 12-15' impedes downward movement of groundwater under the spray fields, forcing groundwater it laterally towards the wetlands:[96]

---

[91] **Ex 39** (2009 Hydrogeological Report Attachment 11); **Ex 23** (Kendall Rebuttal p 3).

[92] **Ex 23** (Kendall Rebuttal pp 3, 5); Ex 15 (Sklash Dep pp 117-8).

[93] **Ex 22** (Kendall Rebuttal pp 3-4).

[94] *Id.*

[95] *Id* at 4.

[96] **Ex 23** (Kendall Rebuttal p 4); **Ex 15** (Sklash Dep pp 77, 101-3); **Ex 39** (2009 Hydrogeological Report Attachment 9).



**Figure 7**[97]

Thus, Burnette's unpermitted wastewater discharges are a near-constant addition into the wetlands, particularly during peak season when the land-treatment system is overloaded.

Burnette retained two hydrogeologists, who offered vague assertions that groundwater containing Burnette's wastewater might never reach the wetlands.[98] Neither presented evidence or data supporting those ambiguous assertions and both admitted to not reviewing or analyzing the wetlands' recharge rates, precipitation records, evaporation/transpiration rates, or other data useful for determining if nearby groundwater is recharging the wetlands.[99] Dr. Gagnon conceded the data Dr. Kendall used for his calculations "seemed reasonable" and is from a "reliable source."[100] Dr. Sklash even conceded groundwater is indeed feeding the wetlands and clarified

---

[97] **Ex 23** (Kendall Rebuttal p 7 Fig 18) (conceptual diagram of groundwater flow path from spray fields into wetlands).

[98] **Ex 24** (Gagnon p 18); **Ex 25** (Sklash pp 10, 17).

[99] **Ex 15** (Sklash Dep pp 124-129); **Ex 16** (Gagnon Dep pp 142-144).

[100] **Ex 16** (Gagnon Dep pp 144).

that his claim groundwater likely doesn't enter the wetlands referred to groundwater *below* the clay layers, not the ground water above the clay layers.[101]

i.    Maui *Factors*

The pollutants discharged from Burnette's spray fields into the adjacent wetlands through the groundwater violate the CWA when they are the "functional equivalent" of a direct discharge. *Maui,* 140 S.Ct. at 1462. *Maui* enumerated seven factors for consideration:

> (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity.

*Id* at 1476-7. Time and distance are the most important factors in most cases. *Id.; see also* EPA Draft Guidance "Applying the Supreme Court's *County of Maui v. Hawaii Wildlife Fund* Decision in the CWA Section 402 NPDES Permit Program to Discharges though Groundwater," (Dec 2000) (time, distance may be "the only factors that need be considered").[102]

Time and distance are the determinative factors here. *Maui* illustrated the outer parameters for when the determination requires almost no analysis: Section 402 permit requirement "clearly applies" when the groundwater travel distance is a few feet and likely does not apply when the distance is 50 miles. *Maui* at 184. Here, the wetlands are immediately

---

[101] **Ex 15** (Sklash Dep pp 139-141, 101-103).

[102] Available at https://www.epa.gov/system/files/documents/2023-11/maui-draft-guidance.pdf, last visited April 25, 2025.

adjacent to wastewater infiltration points and the minimum distance the pollutants travel to enter the wetlands is approximately 70 feet.[103] Additionally, Dr. Kendall calculated the transit times to the wetlands to be as little as 17.5 days with central estimates of 128 – 200 days.[104] In *Maui*, on remand, functional equivalency was found when the pollutants travelled to WOTUS in as little as 84 days but with average transit times of 14-16 months, and the estimated distance was a half-mile or less, a "relatively short distance." *Hawai'i Wildlife Fund v. Cnty. of Maui*, 550 F. Supp. 3d 871, 888 (D. Haw. 2021). Here, the calculated distances range of 70 – 300 feet and average transit time of 4-6 months are significantly less than in *Maui*. The two "most important" *Maui* factors confirm that Burnette's wastewater is reaching the wetlands as the "functional equivalent" of a direct discharge.

Burnette's hydrogeologists made no attempt to calculate contrary values for time and distance factors. They offered only suspect and self-serving conclusions that the factors are impossible to compute and Dr. Kendall's calculations are unverifiable.[105] These conclusions are particularly non-credible as to distance, where the range is not hard to deduce given how well the area is mapped.[106] Dr. Sklash even states "from the [near] edge of the wetland perhaps to the middle of the wetland" would be the "zone" in which groundwater discharges from under the spray fields occur.[107]

Dr. Kendall also provided an in-depth analysis using available data to calculate an average range of transit times of 4-6 months with a minimum time of just a few weeks. Dr.

---

[103] **Ex 22** (Kendall pp 12, 37).

[104] *Id.* at 12-14.

[105] **Ex 25** (Sklash p 17); **Ex 24** (Gagnon pp 20, 22-23).

[106] **Ex 23** (Kendall Rebuttal p 10).

[107] **Ex 15** (Sklash Dep pp 73-74: 20-25, 1-5).

Kendall applied Darcy's law to calculate the groundwater flow velocity needed to determine transit time.[108] Dr. Kendall used conservative values for each of the factors in Darcy's law so his calculated transit time is likely longer than actual transit time.[109] He used data from nearby wells to calculate an average hydraulic conductivity ("K") value of 17.5 feet/day, which he compared to the range of hydraulic conductivity values found in Burnette's onsite 2009 hydrologic field assessment.[110] Dr. Kendall determined hydraulic gradient ("i") of each spray field using water table level data from Burnette groundwater monitoring wells.[111] Finally, Dr. Kendall used the porosity value from Burnette's 2009 Hydrology report.[112]

Burnette's hydrogeologists, Dr. Gagnon and Dr. Sklash, refused to provide any range of transit times for the "functional equivalency" analysis. They merely attempt to sow uncertainty on Dr. Kendall's calculations, but their efforts fail: they show no significant errors that undermine Dr. Kendall's analysis. For example, Dr. Sklash criticizes Dr. Kendall's use of Wellogic data from offsite wells to calculate the "K" factor. However, Dr. Kendall validated his calculations with data from Burnette's onsite wells and data. Dr. Kendall's 17.5 feet/day is a conservative value considering Burnette's 2009 MET data range of 3.64 to 140 feet/day. Given this range, it's more likely Dr. Kendall *under*stated rather than *over*stated the velocity. Further, even if Dr. Kendall overstated the velocity (which Plaintiffs deny), given his conservative estimate, the

---

[108] **Ex 22** (Kendall p 4). Darcy's law is $v = K (i/n)$, where "v" is velocity, "K" is hydraulic conductivity (how easily water flows through sediment), "i" is hydraulic gradient (slope water travels down), and "n" is porosity. Kendall used data from nearby wells pulled from Michigan's Wellogic system to calculate an average hydraulic conductivity ("K").

[109] *Id.* at 4; **Ex 23** (Kendall Rebuttal p 10).

[110] **Ex 39** (2009 Hydrogeological Report pp 5-6).

[111] **Ex 22** (Kendall pp 4, 12).

[112] *Id.* at 4.

impact on overall travel time is unlikely to significantly increase. Dr. Sklash did not acknowledge the conservative nature of Dr. Kendall's "K" value nor the minimal impact any overage would have. Dr. Skalsh conceded his calculations aimed at invalidating Dr. Kendall's "i" value were incorrect; his adjusted "i" value was negligibly different than Dr. Kendall's. [113] Finally, Dr. Sklash postulated the .35 porosity value Dr. Kendal used for "n" was impossible to confirm. However, Dr. Kendall used a conservative value from the range of accepted published values, so any error is likely to result in faster transit; at worst, it might increase transit times by 25%.[114] An increase of 25% would only add a month or two to Dr. Kendall's calculations. Dr. Sklash attempts to sow uncertainty simply for uncertainties sake, regardless of the minimal impact it would have on calculated transit times. Dr. Gagnon even contradicts Dr. Sklash when he stated "the data exist to make reasonable estimates of the transit time of the groundwater at the Site."[115] Burnette's refusal to provide any contrary analysis, combined with the weakness of its criticisms and the conservative nature of Dr. Kendall's assumptions, render Dr. Kendall's time and distance analysis effectively unrebutted.

The remaining *Maui* factors do not sufficiently impact the functional equivalency analysis to overcome the overwhelming implications of proximity and short travel times. Burnette has overloaded and mismanaged the spray fields, so the land-treatment system provides a fraction of the design treatment, and a significant volume of wastewater runs off the treatment area and ponds immediately upstream and adjacent to the wetlands before infiltrating the ground. This short distance negates the impact additional factors might have on the wastewater and its

---

[113] **Ex 15** (Sklash Dep pp 76-77).

[114] **Ex 23** (Kendall Rebuttal p 9).

[115] **Ex 24** (Gagnon p 13).

31

constituent pollutants.[116] Additionally, the high concentration of BOD paired with system overloading has created low-oxygen conditions in the groundwater venting to wetlands[117] and in the soils.[118] Moreover, low oxygen levels in soil: (1) limits the impact of chemical processes slowing down transit, and (2) increases the mobility of many of the constituents with little alteration to their character.[119]

Finally, Dr. Gagnon's assertion that wetland soils may alter the character of pollutants before reaching WOTUS is a misapplication of "the nature of the material through which the pollutant travels" factor. Wetlands need no surface water ponding; saturated soils are in the definition of wetlands.[120] Therefore, once the groundwater begins interacting with the water and soils in the wetlands, it has already reached WOTUS and the *Maui* analysis is complete.[121] It is not necessary for the water in the wetlands to reach the surface of the wetlands before the *Maui* analysis stops.

### (b) Surface Water Addition

Burnette's discharges also enter the wetlands as a surface water addition on occasion when ponded wastewater in the retention basin overtops the main berm between the basin and wetlands. Dr. Kendall analyzed LIDAR elevation data and the dimensions of the basin to

---

[116] **Ex 23** (Kendall Rebuttal p 13).

[117] **Ex 68** (Potential Surface Water Impacts Review p 18) ("Venting groundwater with low dissolved oxygen levels can have a negative impact on the receiving water, especially when the flow of the groundwater is significant compared to the background flow.").

[118] **Ex 67** (Soils Review p 7) ("This is high strength wastewater and the organic load that is being shown would greatly stress the site soil's ability to effectively treat the waste over time.").

[119] **Ex 23** (Kendall Rebuttal pp 14-16).

[120] 40 C.F.R. 230.41(a)(1); **Ex 21** (Kogge Rebuttal pp 2-3, 5).

[121] **Ex 21** (Kogge Rebuttal p 5); **Ex 23** (Kendall Rebuttal p 15).

calculate the volume of water required to overtop the main berm.[122] *Figure 8* shows the annual frequency that daily applications to Field 36 surpass the volume that would overtop the berm:[123]



**Figure 8**

While not all wastewater discharged is accumulating in the retention basin, Dr. Kendall concluded that the application rates combined with substantial rain events likely occur annually, if not multiple times per year.[124] Burnette offered no evidence refuting Dr. Kendall's calculations nor did its hydrogeologists do any substantive analysis of the potential for surface flow over the top of the main berm.

---

[122] **Ex 22** (Kendall p 30).

[123] *Id.* at 29. Total daily volume of applications to Field 36, with dashed red line at volume of retention basin before overflow at field's north end.

[124] *Id.* at 30-32.

EGLE inspections corroborate Dr. Kendall's conclusion that Burnette's polluted wastewater occasionally flows into the wetlands via surface overflow. In 2019, EGLE inspector Walters conducted a site inspection following a complaint of discoloration in Spencer Creek and stated "[a]t the irrigation site I observed runoff from the south center irrigation site entering the wetland area to the north of the irrigation site."[125] Likewise, during inspections in 2020 and 2021, Walters observed dark brown wastewater in the wetlands.[126] Video from July 30, 2021, (just days after EGLE observed wastewater in the wetlands) shows a large dark brownish/reddish murky plume in Elk Lake extending from the Spencer Creek outfall – compelling evidence of surface water overflow into the wetlands and out to the lake.[127] Burnette blamed a large rain event for the July 24 plume.[128] Even so, notwithstanding the rain, Burnette overapplied to various fields on July 24, 25, 26, 27, 30, and 31.[129] Compounding the problem, each of these violations was more severe than reported due to significantly reduced wetted acres. The rain event does not excuse Burnette; the CWA is a strict liability statute.[130] *Sierra Club,* 781 F.3d at 284. Burnette cannot hide behind rain while continuing excessive discharges in the same day and week.

Collectively, this evidence clearly demonstrates surface water additions to WOTUS.

---

[125] **Ex 49** (2019 Violation Notice p 1, referencing  Field 36).

[126] **Ex 50, 52** (2020, 2021 Violation Notices).

[127] **Ex 84** (Elk Lake video).

[128] Burnette Foods letter to EGLE, Jan. 10, 2022 (BFI0000114).

[129] **Ex 52** (2021 Violation Notice p 3).

[130] Ex 1 (GWDP Part I Sec 8(a), (b)).

34

(c) <u>Corroborating evidence confirms the addition of pollutants to WOTUS.</u>

Pollutants are entering the wetlands, Spencer Creek, and Elk Lake and causing resource impairment. EGLE documented BOD at 1,910 mg/L in the wetlands in July 2021, which it described as "unnaturally high."[131] BOD is also reaching and harming the creek: where BOD levels >2  mg/L indicates impairment,[132] ESLA documented BOD at 9 in July 2022 and 6 in August 2023 at the culvert outlet (C-9), and Burnette documents BOD at 8 in August 2024 on the wetland side (EQ-2).[133] These annual BOD spikes coincide with Burnette's peak discharging. Plus, high BOD concentrations in the wastewater contribute to low DO levels detected in groundwater that vents to the wetlands.[134] DO in the creek is frequently below the 5.00 mg/L minimum standard for warm water streams.[135]

Additionally, sodium and chloride levels indicate Burnette's wastewater and constituent pollutants are entering WOTUS. Burnette's wastewater DMRs show 61 sodium violations and 13 chloride violations between 2017 and 2024 representing 31% and 7% of the DMR reporting intervals, respectively.[136] Unsurprisingly, sodium concentrations in the fields increased dramatically corresponding with the reduction of "wetted acres" in 2021 and began exceeding the permitted 230 ml/L "action limit" for groundwater monitoring wells.[137] Additionally, the sodium/chloride ratios in Field 36 monitoring wells show "the concentrated applications caused

[131] **Ex 52** (2021 Violation Notice ₱ 5).

[132] **Ex 46** (ESLA 2022 Report p 6).

[133] *Id.*; **Ex 47** (ESLA 2023 Report p 6); **Ex 34** (Groundwater Monitoring Report p 14 Table 4).

[134] **Ex 68** (Potential Surface Water Impacts pp 17, "This particular facility is a food processing facility that spray irrigates high strength wastewater (BOD >15,000 mg/L at times) to a field about 100' from a wetland/headwaters of a creek.", p 18).

[135] **Ex 80** (Surface Water Sampling Results).

[136] **Ex 22** (Kendall p 32).

[137] *Id.* at 33.

35

by the unpermitted reduction in spray area overwhelms any soil retention of [sodium]. . . and wastewater essentially flushes right through the system."[138] Data from wells in Field 38 also show sodium is venting into the wetlands. Field 38 was placed into use in 2020 after years of not receiving discharges; subsequent dramatic increases of sodium concentrations were recorded in the monitoring wells in that field. The monitoring data also shows the sodium concentration flowing toward the wetlands.[139] Consistent with sodium increasing in the spray fields, Burnette's quarterly creek sampling show sodium levels essentially doubled starting in August 2021.[140] Consistently, ESLA documents higher chloride levels in Spencer Creek during Burnette's peak season compared to other times of the year.[141]

Corresponding high conductivity[142] in the creek corroborates pollution from Burnette's wastewater entering the creek.[143] ESLA began conductivity sampling in 2023. Spencer Creek shows unusually high conductivity for a freshwater stream, peaking during Burnette's high discharge season at levels GTB's aquatic biologist  has "never seen" in over 200 Michigan streams.[144] Typical streams test between 300 to 400 µs/cm; Spencer Creek reaches 600 to 1200 µs/cm during peak cherry season.[145] Notably, the baseline of conductivity in the creek rose between 2020 and 2021, coinciding with the rise in baseline sodium levels discussed above:[146]

---

[138] **Ex 23** (Kendal Rebuttal p 13).

[139] **Ex 22** (Kendall p 33); **Ex 11** (Kendall Rebuttal pp 9-10).

[140] **Ex 32** (2022 Site Status Report p 19); **Ex 35** (2025 Groundwater Monitoring Report p 14).

[141] **Ex 47** (ESLA 2023 Report p12); **Ex 48** (ESLA 2024 Report p 11).

[142] Conductivity – the ability of electricity to pass through water – is a common parameter to test for potential pollution.

[143] **Ex 80** (Surface Water Sampling - conductivity).

[144] *Id.;* **Ex 7** (Mays Dep p 25).

[145] *Id.*; **Ex 80** (Surface Water Sampling - conductivity).

[146] MET, Site Status Report, Aug. 26, 2024 (BFI00018702).

| Sample | Date | Temp (ºC) | pH | DO | COND (uS/cm) | BOD | Sodium | C |
|--------|------|-----------|-----|-----|--------------|-----|--------|---|
| EQ-2 | 2/25/20 | -- | 6.95 | 4 | 363 | <3 | 7.8 | |
| EQ-2 | 5/27/20 | -- | 7.01 | 4.84 | 353 | <7 | 15.8 | |
| EQ-2 | 8/27/20 | -- | 7.2 | 3.39 | 375 | <7 | 13.3 | |
| EQ-2 | 11/11/20 | -- | 7.74 | 5.13 | 332 | <10 | 11.8 | |
| EQ-2 | 2/23/21 | -- | 7.43 | <0.10 | 417 | <2 | 16.2 | |
| EQ-2 | 5/25/21 | -- | 7.44 | 4.78 | 506 | <7 | 13.4 | |
| EQ-2 | 8/26/21 | -- | 7.25 | 0.86 | 574 | <7 | 24.7 | |
| EQ-2 | 11/8/21 | 9.5 | 7.42 | 6.29 | 552 | <4 | 25 | |
| EQ-2 | 2/24/22 | 0.8 | 7.98 | 0.93 | 548 | <7 | 36.4 | |
| EQ-2 | 5/25/22 | 15 | 7.14 | 4.02 | 469 | <10 | 126 | |
| EQ-2 | 8/22/22 | 21.3 | 6.82 | 3.81 | 579 | <7 | 29.6 | |
| EQ-2 | 11/7/22 | 8.1 | 7.4 | 4.78 | 401 | <7 | 26.3 | |
| EQ-2 | 2/23/23 | 0.2 | 7.62 | 6.26 | 495 | <7 | 24.9 | |
| EQ-2 | 5/16/23 | 13.5 | 7.5 | 5.28 | 510 | <7 | 24 | |
| EQ-2 | 8/15/23 | 20 | 6.93 | 4.77 | 466 | <7 | 22.2 | |
| EQ-2 | 11/13/23 | 6.61 | 7.4 | 13.88 | 468 | <7 | 31.6 | |
| EQ-2 | 2/6/24 | 0.88 | 7.56 | 7.15 | 476 | <7 | 27 | |
| EQ-2 | 5/7/24 | 14.3 | 7.61 | 5.02 | 484 | <7 | 19.3 | |
| EQ-2 | 8/5/24 | 22 | 6.15 | 0.25 | 783 | 8 | 46.2 | |

Elevated sodium, chloride, and conductivity levels in the groundwater and creek indicate that Burnette's wastewater is flushing through the wetlands that connect them.

Finally, elevated E.coli levels have been detected in Burnette's wastewater, Spencer Creek, and Elk Lake.[147] ESLA began E.coli testing in the creek after an Elk Lake sampling event showed elevated levels near the creek outfall. While Burnette denied it was possible for E.coli to be in its wastewater,[148] testing showed very high E.coli levels in its wastewater in 2021 and

---

[147] **Ex 80** (Surface Water Sampling - E.coli).

[148] Burnette letter to EGLE, Jan. 10, 2022 (BFI0000122).

2023.[149] Further investigation in 2023 found damaged pipes in the Village's sewer lines combined with damage to Burnette's piping likely resulted in E.coli contamination of Burnette's discharges.[150] E.coli is another indicator that Burnette's polluted wastewater enters WOTUS.

For the reasons discussed above, Plaintiffs request the Court find Burnette's discharges pollutants to WOTUS from a point source without a proper permit, in violation of the CWA.

### B.  Plaintiffs are entitled to summary judgment on their MEPA claim.

The Michigan legislature enacted MEPA, MCL § 324.1701 *et seq*. in response to the constitutional directive that it "provide for the protection of the air, water, and other natural resources of the state from pollution, impairment and destruction." MICH. CONST. of 1963. art. IV, § 52. Reflecting the "paramount public concern" for conservation of natural resources, *id.*, MEPA confers a private right of action to seek declaratory and equitable relief against actions that have caused or are likely to cause environmental harm. MCL § 324.1701; *Ray v. Mason Cnty. Drain Comm'r,* 393 Mich. 294, 302-307; 224 N.W.2d 883 (1975); *Nemeth v. Abonmarche Dev*., 457 Mich. 16, 29; 576 N.W.2d 641 (1998) ( "the Legislature has clearly provided that the protection of the soil and water of this state" is of the upmost importance).

The MEPA statutory scheme imposes a shifting burden of proof. First, a plaintiff must make a "prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources, or the public trust in these resources…" *Preserve the Dunes, Inc. v. Mich. Dep't. of Envtl. Quality,* 471 Mich. 508, 514; 684 N.W.2d 847 (2004) (quoting MCL § 324.1703(1)). Once the plaintiff

---

[149] **Ex 77** (Wastewater E.coli results); **Ex 80** (Summary of Surface Water Sampling - E.coli).

[150] **Ex 14** (Kalchik Dep pp 200-03); **Ex 72** (Euster email to Hamade).

has established a prima facie case, the burden shifts to the defendant to either provide a rebuttal defense presenting evidence that it has not polluted, impaired, or destroyed the air, water, or other natural resources, or an affirmative defense by demonstrating there was no feasible or prudent alternative to its conduct and its conduct was consistent with the promotion of the public health, safety, and welfare in light of the state's concern with protecting Michigan's natural resources. MCL § 324.1703(1).

Plaintiffs are entitled to summary judgment because they have established their prima facie case, and Burnette has offered no evidence to support a rebuttal or affirmative defense.

### 1. *Burnette's repeated violations of pollution control standards in its GWDP establishes Plaintiffs' prima facie MEPA case, and Burnette has or is likely to pollute or impair state water resources.*

The first step in assessing a MEPA claim is determining whether there is an existing pollution control standard in a statute, regulation, or permit. *Nemeth*, 457 Mich. at 25; *Her Majesty the Queen in Right of Province of Ontario v. Detroit*, 874 F.2d 332, 337 (6th Cir. 1989). Burnette operates under a GWDP issued by EGLE pursuant to Part 31 of the Natural Resources and Environmental Protection Act ("NREPA"). MCL § 324.3101 *et seq*. As such, per MCL § 324.1701(2), the Court must determine whether the GWDP limits are "standards for pollution," considering the underlying statute's "provisions and purposes." *Nemeth*, 457 Mich. at 25.

The application, wastewater, and pollution limits in Burnette's GWDP are pollution control standards. Part 31 of NREPA requires EGLE to "establish pollution standards for lakes, rivers, streams, and other waters of the state" and allows the issuance of permits "that will assure compliance with state standards to regulate municipal, industrial, and commercial discharges or storage of any substance that may affect the quality of the waters of the state." MCL § 324.3106;

39

MCL § 324.3101(aa) ("waters of the state" includes groundwater). *See also* MCL § 324.3109(1) (prohibiting discharges of a substance that is or may become injurious to various interests in and uses of natural resources); MCL § 324.3109(6) ("[a] violation of this section is prima facie evidence of the existence of a public nuisance . . ."). The express purpose of the Part 31 permit is to establish wastewater requirements and conditions EGLE "considers necessary to prevent unlawful pollution." MCL § 324.3112(3). EGLE issues groundwater discharge permits that establish wastewater and pollution limits necessary to ensure any discharge will not be injurious to the environment, not cause runoff, ponding, erosion, or nuisance conditions, and not create a Part 201 facility. Mich. Admin. Code R, 323.2204(2). The GWDP expressly incorporates these standards and imposes numeric wastewater, groundwater, and land application limits subject to time, volume, and pollutant restrictions.

Once a court has identified a pollution control permit, the next step in a MEPA claim is to assess whether the Plaintiffs have established a prima facie case:

> A litigating party is said to have a Prima facie case when the evidence in his favor is sufficiently strong for his opponent to be called upon to answer it. A Prima facie case, then, is one which is established by sufficient evidence, and can be overthrown only by rebutting evidence adduced on the other side.

*Ray*, 393 Mich. at 309-10 (citing Black's Law Dictionary (4th ed.), p. 1353). Notably, "the necessary showing to establish plaintiff's prima facie is 'not restricted to actual environmental degradation but also encompasses probable damage to the environment as well.'" *Nemeth*, 457 Mich. at 25 (quoting *Ray*, 393 Mich. at 309). When – as here – a Defendant violates a pollution control permit, such a violation is "sufficient to constitute a prima facie case that the defendant's conduct has, or is likely to pollute, impair, or destroy the air, water or other natural resources."

*Dwyer v. Ann Arbor*, 79 Mich. App. 113, 123 (1977), rev'd on other grounds 402 Mich. 915 (1978).

Burnette's history of exceeding the permit's application volume and rate and pollutant limitations is incontrovertible. Indeed, EGLE cited Burnette for self-reported numeric violations application rate, volume and constituent pollutants[151] as well as violations of state water quality protection standards: the prohibition on wastewater ponding and runoff; the prohibition on using unauthorized water treatment additives; the requirement that the discharge not create a Part 201 facility – including in groundwater and adjacent wetlands; the lack of adequate crop cover; the unauthorized discharge of wastewater to surface waters (wetlands); and the unauthorized discharge of wastewater with excessive E.coli.[152] These violations are largely undisputed – they are based on Burnette's sampling, EGLE sampling, and EGLE observations substantiated by photographs and videos.

Plaintiffs have also made a prima facie showing that Burnette has violated MEPA in-fact based on substantial evidence that pollution, impairment, or destruction of natural resources exists or is likely. *City of Jackson v. Thompson-McCully Co, LLC,* 239 Mich. App. 482, 489; 608 N.W.2d 531 (2000) ("The trial court must independently determine whether pollution, impairment, or destruction exists or is likely.") (citing *Nemeth*, *supra*). Michigan defines "waters of the state" as "groundwaters, lakes, rivers, and streams. . . within the jurisdiction of the state." MCL § 324.3101(aa). It is uncontested that the groundwater beneath, wetlands adjacent to, and creek and lake downstream of Burnette's spray discharges are state water resources. Thus, any polluted wastewater reaching these resources violates MEPA.

---

[151] **Ex 81** (GWDP violations).

[152] **Exs 49, 50, 52, 53** (Violation Notices).

There is ample evidence supporting that Burnette's discharge has or is likely to pollute or impair waters of the state. First, Burnette's chronic violations of its permit discharge limits, its unilateral reduction in wetted acres, and ample sampling and other evidence discussed in the "Addition" section above support that Burnette's wastewater remains polluted when it is infiltrating the groundwater and migrating offsite and downstream. Second, macroinvertebrate studies indicate Spencer Creek can be an unhealthy creek compared to others in the watershed.[153] Third, metals present in the spray fields' soils are being mobilized by Burnette's high strength wastewater and likely impacting waters of the state.[154] Low oxygen levels in the groundwater resulting from Burnette's wastewater allows these metals to freely flow in the groundwater offsite and into the wetlands.[155]

Principally based on the GWDP violations, but also the evidence of pollution or impairment of waters of the state from Burnette's wastewater discharges, Plaintiffs have established a prima facie MEPA case.

### 2.   *Burnette failed to rebut Plaintiffs' prima facie case.*

Having established a prima facie MEPA claim, the issue turns to whether Burnette can present either a rebuttal or affirmative defense. MCL § 324.1703(1); *see Ray*, 393 Mich. at 311..

Burnette produced nothing in this case shows its conduct has *not,* nor is *likely* to pollute or impair Michigan's natural resources. It offered no credible or supported alternative theory for the documented pollution and impairment in the groundwater, wetlands, and Spencer Creek

---

[153] **Ex 6** (Smith Dep p 15).

[154] **Ex 52, 53** (2021, 2023 Violation Notice); **Ex 69** (EGLE Geologist Recommendations).

[155] **Ex 21** (Kendall pp 36-37).

downstream of Burnette's spray fields. And it offered no affirmative defense to demonstrate the lack of feasible or prudent alternatives to its conduct and that its conduct was consistent with the promotion of the public health, safety, and welfare in light of the state's concern with protecting Michigan's natural resources. MCL § 324.1703(1).

For these reasons, Plaintiffs are entitled to summary judgment on their MEPA claim.

## V.    CONCLUSION

For the foregoing reasons, there is no genuine issue of material fact as to Burnette's liability for Count I (CWA) and II (MEPA) of Plaintiffs' First Amended Complaint, and Plaintiffs respectfully ask the Court to grant summary judgment in their favor accordingly.


Respectfully Submitted,


Date: April 25, 2025                By: */s/ Nicholas Leonard*
                                        */s/ Scott Troia*
                                        Nicholas Leonard (P79283)
                                        Scott Troia (P82986)
                                        *GREAT LAKES ENVIRONMENTAL*
                                        *LAW CENTER*
                                        4444 Second Avenue
                                        Detroit, MI 48201
                                        313-782-3372
                                        nicholas.leonard@glelc.org
                                        scott.troia@glelc.org

                                        *Counsel for the Grand Traverse Band of Ottawa*
                                        *and Chippewa Indians; Watershed Center of*
                                        *Grand Traverse Bay; and Elk-Skegemog Lakes*
                                        *Association*

43

Date: April 25, 2025                By: */s/ William Rastetter*
                                    */s/ Rebecca Millican*
                                    William Rastetter (P26170)
                                    Rebecca Millican (P80869)
                                    *OLSON & HOWARD, PC*
                                    520 S. Union Street
                                    Traverse City, MI 49684
                                    (231) 946-0044
                                    bill@envlaw.com
                                    rebecca@envlaw.com

                                    *Counsel for the Grand Traverse Band of Ottawa
                                    and Chippewa Indians*


Date: April 25, 2025                By: */s/ Tracy Jane Andrews*
                                    Tracy Jane Andrews (P67467)
                                    *LAW OFFICES OF TRACY JANE ANDREWS,
                                    PLLC*
                                    420 E. Front Street
                                    Traverse City, MI 49686
                                    (231) 714-9402
                                    tja@tjandrews.com

                                    *Counsel for Grand Traverse Bay Watershed Center*


## CERTIFICATE OF SERVICE

I, Tracy Jane Andrews, hereby certify that on the 25th day of April 2025, I electronically filed the foregoing document with the ECF system, which will send a notification of such to all parties of record.


Date: April 25, 2025                By: */s/ Tracy Jane Andrews*
                                    Tracy Jane Andrews (P67467)
                                    *LAW OFFICES OF TRACY JANE ANDREWS,
                                    PLLC*
                                    420 E. Front Street
                                    Traverse City, MI 49686
                                    (231) 714-9402
                                    tja@tjandrews.com
                                    *Counsel for Grand Traverse Bay Watershed Center*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(d)(i)**

Counsel for Plaintiffs ascertained whether this motion for summary judgment on Plaintiffs' Counts I (CWA) and II (MEPA) will be opposed by Defendant, as required by L. Ci. R. 7.1(d)(i). Counsel for Defendant informed undersigned counsel that Defendant will oppose Plaintiffs motion.

Date: April 25, 2025                    By: */s/ Tracy Jane Andrews*
                                        Tracy Jane Andrews (P67467)
                                        *LAW OFFICES OF TRACY JANE ANDREWS, PLLC*
                                        420 E. Front Street
                                        Traverse City, MI 49686
                                        (231) 714-9402
                                        tja@tjandrews.com

                                        *Counsel for The Grand Traverse Bay Watershed Center*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(b)(i)**

This Brief complies with the word count limit of L. Ci. R. 7.2(b)(i). This brief was written using Microsoft Word Version 2503 and has a word count of 10,648 words.

Date: April 25, 2025                    By: */s/ Tracy Jane Andrews*
                                        Tracy Jane Andrews (P67467)
                                        *LAW OFFICES OF TRACY JANE ANDREWS, PLLC*
                                        420 E. Front Street
                                        Traverse City, MI 49686
                                        (231) 714-9402
                                        tja@tjandrews.com

                                        *Counsel for The Grand Traverse Bay Watershed Center*