UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

───────────────

GRAND TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS, GRAND
TRAVERSE BAY WATERSHED
INITIATIVE, INC., AND ELK-SKEGEMOG
LAKES ASSOCIATION,

          Plaintiffs,

v.

BURNETTE FOODS, INCORPORATED,

          Defendant.

Case No. 1:23-cv-00589

Hon. Jane M. Beckering

───────────────

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

**(Oral Argument Requested)**

i

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................................ iii

I.      INTRODUCTION .....................................................................................................1

II.     BACKGROUND .......................................................................................................2

        A.      BURNETTE'S SPRAY IRRIGATION SYSTEM IS FULLY PERMITTED BY EGLE. .............2

        B.      EGLE AND BURNETTE ARE FINALIZING AN ACO TO RESOLVE THE PAST
                PERMIT VIOLATIONS. ...................................................................................4

        C.      PLAINTIFFS ASSUME ROLE OF ENVIRONMENTAL REGULATOR. ................................5

                1.      TWC is an Advocacy Organization that Experienced No Harm From
                        Burnette.......................................................................................5

                2.      GTB's Corporate Representative Could Not Identify Any Injury
                        Suffered by the Tribe. ...................................................................8

                3.      ESLA Members Have Suffered No Injury.....................................9

III.    LAW AND ARGUMENT .......................................................................................13

        A.      STANDARD OF REVIEW. ..............................................................................13

        B.      PLAINTIFFS LACK ARTICLE III STANDING..........................................................14

                1.      TWC Lacks Standing......................................................................18

                2.      GTB Lacks Standing......................................................................19

                3.      ESLA Does Not Have Standing......................................................20

                4.      The Plaintiffs' Injuries are not Fairly Traceable to Burnette Foods'
                        Spray Field Operations. ...............................................................24

        C.      PLAINTIFFS LACK CWA STANDING. ..................................................................28

        D.      MICH. COMP. LAWS § 324.20137(6)'S BAR ON PRE-ENFORCEMENT REVIEW
                DEPRIVES THIS COURT OF SUBJECT-MATTER JURISDICTION OVER
                PLAINTIFFS' MEPA CLAIM. ...................................................................30

i

E.    THE COURT LACKS JURISDICTION TO AWARD PLAINTIFFS ANY RELIEF PURSUANT TO MEPA THAT CONFLICTS WITH THE PART 22 PERMIT ISSUED TO BURNETTE. ....................................................................................32

IV.    CONCLUSION.............................................................................................35

## <u>INDEX OF AUTHORITIES</u>

**<u>Cases</u>**

*Abnet v. Coca-Cola Co.*,
    786 F. Supp. 2d 1341 (W.D. Mich. 2011) ........................................................... 13, 31, 32

*Ailor v. City of Maynardville*,
    368 F.3d 587 (6th Cir. 2004) .......................................................................... 28

*Assoc. of Am. Physicians & Surgeons v. United States Food & Drug Admin.*,
    13 F.4th 531 (6th Cir. 2021) ..................................................................... 16, 28

*Bearden v. Ballad Health*,
    967 F.3d 513 (6th Cir. 2020) .......................................................................... 29

*Buchholz v. Meyer Njus Tanick, PA*,
    946 F.3d 855 (6th Cir. 2020) .......................................................................... 14

*Canadian Silica Indus., Inc. v. Sand Prod. Corp.*,
    1:20-cv-1229, 2022 WL 17225174 (W.D. Mich. Nov. 26, 2022) ................................... 14

*Carman v. Yellen*,
    112 F.4th 386 (6th Cir. 2024) ....................................................................... 24

*Fair Housing Ctr. of Metro. Detroit v. Singh Senior Living, LLC*,
    124 F.4th 990 (6th Cir. 2025) ....................................................................... 17

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ........................................................ 15, 16, 17, 19, 20, 28

*Fednav, Ltd. v. Chester*,
    547 F.3d 607 (6th Cir. 2008) .......................................................................... 29

*Genesco, Inc. v. Michigan Dep't of Envtl. Quality*,
    250 Mich. App. 45 (2002) ......................................................................... 14, 31

*Gwaltney of Smithfiled, Ltd. v. Chesapeake Bay Foundation, Inc.*,
    484 U.S. 49 (1987) ....................................................................................... 28

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ...................................................................................... 17

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ...................................................................................... 16

*Lakeshore Group v. State*,
    341310, 2018 WL 6624870 (Mich. Ct. App. Dec. 18, 2018) ..................................... 33

*Lakeshore Group v. State*,
    977 N.W.2d 789 (Mich. 2022) ....................................................................... 34

*Loren v. Blue Cross & Blue Shield of Mich.*,
    505 F.3d 598 (6th Cir. 2007) ........................................................................ 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................... 15, 24, 28

*Miller v. Thurston*,
    967 F.3d 727 (8th Cir. 2020) ........................................................................ 15

*Nestle Ice Cream Co. v. NLRB*,
    46 F.3d 578 (6th Cir. 1995) .......................................................................... 16

*Ohio Nat'l Life Ins. Co. v. United States*,
    922 F.3d 320 (6th Cir. 1990) ........................................................................ 14

*RMI Titanium Co. v. Westinghouse Elec., Corp.*,
    78 F.3d 1125 (6th Cir. 1996) ........................................................................ 14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................................... 14, 15

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..................................................................................... 16

*Tennessee Riverkeeper v. Waste Connections of Tenn., Inc.*,
    3:24-cv-00883, 2025 BL 73640 (M.D. Tenn. Mar. 6, 2025) ........................... 29

*Town of Chester v. Laroe Estates, Inc.*,
    581 U.S. 433 (2017) ..................................................................................... 15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..................................................................................... 15

*Turaani v. Wray*,
    988 F.3d 313 (6th Cir. 2021) ........................................................................ 23

*Ward v. Stucke*,
    21-3911, 2022 WL 1467652 (6th Cir. May 10, 2022) ......................... 28, 29, 30

*Ward v. Stucke*,
    3:18-cv-263, 2021 WL 4033166 (S.D. Ohio Sept. 3, 2021) ........................... 28

*White v. United States*,
    601 F.3d 545 (6th Cir. 2010) ........................................................................ 29

## **Statutes**

1969 PA 306 ................................................................................................................ 32

Mich. Comp. Laws § 24.201 ....................................................................................... 32

Mich. Comp. L-aws § 24.301 ...................................................................................... 33

Mich. Comp. Laws § 24.328 ....................................................................................... 32

Mich. Comp. Laws § 324.20101 ................................................................................. 32

Mich. Comp. Laws § 324.20101(vv) .......................................................................... 31

Mich. Comp. Laws § 324.20137(6) .............................................................. 13, 31, 32

Mich. Comp. Laws § 324.20137(7) .................................................................... 31, 32

Mich. Comp. Laws § 324.3101 ..................................................................... 30, 32, 34

Mich. Comp. Laws § 324.3106 ................................................................................... 30

Mich. Comp. Laws § 324.3109b ................................................................................. 30

Mich. Comp. Laws § 324.3112(5) .............................................................................. 32

Mich. Comp. Laws § 324.3115 ................................................................................... 30

## **Rules**

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 13

## **Regulations**

Mich. Admin. Code. R. § 323.2201 ............................................................... 30, 31, 32

## **Constitutional Provisions**

U.S. Const. Art. III, § 2 ........................................... 1, 13, 14, 16, 17, 18, 20, 23, 24, 28

## I.    __INTRODUCTION__

Burnette Foods, Incorporated ("Burnette") is a family-owned farming and food-processing company that has been operating in the Elk Rapids area for nearly a century.  Burnette's operation generates wastewater from rinsing fruit and other activities and that water is irrigated onto a hay field, owned by Burnette.  Burnette's irrigation system is fully permitted by the State of Michigan, and has operated since the 1970's.  Once irrigated, Burnette's wastewater evaporates, is absorbed by the hay crop, and/or eventually infiltrates the ground, as required by its aptly-named groundwater-discharge permit.

Plaintiffs Grand Traverse Band of Ottawa and Chippewa Indians ("GTB"), the Grand Traverse Bay Watershed Initiative, Inc., d/b/a The Watershed Center ("TWC"), and the Elk-Skegemog Lakes Association ("ESLA")—are not affected by these activities.  They do not own any property at or near Burnette's Spray Fields, they do not drink or use the groundwater (at the Spray Fields or anywhere), and they have otherwise failed to identify any injury-in-fact to themselves or in the case of ESLA, its members.  Indeed, the organizations' representatives have testified that they have suffered no direct injury, but instead, are motivated to pursue this litigation by a generalized desire to "protect the water."

While Plaintiffs' underlying theory of liability is pure conjecture (Plaintiffs have no evidence that any of Burnette's activities have affected any water body, anywhere, at any time), it does not matter because Plaintiffs have not suffered the concrete injury necessary to satisfy Article III standing in the first place.  Instead, Plaintiffs identify only "harms" that the United States Supreme Court has ruled insufficient, such as bystander concern, diversion-of-resources, and harm to mission statement.

Moreover, even if Plaintiffs had standing, their claim under the Michigan Environmental Protection Act ("MEPA") is subject to dismissal pursuant to the statute's bar on pre-enforcement judicial review.  This bar deprives courts of jurisdiction over citizen suits if the Michigan Department of Environment, Great Lakes, and Energy ("EGLE") has already chosen a "response activity" to address the underlying environmental concern.  EGLE has done just that, namely ordering Burnette to undertake a hydrogeological evaluation of the Spray Fields.  Indeed, EGLE and Burnette are in the final phase of executing an Administrative Consent Order ("ACO") resolving any alleged permit violations and implementing a response plan.  Accordingly, the bar on pre-enforcement judicial review forecloses Plaintiffs' MEPA claim.  Further, Plaintiffs have failed to substantiate the continuing violation necessary to trigger jurisdiction under the Clean Water Act and, pursuant to the Michigan Administrative Procedures Act, this Court also lacks jurisdiction to award any relief that adds to, or modifies, the parameters of the permit that Burnette possess under state law.

For these reasons, Burnette respectfully requests that the Court dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction.

## II.    BACKGROUND

### A.    BURNETTE'S SPRAY IRRIGATION SYSTEM IS FULLY PERMITTED BY EGLE.

Burnette Foods is an integrated farming and food-processing company based in Northern Michigan that grows, processes, and distributes fruits and vegetables.  Burnette operates a facility in Elk Rapids, Michigan, where it washes, cuts, and transforms fruit into shelf-stable products, such as applesauce, canned apples, and canned cherries.  *See, generally*, https://www.burnettefoods.com/ (last accessed April 13, 2025); Am. Compl. ¶¶ 45, 47 (ECF No. 16, PageID.15).

2

Burnette's fruit processing creates wastewater.  Am. Compl. ¶ 47 (ECF No. 16, PageID.15). However, this wastewater is not refuse.  Because of its prior use in fruit processing, the water contains nutrients suitable for irrigating crops.  So, to both dispose of its processing byproduct and to irrigate some of its crops, Burnette transports this water about a mile south of the Elk Rapids facility and sprays it on several agricultural fields (the "Spray Fields").  Burnette irrigates the Spray Fields in accordance with a groundwater discharge permit issued by EGLE.  ("the Groundwater Permit.").  Am. Compl. ¶ 54.  The Groundwater Permit allows Burnette to discharge 425,000 gallons of wastewater per day and 15,000,000 gallons per year into the Spray Fields.  *Id.*  Further, the Groundwater Permit *requires* Burnette to grow crops to facilitate the absorption of the wastewater and its nutrients. Groundwater Permit, JX 1 at BFI00000930 ("The system shall be seeded with a mixture of perennial vegetative cover").

Burnette has acknowledged violations of the effluent limits in its Groundwater Permit. These violations do not, as Plaintiffs allege, relate to unpermitted chemical discharges to the Spray Fields.  Burnette merely applied more wastewater to the fields than was allowed by the permit, but the manner and location of that application—spray irrigation to the Spray Fields—was expressly allowed by the permit.  For the last several years, Burnette has been developing a new multi-million-dollar wastewater treatment system, which is expected to be completed in 2025 (subject to any delays for the construction of additional treatment that may be required by EGLE). And EGLE has been involved at every step of the way, working in partnership with Burnette to address the irrigation at the Spray Fields.  *See* Am. Compl. ¶¶ 70, 72-77, 79, 81, 83-84 (describing various EGLE investigations that occurred in or before 2021).  Importantly, none of these Groundwater Permit violations involved any discharges to any Waters of the United States ("WOTUS"), and they relate in no way whatsoever to Plaintiffs.

3

**B.**    **EGLE AND BURNETTE ARE FINALIZING AN ACO TO RESOLVE THE PAST PERMIT VIOLATIONS.**

In October 2019, EGLE requested that Burnette undertake a hydrogeologic study of the Spray Field area to better understand the wastewater's interaction with groundwater.  03/29/2021 Letter from EGLE to Burnette, JX 54.  Multiple communications between EGLE and Burnette followed, which ultimately culminated in the exchange of a draft ACO.  *See, e.g.*, Draft ACOs, JX 55 and JX 56.  In these drafts, EGLE formalized its request for a hydrogeological evaluation, requiring the hydrogeological studies as part of the mandatory compliance program in each draft of the ACO.  See JX 55 at PLF-EGLE003530 ("BFI shall implement the Hydrogeological Study Plan…."), and JX 56 at PLF-EGLE003606-07("BFI shall implement the Hydrogeological Study Work Plan….").

Sarah McAuliffe, an enforcement specialist in the water quality enforcement division of EGLE and the case manager for EGLE's enforcement action against Burnette, confirmed that EGLE was already in enforcement with Burnette well before Plaintiffs filed their lawsuit. McAuliffe Dep 69:12-17, 154:4-25, JX 17.  In fact, EGLE's investigation of Burnette has lasted years and included several rounds of inspections, samplings, and internal discussions regarding potential changes to Burnette's practices and permit requirements.  *Id*. at 103:3-19.  Ms. McAuliffe confirmed that EGLE and Burnette are in the process of crafting an ACO, which is a "means to resolve the violations."  *Id*. at 82:8-14.  Ms. McAuliffe also described how the "compliance program" is "the section in the ACO that would house the corrective actions" required by EGLE. *Id*. at 72:18-20.

As part of EGLE's enforcement proceedings against Burnette and the ACO, EGLE has "demanded" that Burnette conduct "an evaluation of the hydrogeologic conditions at the Spray Fields."  *Id*. at 153:2-11.  Ms. McAuliffe described how the hydrogeologic evaluation was "part of

4

the compliance program" in the proposed ACO, which would "evaluate the impacts of the groundwater discharge" and thus "dictate further response activity" such as stricter effluent limits. *Id*. at 156:16-157:24.  Ms. McAuliffe explained that EGLE's position is that the hydrogeologic evaluation is "necessary to protect the natural resources in and around the Spray Fields" and that the pending version of the ACO still contains a requirement for such hydrogeologic studies.  *Id*. at 158:2-13.  Ms. McAuliffe testified that the ACO is currently in "management review" at EGLE and that she expects the ACO to be executed by the end of the year.  *Id*. at 117:14-120:3.  In tandem with the ACO,  EGLE is also issuing a new groundwater permit for Burnette, which would modify the company's discharge parameters.  *Id*. at 124:20-24.

### C.  PLAINTIFFS ASSUME ROLE OF ENVIRONMENTAL REGULATOR.

Plaintiffs believe they are better suited to oversee and regulate Burnette's water application than EGLE is, and have filed this lawsuit seeking to do just that.  In their Complaint, Plaintiffs have asked the Court to award injunctive relief to abate Burnette's wastewater discharges.  ECF No. 16, PageID.1644.  Put another way, Plaintiffs ask this Court to usurp EGLE's power and primacy as regulator and substitute their judgment for EGLE's. Plaintiffs, however, have no standing to enforce environmental law generally, and may only avail themselves of the federal courts to remedy a particularized concrete injury, fairly traceable to Burnette's activities.  As discovery has established, Plaintiffs cannot do so.

### 1.  TWC is an Advocacy Organization that Experienced No Harm From Burnette.

Burnette deposed Christine Crissman, TWC's Executive Director. Ms. Crissman confirmed that TWC is a "director-based corporation" that does not have shareholders.  Crissman Dep 8:3-6, JX 18.  TWC considers all of its "supporters" and folks who "financially contribute to . . . or volunteer" as "members."  *Id*. at 9:25-10:7; *see also* 10:8-10 ("**Q:** So, if I sent you 10 bucks you

would consider me a member? A: Yes").  These "members" do not have the right to vote on any of the TWC's activities or to elect TWC's leadership.  *Id*. at 8:21-24, 9:18-20.  There is never a meeting of TWC's supporters to determine any matter related to TWC.  *Id*. at 9:21-24.  Rather, the only benefit that TWC's alleged "members" receive is the furtherance of TWC's work.  *Id*. at 10:11-11:6.

Despite her organization's role as a key Plaintiff in this lawsuit, Ms. Crissman's actual behavior has demonstrated indifference to the alleged situation her organization vehemently claims is taking place at Spencer Creek.  Ms. Crissman could not be bothered to stop and look at the creek even once, despite living nearby:

> **Q:**     And you know exactly where this location is at Elk Lake Road, correct?
>
> A:      Yes.
>
> **Q:**     And in fact you live in Elk Rapids, correct?
>
> A:      Yes.
>
> **Q:**     And you haven't one time gotten out of your car to look at Spencer Creek?
>
> A:      No.
>
> **Q:**     Is that right?
>
> A:      Correct.
>
> **Q:**     And you've heard from ESLA that there's discoloration of the creek and foam in the creek, correct?
>
> A:      Yes.
>
> **Q:**     And you've made no effort to lay eyes on it yourself to see if that's accurate; is that right?
>
> A:      Correct.
>
> **Q:**     How often have you driven past Spencer Creek?
>
> A:      I drive by it probably once a day, maybe more.

*Id.* at 49:4-21.  She explained further that she "didn't have any reason" to stop and actually look at Spencer Creek.  *Id.* at 50:14-15.

When asked about the injuries that TWC had suffered due to Burnette's activities at its Spray Fields, Ms. Crissman could only articulate impacts arising from *this litigation* with Burnette—but could not refer to injuries stemming from Burnette itself.  As Ms. Crissman put it, TWC's "resources" are "impacted when we are called to look at one site very intensively."  *Id.* at 79:19-24.  Ms. Crissman is of course referring to the many site visits that TWC has taken to Spencer Creek *since the inception of this lawsuit.*  She goes on to discuss theoretical harms to reputation, but again, due only to this litigation: "And so our reputation and the public perception that people have about our organization is important to us and it's ***impacted through this litigation*** and the fact that we are communicating with our constituents about what we're doing and why."  *Id.* at 80:4-8 (emphasis added).

Burnette also deposed Heather Smith, who is TWC's "Waterkeeper" and was designated as TWC's corporate representative.  Ms. Smith confirmed that, although TWC sometimes refers to its donors as "members," TWC is "not a membership organization."  Smith Dep 83:19-84:3, JX 6.  Its donors are members of the general public who do not have a right to vote on TWC's governance or activities and TWC does not have shareholders or annual meetings.  *Id.*  When asked to identify how Burnette's alleged pollution has affected the TWC, Ms. Smith described harm to TWC's mission statement and a diversion of resources:

> A:    It's affected the Watershed Center in several ways.  It affects our mission.  Our mission is to protect clean water, our mission is to advocate for clean water in Grand Traverse Bay and preserve and protect the watershed, so any pollution is affecting clean water in the Grand Traverse Bay watershed.  It's affecting our resources.  It takes capacity, staff time to respond to this threat, affects our budget, it -- it affects our reputation in our community.  We need to spend time responding to citizens' questions about the pollution.  We're the watchdog organization and we have to think about

7

our reputation in the community when we're in a lawsuit, we're tackling a
big pollution issue.

Smith Dep 84:12-23, JX 6.  Ms. Smith and Ms. Crissman ultimately concluded that the only

impacts to TWC have been related to its mission, its diversion of resources to investigate and sue

Burnette, "public perception," and litigation expenses. Crissman Dep at 79:8-82:19, JX 18.

## 2. GTB's Corporate Representative Could Not Identify Any Injury Suffered by the Tribe.

Dan Mays is GTB's inland policy biologist and designated corporate representative, and

testified that GTB has hunting, fishing, trapping, gathering, and ceremonial rights in Elk Lake.

Mays Dep 10:18-23, JX 7.  GTB does not, however, have any rights in Spencer Creek because it

runs on private property.  *Id*. at 11:13-16.  GTB does not use Spencer Creek for any tribal activity.

*Id*. at 12:2-5, 31:23-25.  GTB does not know of any treaty-protected resource that has been

degraded because of Burnette's spray operations.  *Id*. at 15:15-25.  No tribal member has sought to

hunt or fish or gather on Elk Lake but has been unable to do so because of Burnette's activities:

> Q:    You're not aware of anybody, a tribal member, who has sought to hunt and
> fish or gather on Elk and they've been unable to do so because of
> Burnette Foods?
>
> A:    Not that I'm aware of.

*Id*. at 16:21-24.  Mr. Mays acknowledged that GTB has not advised any of its members to refrain

from enjoying their tribal rights in Elk Lake, Spencer Bay, or Spencer Creek:

> Q:    Has GTB advised any of its members to stay out of Elk Lake or Spencer
> Bay?
>
> A:    No.
>
> Q:    Has GTB issued any kind of health advisory or warning to any of its
> members related to Spencer Creek or Spencer Bay?
>
> A:    No.

8

> Q:  Has GTB cautioned any of its members against fishing or exercising any of their tribal rights in Spencer Bay?
>
> A:  No.
>
> Q:  Has GTB warned or advised any of its members to refrain from swimming or otherwise coming into contact with the water in Spencer Bay or Spencer Creek?
>
> A:  No.

*Id*. at 61:23-62:10.

### 3.    ESLA Members Have Suffered No Injury.

The current President of ESLA is George Seifried, and he testified just last month that the ELSA membership contains a significant number of people who "are looking for something to volunteer" for and may "feel a concern over the environmental quality of waters that they might be using."  Seifried Dep 10:11-19, JX 19.  But when it came to the specific issues facing ESLA's members, Mr. Seifried kept drawing blanks:

> Q:  Can you identify any member of ESLA who has stated a specific complaint related to Spencer Creek?
>
> A:  Of the 350 or so members, I cannot, no, I do not know that.
>
> Q:  Can you identify for me any member of ESLA that has identified any injury they've suffered as a result of Burnette Foods' spray operation?
>
> A:  Of the—of the large membership, I have not been contacted by any of them.

*Id.* at 41:9-17; *see also* 42:11-18 ("**Q:** To your knowledge have any ESLA members more generally, whether they live on Elk Lake or otherwise, have they identified any injury they have suffered as a result of Burnette Foods' spray operations?  A: I have not had any conversation like that.").

When asked about whether *anyone* had been unable to use either Spencer Creek or Elk Lake due to Burnette's Spray Field operation, Mr. Seifried similarly responded: "No one has

9

contacted me with any complaint like that." *Id.* at 42:23-43:1.  Financial damages are also nonexistent for ESLA members. *Id.* at 54:4-7 ("**Q:** So at least as you sit here today, you're not aware of any financial injury that any of the members have suffered as a result of Burnette Foods; correct? A: No one has brought it to my attention.").

Mr. Seifried, for his part, has only visited the Spencer Creek site once. *Id.* at 19:3-6.  He was unaware of any other board members having visited the site. *Id.* at 19:25-20:3.  However, when he was there, Mr. Seifried did not remember experiencing any unusual or foul odors in or around the Creek. *Id.* at 28:4-10.  He also did not observe anything abnormal or unnatural regarding the Creek itself.

ESLA also attached to its Amended Complaint the affidavits of two members (Gretel and Taylor), who purportedly suffered injury at the hands of Burnette.  During his deposition, however, Mr. Gretel explained that the "discoloration" he noted in his affidavit comes from "rotting leaves," not Burnette.  Gretel Dep 30:1-31:4, JX 8.  He lets his dog play near Spencer Creek and is not concerned if she "goes in the tannin water." *Id*. at 32:20-33:15.  He specifically disavowed that Burnette caused undesirable weed growth. *Id*. at 40:17-20.  And the "odors" that he complained of in his affidavit occurred in the 1980s. *Id*. at 34:16-35:1; see also 38:18-21 ("**Q:** So, over the last 20 years, have you experienced any foul odor, other types of odors coming from the wastewater system? A: No.").

Mr. Gretel has not experienced any issues with Spencer Creek in the past two decades:

**Q:**    Well, so really, to put a final point on it, just want to look at the last 20 years.  You're not aware of any problem with wastewater from the Burnette processing facility affecting the creek, is that right?

**A:**    I believe so, yes.

**Q:**    Meaning you haven't observed any of that wastewater affecting the creek, right?

A:      Not that I know of.  No.

*Id*. at 37:10-18; *see also* 39:12-16 ("**Q:** And at least the last 20 years or so, you are not aware of any sort of contamination coming from the Burnette Spray Fields affecting Spencer Creek or the lake, is that right?  A: At this time, yes.").  Mr. Gretel specifically denied that Burnette's spraying operations have any negative impact on his property:

> **Q:**      At present time, is Burnette Foods' spraying operation, is that negatively impacting you in any way?
>
> A:      No.
>
> **Q:**      It is not, correct?
>
> A:      Correct.
>
> **Q:**      And has that been true over the last 20 years or so?
>
> A:      Pretty much.

*Id*. at 40:3-11.  Mr. Gretel confirmed that Burnette Food's spray operations did not negatively impact his use and enjoyment of his riparian rights in Elk Lake and that he had not lost any rental income due to alleged pollution:

> **Q:**      Over the last 20 years, has the Burnette Foods Spray Field operation, has that in any way negatively impacted your use and enjoyment of Elk Lake?
>
> A:      No.
>
> **Q:**      And you rent cottages, correct?
>
> A:      Correct.
>
> **Q:**      And I assume you haven't lost any rental income or renters because of Burnette Foods, is that true?
>
> A:      Oh, no. No.

*Id*. at 44:4-14.  Mr. Gretel characterized Elk Lake (including Spencer Bay) as "pristine," "clear," "beautiful looking," and "one of the cleanest lakes."  *Id*. at 40:21-41:11.

Another riparian of Elk Lake and Spencer Creek, Mr. Taylor, explained that the odor he described in his affidavit does not interfere with the use of his property, Taylor Dep 34:1-18, JX 9. In fact, he admitted that he cannot smell the odor from either his house or his beach. *Id.* at 32:20-25. According to Mr. Taylor, the smell does not drive him away from the creek or cause serious reactions like gagging, difficulty breathing, or needing fresh air. *Id.* at 34:1-12. Mr. Taylor also admitted that any discoloration in Spencer Creek has not affected his use of Elk Lake for at least five years. *Id*. at 40:14-24. When questioned about his response to seeing the discoloration in the creek for apparently several decades, Mr. Taylor was nonchalant:

**Q:**    And the first time you went to ESLA was 2022?

A:    Yes. That was probably when it was at its worse. That was one of the—

**Q:**    So, what —what did you do about this concerning red color in the creek for the 30-some years before that?

A:    Nothing.

*Id.* at 10:18-23. Mr. Taylor's decades-long delay to take any action at all on the discoloration belies his assertion that he and his property are being injured. Indeed, Mr. Taylor confirmed that Burnette's spray operations has not affected him or his family in their use and enjoyment of this property. *Id*. at 40:25-41:3. Mr. Taylor even undermined his statement in his affidavit regarding his inability to clean out debris in the creek, agreeing that it was "fair" to say that his inability to clean it had "as much to do with time constraints" as with any fears of contamination in the creek. *Id.* at 51:5-13.

Finally, in regard to his claim in his affidavit detailing the peeling of paint off his boat motor, Mr. Taylor provided important context during his deposition:

**Q:**    And when did this happen, this paint incident?

A:    That was probably back in the '90s.

12

> **Q:** Oh, wow, okay.· Yeah, that wasn't in your affidavit, the time period, so you were reaching back into the '90s, okay.  So, in the 1990s, you recall having a boat on a boat lift and the motor in the water that coincided with a red discoloration event and when you pulled the boat motor out of the lake, you saw the paint peeling off?
>
> **A:** Yes.
>
> **Q:** And then you assumed that the red discoloration removed the paint on your motor?
>
> **A:** I assumed that, yes.

*Id.* at 54:12-24.  Curiously, Mr. Taylor's affidavit is ambiguous in terms of the date that this event occurred; in the context of the affidavit, the implication is clearly that the paint peeling issue was a current, or at least a recent problem.  *See* ECF No. 16-3, PageID.1680, Taylor Affidavit ¶ 18 ("I believe there is serious cause for concern when the discolored water takes the paint off the outdrive of my pleasure boat.").  Mr. Taylor did nothing about the paint peeling at the time, though (he did not even take a picture).  In his words, he "[didn't] recall taking any specific action in the '90s when that happened.  I think I just kind of raised an eyebrow and went on with my life."  Taylor Dep at 56:24-57:2, JX 9.

## III.    LAW AND ARGUMENT

### A.    STANDARD OF REVIEW.

Pursuant to Rule 12(b)(1), Burnette brings a factual attack on Plaintiffs' claims based on a lack of subject-matter jurisdiction.  The Court lacks subject-matter jurisdiction over this suit because no plaintiff has the Article III standing necessary to bring its claims in federal court.  *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007).  And even if Plaintiffs' have Article III standing, Plaintiffs' MEPA claim is barred by Mich. Comp. Laws § 324.20137(6), which strips courts of jurisdiction to consider MEPA claims if EGLE has selected a "response activity."  *Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341, 1347 (W.D. Mich. 2011)

("Courts have no subject matter jurisdiction to review [EGLE] decisions until the remedial activities deemed necessary by [EGLE] have been completed."); *see also Genesco, Inc. v. Michigan Dep't of Envtl. Quality*, 250 Mich. App. 45, 55-56 (2002).  Moreover, as detailed below, both CWA and MEPA contain statute-specific jurisdictional limits that apply here.

"Factual attacks challenge the actual existence of matters affecting jurisdiction." *Canadian Silica Indus., Inc. v. Sand Prod. Corp*., Case No. 1:20-cv-1229, 2022 WL 17225174, at *3 (W.D. Mich. Nov. 26, 2022) (citing *RMI Titanium Co. v. Westinghouse Elec., Corp*., 78 F.3d 1125, 1134 (6th Cir. 1996)).  "To resolve a factual attack, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  The existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id*. (internal quotation marks, brackets, and ellipses omitted.  "No presumption of truth applies in a 'factual attack' on subject matter jurisdiction." *Id*. (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.3d 320, 325 (6th Cir. 1990)).  Plaintiffs bear the burden of proof to establish subject-matter jurisdiction. *Id*.

### B.    PLAINTIFFS LACK ARTICLE III STANDING.

Article III "limits the judicial power to resolving actual 'Cases' and 'Controversies,' not theoretical questions." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020) (quoting U.S. Const. Art. III, § 2).  For a dispute to meet Article III's case-or-controversy requirement, a party must "have standing" to bring a claim. *Id*.  "Although the term 'standing' does not appear in Article III, our standing doctrine is 'rooted in the traditional understanding of a case or controversy' and limits 'the category of litigants empowered to maintain a lawsuit in federal court'.  The effect is to confine 'the federal courts to a properly judicial role.'" *Id*. at 861 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)).  Article III standing has three elements: a plaintiff

14

"must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338.  "[S]tanding is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).[1]

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id*. (internal quotation marks omitted).  To be concrete, the injury must "actually exist." *Id*.

For the particularized, concrete injury to be fairly traceable, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation marks, brackets, and ellipses omitted).  The traceability requirement is not met if the "links in the chain of causation" are "too speculative or too attenuated." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024).  To establish this causation, the plaintiff "must show a predictable chain of events leading

---

[1] Apparently anticipating that they may lack standing, Plaintiffs assert that if even one of them has standing, the Court can skip straight to the merits without examining the standing of the others.  (ECF No. 16, PageID.1619).  This is wrong.  "Each Plaintiff must establish standing[.]" *Miller v. Thurston*, 967 F.3d 727, 734 (8th Cir. 2020) (citing *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017)).  This requirement has real-world consequences in fee-shifting cases where there are multiple plaintiffs, each represented by separate counsel.  Under Plaintiffs' view, a CWA plaintiff could never have its standing determined, prevail on the merits at trial, and then receive an award of attorney's fees without the Court ever having jurisdiction over that plaintiff's claims in the first place.  Nonsense.

15

from the [defendant's] action to the asserted injury."  *Id*. at 385.  "The causation requirement is central to Article III standing" because it "screens out plaintiffs who were not injured by the [defendant's] action."  *Id*. at 384.

Plaintiffs TWC and ESLA are associations that are seeking to sue over injuries that their members have suffered.  *See* Am. Compl. ¶¶ 11, 12, 19.  The doctrine of "associational standing" sometimes allows these kinds of representational suits.  "An organization may sue on behalf of its members if it shows that: (1) its 'members would otherwise have standing to sue in their own right'; (2) the 'interests' that the suit 'seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Assoc. of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021).  A threshold requirement to invoke associational standing is that the association must actually have "members."  *See Nestle Ice Cream Co. v. NLRB*, 46 F.3d 578, 586 (6th Cir. 1995).  Although a formal membership is not required, the individuals that the organization purports to represent must possess "indicia of membership," including the ability to elect the organization's leadership; the ability to serve as organizational leadership,  and the need to pay a "mandatory assessment" of dues to further the organization's activities.  *Id*.  (discussing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344-45 (1977)).

To satisfy the first element of associational standing, an organization "must do more than identify a likelihood that the defendant's conduct will harm an unknown member in light of the organization's extensive size or membership base."  *Am. Physicians* 13 F.4th at 543 (citing *Summers v. Earth Island Inst*., 555 U.S. 488, 498-99 (2009)).  "The organization must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct."  *Id*. (citing *Summers*, 555 U.S. at 498-99).

16

Organizations like Plaintiffs may also "sue on their own behalf for injuries they have sustained." However, the Supreme Court recently clarified the organizational interests that satisfy Article III's injury-in-fact requirement. In *Alliance*, the Supreme Court confirmed that organizations "may not establish standing simply based on the intensity of the litigants' interest or because of strong opposition to the [defendant's] conduct." *Id*. at 394. A mere "setback to the organization's abstract social interests" is not enough. *Id*.; *see also Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) ("Article III standing is not to be placed in the hands of 'concerned bystanders,' who will use it simply as a vehicle for the vindication of value interests. No matter how deeply committed petitioners may be to upholding [water quality] or how zealous their advocacy, that is not a particularized interest sufficient to create a case or controversy under Article III.").

The Supreme Court also expressly rejected the argument that an organization can "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id*. If a diversion of resources was a sufficient injury, "all the organizations in America would have standing to challenge almost every [action] they dislike, provided they spend a single dollar opposing those [actions.]" *Alliance*, 602 U.S. at 395; *see also Fair Housing Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992-993 (6th Cir. 2025) ("*Alliance* thus clarified that the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing . . . It is not enough to broadly gesture toward a drain on an organization's resources and call it a day[.]"). "There must be something more—the court must find that the organization has . . . shown that the conduct challenged in the suit interfered with the organization's 'core business activities.'" *Singh Senior Living*, 124 F.4th at 992-993 (quoting *Alliance*, 602 U.S. at 395).

17

Applying these principles together, no plaintiff has Article III standing, either under an associational-standing theory or an organizational-theory standard, because none have established a sufficient injury-in-fact or traceability.

### 1.    TWC Lacks Standing.

TWC is a "director-based," not "membership-based," organization.  Crissman Dep 8:3-6, JX 18; Smith Dep 83:19-84:3, JX 6.  Although TWC sometimes colloquially refers to its donors as "members" these individuals do not elect the TWC's leadership, do not serve as TWC's leadership, do not vote on TWC's activities, and are not subject to a dues requirement.  Crissman Dep 8:21-24, 9:18-10:10, JX 18.  Accordingly, TWC's donors do not possess the "indicia of membership" necessary to sidestep association-standing's membership requirement.  Even if TWC had actual "members," TWC has not identified any member with any concrete particularized injury sufficient for that theoretical member to have standing.

TWC also lacks organizational standing.  According to its executive director, Ms. Crissman, TWC has not been impacted directly by Burnette's operations in any way.  *See id.* at 80:18-81:6 (stating that Burnette has not impacted TWC's property and litigation-related expenses are the only "indirect" monetary costs).  TWC does not own real property anywhere, much less near Burnette's operations.  Instead, TWC asserts standing based on the mission of the organization—as Crissman confirmed — "to advocate for clean water in Grand Traverse Bay and act to protect/preserve its waters."  *Id.* at 16:1-5.  Ms. Crissman admits that the alleged activities by Burnette do "impact a property owner in a different way than it's going to impact a group whose responsibility it is to make sure that that water is clean."  *Id.* at 89:7-15.  Curiously, however, for all TWC's talk of its "mission" and "responsibility" to ensure water is clean, this case is the only

18

lawsuit that TWC has filed in the last ten years.  ("**Q:** Has The Watershed Center filed other lawsuits in the past ten years? A: No, we have not."). *Id.* at 89:21-23.

The U.S. Supreme Court has foreclosed standing on bases asserted by TWC.  In *Alliance*, the Supreme Court stated plainly that it is "incorrect" to assert that "standing exists when an organization diverts its resources in response to a defendant's actions."  602 U.S. at 395.  Yet that is exactly what TWC has done here—claimed that it has been injured because "it does cost us money to be engaged in [this lawsuit]" including paying lawyers, experts, and monitoring costs. Crissman Dep at 82:8-20, JX 18.  This is the exact kind of resource diversion that *Alliance* foreclosed from establishing standing.  Accordingly, TWC lacks standing to bring this suit and its claims must be dismissed for lack of subject-matter jurisdiction.

### 2.    <u>GTB Lacks Standing.</u>

GTB asserts only organizational standing based on its treaty rights.  Am. Compl. ¶ 20, 27. But GTB's corporate representative, Mr. Mays, confirmed that no treaty rights extend to Spencer Creek because it runs through private property.  Mays Dep 11:13-16, JX 7.  He also testified that no treaty-protected resource has been degraded because of Burnette's spray operations and that no tribal member has sought to hunt or fish or gather on Elk Lake and has been unable to do so because of Burnette's activities.  *Id*. at 16:21-24 ("**Q:** You're not aware of anybody, a tribal member, who has sought to hunt and fish or gather on Elk Lake and they've been unable to do so because of Burnette Foods? A: Not that I'm aware of.").

Indeed, it did not appear that GTB could articulate *any* injury that Burnette had inflicted upon any member of the tribe.  Mr. Mays' testimony confirmed that GTB does not assert that Burnette has caused any fish kills in Elk Lake—as they "have not monitored for that." *Id.* at 15:23-25. Further, Mr. Mays admitted he "cannot specify" "anything specific that's been degraded

in the lake as a result of Burnette Foods' activities." *Id.* at 15:15-21.  Additionally, GTB was unable to identify a single pollutant at issue in this supposedly dire, ongoing contamination of their tribal fishing grounds:

> **Q:**  As you sit here today can you identify any specific contaminant that is in fact in Elk Lake as a result of Burnette Foods?
>
> A:  We have not tested, so I—no.

*Id.* at 23:8-11.

 This testimony—by GTB's own corporate representative—conclusively establishes that none of GTB's property or treaty rights have been impacted by Burnette.  Accordingly, GTB lacks Article III standing to invoke this Court's jurisdiction.

### 3.  <u>ESLA Does Not Have Standing.</u>

The only organizational harm that ESLA has identified in this case relates to "[t]he protection and improvement of the water quality of the Waterbodies" and "ensuring compliance with federal and state environmental laws and regulations."  Am. Compl. ¶ 26.  This is precisely the type of "setback to the organization's abstract social interests" that *Alliance* recently recognized as insufficient to establish organizational standing.  602 U.S. at 363.  Further, the President of ESLA testified as recently as last month that no ESLA members have identified any injury they have incurred due to Burnette Foods' spray operations, no ESLA members have been unable to use Spencer Creek or Elk Lake due to Burnette's operations, and that no ESLA members have financial damages resulting from Burnette's operations.  Seifried Dep at 42:11-18, 42:23-43:1, 54:4-7, JX 19.

Although Mr. Seifried couldn't identify any members affected by Burnette's irrigation system, ESLA's counsel obtained affidavits from members Mr. Gretel and Mr. Taylor and

submitted them with the Amended Complaint.  Both members were deposed, and neither offered any evidence of any concrete, particularized injury in fact, traceable to Burnette Foods.

While Mr. Gretel did discuss odors he had experienced on his property "at one point," he confirmed that those odors occurred "way back in the 80s."  Gretel Dep at 34:19-35:1, JX 8.  Mr. Gretel's affidavit also discusses discolored "tannin water" on several occasions.  ECF No. 16-2, PageID.1672.  Yet when asked about the nature of the discolored water at the outfall of Spencer Creek into Elk Lake, Mr. Gretel clarified that he understood the discoloration to be a natural process:

> Q:    Okay.· I mean, when—I'm trying to understand what you mean when you say tannin-colored.  I mean, you mean, like, a tea color?
>
> A:    Correct.· It's reddish-brown, put it that way.
>
> Q:    And did you say that—you thought that was from the leaves?
>
> A:    That's from the leaves rotting across the street from that swamp.
>
> Q:    Well, and that creek bed, when I was there, was full of leaves. Is that—
>
> A:    (Interposing) Correct.
>
> Q:    —Also have leaves in it? I mean, there's trees all over the whole area.
>
> A:    Correct. There is all this—always have leaves, plus you have rotting branches, dead trees in there.
>
> Q:    All right. And you believe that to be the cause of the tannin color?
>
> A:    Oh, correct.

Gretel Dep at 30:29-31:14, JX 8.  Of course, this statement directly contradicts his affidavit, which described the water near the outfall having an "unnatural discoloration"—clearly not what Mr. Gretel actually believes.  ECF No. 16-2, PageID.1672.

In fact, Mr. Gretel's disagreement with his own affidavit went even further—he explicitly disavowed his own affidavit on multiple occasions during his deposition, and instead affirmatively testified that he was not affected in any way by Burnette's operations.[2]  When asked about additional water flow through the creek, Mr. Gretel confirmed that "that would still be back 80s and early 90s.  Since then, there has been no problems that I know of."  Gretel Dep at 36:22-24, JX 8.  Mr. Gretel's affidavit discusses the staining of his boat, insinuating that Burnette's wastewater was the cause; Mr. Gretel's deposition confirms that this was just the result of contact with tannin-rich water.  ("**Q:** In your affidavit, you talked about some of the boats getting stains on them?  A: Correct.  **Q:** Do you remember that?  And is that from that tannin-colored water?  A: Correct.").  *Id.* at 39:17-22.  Mr. Gretel even goes as far as to say that Burnette is not affecting him *in any way*.  ("**Q:** At present time, is Burnette Foods spraying operation, is that negatively impacting you in any way?  A: No.").  *Id.* at 40:3-11.  Mr. Gretel also confirmed that in the last 20 years, Burnette's spraying operation did not impact his use or enjoyment of Elk Lake, or negatively impact his income from his rental properties.  *Id.* at 44:4-14.

Mr. Taylor's affidavit contains similar inconsistencies.  When asked to identify any specific injuries he was suffering as a result of Burnette's operations, Mr. Taylor recounted a story of paint peeling off his boat's motor.  According to Mr. Taylor, when he left his boat in the water during a discoloration event from Spencer Creek for several days, when he "raised the boat out of the water, the paint on the outdrive had been affected, taken off."  Taylor Dep at 53:10-12, JX 9.  Yet his affidavit failed to specify that this series of incidents took place "probably back in the 90s."  *Id.* at 54:13.

---

[2] Mr. Gretel's deposition testimony directly contradicted his sworn affidavit, which Plaintiffs attached to their Amended Complaint.  Plaintiffs have yet to correct the Court record and withdraw this false affidavit.

Mr. Taylor also claims to have experienced occasional odor and discoloration of the water in Spencer Creek.  However, odor does not appear to be a problem for others who visit the site. Dan Mays (GTB's Corporate Representative) did not experience such odors at the creek.  ("**Q:** Any time you've been to the creek, have you smelled strong odors? A: I have not.").  Mays Dep at 58:25-59:2, JX 7.  Neither did George Seifried (current President of ESLA).  ("**Q:** …do you recall smelling any sort of foul odor in the creek? A: I do not remember smelling anything unusual."). Seifried Dep at 28:7-10, JX 19.  The same was true for Heather Smith (TWC Corporate Representative).  ("**Q:** Do you have personal knowledge of any strong odors at the creek?  A: I have not detected strong odors at the creek.").  Smith Dep at 59:2-4, JX 6.  And even for Mr. Taylor, the smell only occurs in July, and only within 15-20 feet of the creek; even then, the smell is "noticeable" but "not enough" to force Mr. Taylor to avoid the creek. Taylor Dep at 32:4-22, 34:1-7, JX 9.  Such vague assertions of injury from odor do not satisfy Article III standing requirements.  Generalized allegations of harm are not enough without alleging specific, concrete facts showing a demonstrable injury. *Turaani v. Wray*, 988 F.3d 313, 317–18 (6th Cir. 2021).  Mr. Taylor has stated that he has noticed an odor on occasion, for one month out of the year, but has not described how such odors have created a "demonstrable injury."

Mr. Taylor has suffered no real injury by his own admission—Mr. Taylor confirmed that Burnette's operations do not currently impact his use and enjoyment of his property.  Taylor Dep at 40:14-41:3, JX 9 ("**Q:** Okay, so if we say over the last five years or so, has the red discoloration in the creek, has that affected your use of the lake? A: I—in—the answer to that question would be no because the boys and girls—the grandchildren now are adults and they just simply don't enter the water at that point, they go past the area where the discoloration occurs before they get into the lake.").  In sum, ESLA's "injuries" have not been demonstrated to be "concrete or

23

particularized," as necessary to satisfy Article III standing requirements.  *Lujan*, 504 U.S. at 560-61.

### 4.    The Plaintiffs' Injuries are not Fairly Traceable to Burnette Foods' Spray Field Operations.

Even assuming some unidentified odor and alleged "discoloration" impacted Plaintiffs, there is no evidence that these circumstances are fairly traceable to Burnette.  The party invoking federal jurisdiction must establish these elements commensurate with the burden of proof required at each stage of a litigation.  *Carman v. Yellen*, 112 F.4th 386, 399 (6th Cir. 2024) (internal quotations omitted).

The Burnette Spray Fields lie approximately one half-mile to over a mile away from Elk Lake.  Plaintiffs have done no actual testing to identify the cause or source of the discoloration.  Indeed, Plaintiffs have done next to no analysis of the discoloration and odors that they claim cause their complaints.  How can Plaintiffs reasonably claim to trace these issues back to Burnette if they do not even know the composition of what they are tracing?

For example, ESLA claimed that they know that Burnette is causing the odor in Spencer Creek.  When asked for the evidence to support that claim, they simply referred to violation notices Burnette has received from EGLE "[b]ased on Burnette Foods' DMRs, and their—the self-reporting data, and the—the many violations that they have."  Ogle Dep at 27:14-20, JX 5.  But when ESLA's corporate representative was asked to connect the dots between the data and explain how that data indicated the odor's cause, ESLA could not.  *Id.* at 27:21-23 ("**Q:** Okay.  Connect those things up to the odor.  Explain to me how those caused an odor.  A:  I cannot explain that.  That's beyond my expertise.").  ESLA similarly could not explain how the water was being discolored, or how the foam was being caused.  *Id.* at 34:7-13; 51:2-12.

Regarding alleged "discoloration," Plaintiffs have done nothing to trace that alleged visual observation to anything Burnette has done (other than posit that cherries are red and the creek water, half a mile away, sometimes has a reddish color):

> **Q:**  Have you ever seen any pictures of the cherry pulp?
>
> A:  I have many photos of some type of reddish to brown settleable solids in the creek.
>
> **Q:**  Okay.  And is it your testimony that that is cherry pulp?
>
> A:  It's not.  I don't know what it is.  I would say that it's an unnatural substance.
>
> **Q:**  Well, you would say that, but did you test it?
>
> A:  We did not.
>
> **Q:**  Why not?
>
> A:  I'm not sure.

*Id.* at 136:9-18.  GTB similarly did not test Elk Lake to establish the presence of the constituents they claim are present there.  Mays Dep at 23:8-11, JX 7.

Plaintiffs also cannot establish a fairly traceable connection between their alleged injuries and Burnette because they have done zero work to rule out other potential sources, as their hydrogeologist Dr. Kendall explains:

> **Q:**  Speaking of contaminants, do you know whether there are any contaminants that flow into the wetland from areas that are not owned by Burnette Foods?
>
> A:  I did not analyze those areas.  I know that there are a variety of, you know, fields of different types, some actively managed as orchards, others as hay fields, and I don't know how they're being managed.
>
> **Q:**  So, what, if any, contaminants flow into the wetland from the west or south or north—
>
> A:  Uh-huh.
>
> **Q:**  —you're not sure?
>
> A:  No.  That's right, I'm not sure.

25

Kendall Dep at 242:23-243:9, JX 11.    Despite many other agricultural operations in the area—including orchards bordering the western half of the Wetlands—Plaintiffs have not felt it necessary to analyze such other potential causes.

Similarly, it is generally accepted that discolored water and foam are the naturally occurring result of stormwater flowing through leaflitter and accumulated biological debris within a wetland or stream system.   Kendall Dep. 239:7-10 ("**Q:** Do leaves stain water?  A: Leaves do stain water, yes. **Q:** What color do leaves turn water?  A: Brown to black, typically."), JX 11; Rediske Report 10 ("The refractory humic, fulvic, and tannic compounds will produce foam and impart a brown stain to the water and paired with iron, the color can appear red to orange.  Iron bacteria will also grow on iron precipitates and from orange to reddish-orange mats on sediments and sheens on the water's surface (Brooks & Field, 2020)."), JX 13; *see also* EGLE, FOAM: A NATURALLY OCCURRING PHENOMENON, (available at https://www.michigan.gov/egle/about/organization/water-resources/glwarm/naturally-occurring-phenomena/foam) (last access April 23, 2025).

In other words, discolored effluent and foam are naturally occurring phenomena, routinely observed in wetlands and the waters into which they discharge.  These phenomena are common on Elk Lake itself.  For example, Google Earth clearly shows a plume of discolored water—fed by wetlands and an associated stream—discharging into another portion of Elk Lake approximately 5.5 miles south of the Spray Fields:



There is another creek-fed, wetland discharge of discolored water a little farther north:



Notably, those plumes emanate from creeks ("Battle Creek" and "Williamsburg Creek") and wetlands that are not adjoined by any Spray Fields, and yet they still exhibit even greater discoloration than what has been observed in any discharge from Spencer Creek.

Plaintiffs' reliance on correlation rather than causation is best captured by their "logical" theory that Burnette *must* be the cause of their injuries because "water flows downhill." Ogle Dep at 110:19-23, JX 5 ("**Q:** How do you know that the Chloride has actually in fact migrated from the Burnette spray irrigation field to the creek? A: That's logically what makes sense because water flows downhill."); Smith Dep at 46:5-15, JX 6. Further, Mr. Taylor asserts that Burnette is the cause of the discoloration simply because "cherries are red." Taylor Dep at 25:4-10, JX 9.

Plaintiffs' theory of causation is no more convincing than claiming that, because cherries are red and water flows downhill, Burnette is the source of their woes (which appear to be nothing more than vague and subjective descriptions of occasional odor and discoloration). Such theories cannot establish Article III standing. *Lujan*, 504 U.S. at 560-61. Plaintiffs have failed to show the "links in the chain of causation" are not speculative or attenuated, and so the traceability requirement is not met. *Alliance*, 602 U.S. at 383. Because ESLA cannot identify any member who has Article III standing to pursue its claims, ESLA cannot satisfy the first element of associational standing. *Assoc. of Am. Physicians & Surgeons,* 13 F.4th at 537.

C.    PLAINTIFFS LACK CWA STANDING.

"It is well established that the CWA does not permit citizens' suits for violations that were wholly in the past." *Ward v. Stucke* ("*Ward II*"), No. 21-3911, 2022 WL 1467652, at *3 (6th Cir. May 10, 2022) (citing *Gwaltney of Smithfiled, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57 (1987)); *see also, Ward v. Stucke* ("*Ward I*"), No. 3:18-cv-263, 2021 WL 4033166, at *5 (S.D. Ohio Sept. 3, 2021) (citing *Ailor v. City of Maynardville*, 368 F.3d 587, 596-97 (6th Cir. 2004) ("Citizens who bring CWA citizen suits only for past violations lack standing.")). In *Ward v. Stucke*, the 6th Circuit recently dismissed a CWA citizen suit for lack of standing based on its determination that the plaintiffs had failed "to carry their burden of setting forth specific facts

showing that there was a genuine dispute for trial regarding whether the alleged violation(s) are wholly past." 2022 WL 1467652, at *2.  The Court further described the manner in which a plaintiff could establish an ongoing violation, stating as follows:

> Litigants bringing citizen suits can establish an ongoing violation in two ways: "1) by proving violations that continue on or after the date the complaint is filed, or 2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."

*Ward II*, 2022 WL 1467652, at *3 (emphasis added).

In the present case, Plaintiffs merely alleged that they have a "good faith belief" that Burnette is in continuing violation of Section 301(a) of the CWA and its Groundwater Permit.[3] *See* Am. Compl. ¶ 111. Although a good faith belief may suffice to establish standing at the pleading stage, courts have consistently held that plaintiffs bear the burden of producing evidence sufficient to establish an ongoing violation following discovery.  *Tennessee Riverkeeper v. Waste Connections of Tenn., Inc.*, No. 3:24-cv-00883, 2025 BL 73640, at *5 (M.D. Tenn. Mar. 6, 2025); s*ee also, Bearden v. Ballad Health*, 967 F.3d 513, 518 (6th Cir. 2020) (quoting *Fednav, Ltd. v. Chester*, 547 F.3d 607, 617 (6th Cir. 2008) (standing "cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.")); *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010).

Plaintiffs unsupported allegation of a "good faith" belief that there are continuing violations of the CWA is not sufficient to establish standing.  Plaintiffs have not produced any evidence of an actual or alleged violation of the CWA after the date that this lawsuit was filed nor have Plaintiffs produced evidence from which a reasonable trier of fact could find a continuing

---

[3] Plaintiffs allegations of a "good faith" belief that Burnette violated its Groundwater Permit are completely irrelevant.  Violations of a groundwater discharge permit issued pursuant to state regulations would not constitute violations of the CWA.

likelihood of a recurrence in intermittent or sporadic violations.  As a result, Plaintiffs lack standing to assert a CWA citizen suit.  *See Ward II*, 2022 WL 1467652, at *3.

### D.    MICH. COMP. LAWS § 324.20137(6)'S BAR ON PRE-ENFORCEMENT REVIEW DEPRIVES THIS COURT OF SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' MEPA CLAIM.

In Count II, Plaintiffs bring a claim under Chapter 17 of the Michigan Natural Resources and Environmental Protection Act ("NREPA"), known as the Michigan Environmental Protection Act ("MEPA"), asserting that Burnette is violating its Groundwater Permit.  (ECF No. 16, PageID.1643).  However, because EGLE has already begun enforcement proceedings against Burnette for exceedances of its Groundwater Permit, Plaintiffs are not entitled to relief, pursuant to Michigan's bar on pre-enforcement judicial review.

EGLE has primary jurisdiction over the issuance and enforcement of groundwater permits and other environmental matters.  *See, e.g.,* Mich. Comp. Laws § 324.3106; Mich. Comp. Laws § 324.3115.  EGLE regulates groundwater using its Part 22 Rules.  The Michigan Part 22 Rules, Mich. Admin. Code. R. § 323.2201 et seq., are promulgated pursuant to Part 31 of NREPA, Mich. Comp. Laws § 324.3101 et seq.  Part 31 explicitly states that "[n]otwithstanding any other provision of this part, remedial actions that satisfy the requirements of Part 201 satisfy a person's remedial obligations under this part."  See Mich. Comp. Laws § 324.3109b.  The Part 22 Rules also indicate that response activities are conducted pursuant to Part 201 criteria.[4]

---

[4] See, e.g., Rule 2227(2), a Part 22 Rule that relies on response activities pursuant to Part 201: "If the department determines that a limit on the concentration of a substance in effluent or groundwater has been exceeded, then the department may require the discharger to undertake 1 or more of the following activities: (e) Define the extent to which groundwater quality exceeds the applicable criteria established by the department under section 20120a(1)(a) of the act, if applicable, or under section 21304(a) of the act, if applicable; and (k) Remediate contamination to comply with the terms of section 20120a and b of the act, if applicable, or section 21304(a) of the act, if applicable."

30

In other words, response activities for violations of Part 22 are conducted pursuant to Part 201. Part 22 adopts and incorporates by reference Part 201 standards for response activities. Although MEPA contemplates that private citizens may sue for environmental violations, consistent with EGLE's primary jurisdiction, Michigan law deprives courts of subject-matter jurisdiction over private suits when EGLE has already responded to the alleged violation.

Except in limited circumstances not applicable here, Part 201 provides that "[a] state court does not have jurisdiction to review challenges to a response activity selected or approved by [EGLE] under this part or to review an administrative order issued under this part[.]" Mich. Comp. Laws § 324.20137(6). Rather, "judicial review" of EGLE's response "is delayed until after response activity is completed." *Genesco, Inc.*, 250 Mich. App. at 55; *see also* Mich. Comp. Laws § 324.20137(7). Both this Court and the Michigan Court of Appeals have confirmed that this bar on pre-enforcement review applies to claims arising under MEPA. *Abnet*, 786 F. Supp. 2d 1341, 1347 (citing *Genesco*, 250 Mich. App. at 55-56). This bar extends to requests "for injunctive relief which would require additional remedial actions." *Id.*

The term "response activity" is defined broadly, and includes any "**evaluation**, interim response activity, remedial action, demolition, providing an alternative water supply, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment or the natural resources." Mich. Comp. Laws § 324.20101(vv) (emphasis added).

As part of EGLE's enforcement proceeding against Burnette, EGLE is requiring that Burnette conduct "an evaluation of the hydrogeologic conditions at the Spray Fields[.]" McAuliffe Dep. 153:8-11, JX 17. This evaluation falls squarely within Mich. Comp. Laws § 324.20101(vv)'s definition of "response activity." EGLE has also conducted a years-long investigation and, based

on its expertise, it has drafted an ACO that addresses Burnette's alleged issues.  This ACO is (or will be) an "administrative order" under Mich. Comp. Laws § 324.20101.

EGLE had selected an initial response activity in the form of the hydrogeologic study. Because Part 31 adopts Part 201's standards for "remedial actions" throughout, the selection of a response activity for a Part 22 violation triggers Part 201's bar on pre-enforcement judicial review. Put simply, Plaintiffs ask this Court to swoop in at the last minute; upend these years of effort, and disturb EGLE's expertise as to the appropriate measures to take at Burnette's Spray Fields. *They are literally asking for additional forms of injunctive relief*, which is expressly prohibited. *Abnet*, 786 F. Supp. 2d at 1341.  This sort of judicial second-guessing is precisely what Mich. Comp. Laws § 324.20137(6) is meant to prevent.  Because EGLE has already chosen a "response activity" and is on the cusp of issuing an "administrative order," this Court lacks jurisdiction over Plaintiffs' MEPA claim.  To the extent that Plaintiffs disagree with EGLE's judgment, their remedy is post-enforcement review by a state court.  *See* Mich. Comp. Laws § 324.20137(7).

### E.    THE COURT LACKS JURISDICTION TO AWARD PLAINTIFFS ANY RELIEF PURSUANT TO MEPA THAT CONFLICTS WITH THE PART 22 PERMIT ISSUED TO BURNETTE.

EGLE renewed Burnette's Groundwater Permit on June 1, 2017 pursuant to Part 31 of MEPA. (Permit No. GW1810211v.2).  Part 31 specifies the correct procedure for challenging the terms of permits at Mich. Comp. Laws § 324.3112(5), which provides that  "A person who is aggrieved . . . by the reissuance, modification, suspension, or revocation of an existing permit of the department executed pursuant to this section may file a sworn petition . . . requesting a contested case hearing on the matter pursuant to the administrative procedures act of 1969, 1969 PA 306, Mich. Comp. Laws § 24.201 to § 24.328" within 60 days after the issuance of the permit. (emphasis added).

Pursuant to the express terms of the Michigan Administrative Procedures Act ("MAPA") any challenge to the terms of an existing permit is not subject to judicial review until such time as the challenging party (1) has exhausted all administrative remedies; and (2) is aggrieved by a final decision or order in a contested case. Mich. Comp. Laws § 24.301.  Plaintiffs failed to exhaust their administrative remedies by requesting a contested case within 60 days of the issuance of the Groundwater Permit <u>and</u> are not aggrieved by a final decision or order from a contested case.  As a result, Plaintiffs are clearly precluded from seeking to challenge the terms and conditions of the permit pursuant to MAPA.

Rather than following the procedures prescribed by the Michigan Legislature, Plaintiffs now seek injunctive relief from this Court under MEPA that is directly related to the terms and conditions of the Groundwater Permit.  (ECF No. 16, PageID.1644).   Michigan courts have previously rejected attempts to use MEPA to circumvent the permit appeal process.  In *Lakeshore Group v. State*, No. 341310, 2018 WL 6624870 (Mich. Ct. App. Dec. 18, 2018),  the Michigan Court of Appeals rejected plaintiffs' MEPA claim seeking to challenge a permit  issued under the Sand Dunes Protection and Management Act (the "SDPMA").  The Court of Appeals explained its rationale, stating as follows:

> Our Legislature created a bifurcated scheme for challenging a project like the one at issue here.  <u>A plaintiff can challenge the MDEQ's permitting decision at the administrative level with limited judicial review. MCL 324.35305(1); MCL 24.201 et seq.  A plaintiff can also challenge the permit holder's actual conduct in a separate lawsuit without having to go through any administrative review. MCL 324.1701. What a plaintiff cannot do, however, is challenge the MDEQ's permitting decision in a lawsuit without first going through the administrative review process.  With this lawsuit, plaintiffs tried to by-pass the administrative review process, and, accordingly, the Court of Claims properly granted summary disposition to the MDEQ under MCR 2.116(C)(8)</u>.

*Id.* at *3 (emphasis added).

33

The Michigan Supreme Court subsequently denied plaintiffs application for leave to appeal in *Lakeshore Group v. State*, 977 N.W.2d 789 (Mich. 2022).  The concurring opinion from Justice Bernstein explained that the statutory permit appeal process was controlling as follows:

> When read together, it appears that MEPA provides general authorization for challenging a permitting decision, while the SDPMA provides specific authorization to challenge permitting decisions made under the SDPMA.  Accordingly, we apply the well-established canon of statutory interpretation that holds that, in the event of a conflict, the more specific provision controls over the more general one. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645; 132 S. Ct. 2065; 182 L. Ed. 2d 967 (2012) (explaining that the canon has full application to statutes "in which a general authorization and a more limited, specific authorization exist side by side"); *TOMRA v. Dep't of Treasury*, 505 Mich. 333, 350; 952 N.W.2d 384 (2020). Because the SDPMA presents the more specific pathway to challenging permits authorized under the SDPMA and MEPA does not expressly state that an individual may use MEPA provisions to challenge SDPMA permits, plaintiffs' MEPA action must fail. Otherwise, MEPA would seemingly create a workaround through which: (1) the statutory restrictions on who may challenge SDPMA permits would be rendered meaningless; (2) no permit challengers would be motivated to file their challenges within the DEQ as the SDPMA requires, if they could get a more favorable standard of review by raising a MEPA challenge; and (3) the DEQ's expertise, which the SDPMA appears to rely on by requiring SDPMA permit challenges to originate within the DEQ, would be absent from the circuit court's primary review of the record.

*Lakeshore Group v. State*, 977 N.W.2d 789 (Mich. 2022) (concurring opinion) (emphasis added).

Plaintiffs failed to challenge the issuance of Burnette's Groundwater Permit under the procedures prescribed by both Part 31 and MAPA, and are now foreclosed from doing so under MEPA.  Accordingly, the court does not have jurisdiction to award declaratory or injunctive relief that conflicts with or seeks to modify the terms or conditions of the Groundwater Permit—Plaintiffs sole forum for such relief was through the permit appeal process provided by applicable law as set forth above.

IV.  **CONCLUSION**

For these reasons, Burnette respectfully requests that this Court dismiss Plaintiffs' Complaint.

**VARNUM LLP**
*Attorneys for Defendant*

Dated:  April 25, 2025

By: */s/Neil E. Youngdahl*
Aaron M. Phelps (P64790)
Matthew B. Eugster (P63402)
Neil E. Youngdahl (P82452)
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
amphelps@varnumlaw.com
mbeugster@varnumlaw.com
neyoungdahl@varnumlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 25, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Neil E. Youngdahl*

Neil E. Youngdahl (P82452)
