UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

GRAND TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS, GRAND
TRAVERSE BAY WATERSHED
INITIATIVE, INC., AND ELK-SKEGEMOG
LAKES ASSOCIATION,

        Plaintiffs,

v.

BURNETTE FOODS, INCORPORATED,

        Defendant.

Case No. 1:23-cv-00589

Hon. Jane M. Beckering

## **DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

### **(Oral Argument Requested)**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES..................................................................................................iii

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND .....................................................................................................3

       A.     AGRICULTURAL ACTIVITY AT THE SPRAY FIELDS AND BURNETTE'S
              OPERATIONS. ...............................................................................................3

       B.     PLAINTIFFS MANUFACTURE THIS LAWSUIT. .............................................6

       C.     PLAINTIFFS ADOPT AN UNTENABLE POLLUTANT-MIGRATION THEORY, THEN
              FAIL TO SUPPORT IT. ................................................................................12

III.   LAW AND ARGUMENT .....................................................................................18

       A.     APPLICABLE LAW. .....................................................................................18

       B.     PLAINTIFFS CANNOT PROVE A POINT-SOURCE DISCHARGE OR ITS
              FUNCTIONAL EQUIVALENT. ......................................................................19

              1.     The Irrigated-Agriculture Exception Applies. ...........................20

              2.     Plaintiffs Cannot Establish the Functional Equivalent of a Point-
                     Source Discharge. .......................................................................24

                     a.     Maui's Background Principles. ......................................24

                     b.     Discharges to the Spray Fields are not the Functional
                            Equivalent of a Direct Discharge Under the Maui Factors............26

                            i.      "Transit Time." ...................................................26

                            ii.     "Distance Travelled" ............................................27

                            iii.    "The Nature of the Material Through which the
                                    Pollutant Travels" ...............................................28

                            iv.     "The Extent to which the Pollutant is Diluted or
                                    Chemically Changed as it Travels".....................29

                            v.      "The Amount of Pollutant Entering the Navigable
                                    Waters Relative to the Amount of the Pollutant that
                                    Leaves the Point Source" .....................................33

vi.    "The Manner By or Area in Which the Pollutant Enters the Navigable Waters" ............................................37

vii.    "The Degree to Which the Pollution (At that Point) has Maintained its Specific Identity" .................................38

C.    THE WETLANDS ARE NOT WOTUS. ........................................................38

1.    Plaintiffs Cannot Establish that Spencer Creek is a WOTUS....................39

2.    Plaintiffs Cannot Establish a Continuous Surface Connection to a WOTUS, Such That It Is Difficult to Distinguish the Wetlands from the WOTUS. ..............................................................46

D.    IF THE COURT GRANTS SUMMARY JUDGMENT ON PLAINTIFFS' CWA CLAIM, IT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' MEPA CLAIM ..............................................................48

IV.    CONCLUSION......................................................................................49

## INDEX OF AUTHORITIES

**Cases**

*Burgess v. Fischer,*
　　735 F.3d 462 (6th Cir. 2013) .............................................................. 18

*Conservation Law Foundation, Inc. v. Town of Barnstable,*
　　615 F. Supp. 3d 26 (D. Mass. 2022) ................................................. 25

*County of Maui v. Hawaii Wildlife Fund,*
　　590 U.S. 165 (2020)........................................ 20, 24, 25, 26, 28, 29, 31, 33, 35, 36, 37, 38

*Courte Oreilles Lakes Assoc. v. Zawawistowski,*
　　24-cv-128, 2025 WL 993525, -- F. Supp. 3d -- (Feb. 7, 2025) .................................. 20, 21

*Gamel v. City of Cincinnati,*
　　625 F.3d 949 (6th Cir. 2010) .............................................................. 49

*Hawai'i Wildlife Fund v. Cnty. of Maui,*
　　550 F. Supp. 3d 871 (D. Haw. 2021)................................................. 28

*Hawai'i Wildlife Fund, Non-Profit Corp. v. Cnty. of Maui,*
　　24 F. Supp. 3d 980 (D. Haw. 2014)............................................. 36, 37

*Hiebenthal v. Meduri Farms,*
　　242 F. Supp. 2d 885 (D. Or. 2002) ................................................. 21

*Jakubowski v. Christ Hosp., Inc.,*
　　627 F.3d 195 (6th Cir. 2010) .............................................................. 19

*Lewis v. United States,*
　　88 F.4th 1073 (5th Cir. 2023) ............................................................ 47

*Minadeo v. ICI Paints,*
　　398 F.3d 751 (6th Cir. 2005) .............................................................. 19

*Pacific Coast Fed. of Fisherman's Assoc. v. Glaser,*
　　945 F.3d 1076 (9th Cir. 2019) ...................................................... 20, 21

*Parkser v. Scrap Metal Processors, Inc.,*
　　386 F.3d 993 (11th Cir. 2004) ............................................................ 19

*Ragsdale v. JLM Construction Services, Inc.,*
　　737 F. Supp. 3d 449 (W.D. Tex. 2024)............................................. 40, 41, 46

*Rapanos v. United States,*
　　547 U.S. 715 (2006)....................................................................... 40, 41

*Sackett v. EPA,*
    598 U.S. 651 (2023) ............................................................... 39, 40, 41, 46, 48

*Stone v. High Mountain,*
    89 F.4th 1246 (10th Cir. 2024) ........................................................... 26

*United States v. Sharfi,*
    2024 WL 4483354 (S.D. Fla. Sept. 21, 2024) ...................................... 41, 47, 48

*Waterkeeper Alliance, Inc. v. EPA,*
    399 F.3d 486 (2d Cir. 2005) ............................................................... 23

**Statutes**

28 U.S.C. § 1367(a) ...................................................................................... 49

33 U.S.C. § 1362(6) ...................................................................................... 20

33 U.S.C. § 1362(14) ................................................................................. 19, 31

Mich. Comp. Laws § 323.2201 ......................................................................... 24

Mich. Comp. Laws § 324.3101 ......................................................................... 24

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................... 18

## I.    INTRODUCTION

This dispute began in a gully near Elk Lake known as "Spencer Creek." It would be generous to describe this area as a "creek." It is more like a drainage ditch, comprised of a network of culverts and pipes that run underground, beneath garages and cottages, and occasionally in open channels. According to members of Plaintiff Elk-Skegemog Lakes Association ("ESLA"), some of whom have lived on Elk Lake for over 40 years, the "creek" is completely dry many months of the year and only flows because of snow melt or other precipitation events.

Enter Samantha Ogle. Ms. Ogle is an environmental activist affiliated with Grand Traverse Bay Watershed Initiative, Inc., d/b/a The Watershed Center ("TWC"). Several years ago, Ms. Ogle noticed foam at Spencer Creek (Michigan's Department of Environment, Great Lakes and Environment ("EGLE") says foam is a natural occurrence). To her eye, the water was unnaturally reddish in color (though other of Plaintiffs' witnesses describe it as brown or tannin colored). Ms. Ogle also claimed a foul odor, noticeable from 40 feet away, was coming from the water (she is the only witness to allege that). She even saw a one-eyed frog (which no one else has seen and she did not photograph). Ms. Ogle decided to investigate these phenomena herself and began periodic water testing.

Ms. Ogle's testing revealed nothing that would not otherwise be expected in water flowing directly from a wetland. For example, the dissolved oxygen ("DO") levels that Ms. Ogle found troubling were in the range of 3.09-10.04 mg/l, as set forth in her 2023 report. Even though some of those samples were below the state water quality standard she cited, she was measuring water flowing from a wetland, where DO concentrations will necessarily be low. Spencer Creek is not a rapid-flowing stream (often it does not flow at all) and is full of organic material that negatively impacts DO concentrations, so low DO is to be expected. Ms. Ogle also detected *E. coli,* which

alarmed her, but it shouldn't have. *E. coli* is naturally occurring everywhere, especially in areas frequented by deer and other warm-blooded wildlife. In fact, the photos and video evidence produced by Plaintiffs showed that *E. coli*-producing wildlife was present during their investigations. Ms. Ogle also thought chloride was high, but she was testing an area immediately adjacent to a road that is covered in chloride (road salt) by the local road commission every winter.

Nevertheless, these unremarkable and easily explained test results were communicated to TWC and ESLA as serious threats to water quality and the search for a cause began. As they scanned the area, Defendant Burnette Foods, Incorporated ("Burnette") immediately became the leading (and only) suspect. Burnette irrigates its food processing wastewater on fields a half mile away. Burnette's wastewater, like all process wastewater, was low in DO. Some testing showed *E. coli* and some of the other common constituents detected by Ms. Ogle. Most damning of all, Plaintiffs concluded that because Burnette sometimes processes cherries (which are, of course, red) and since water in the creek is sometimes reddish (at least according to Ogle), Burnette must be the cause.

Ultimately, Plaintiffs failed to substantiate that Burnette was the source of any alleged environmental impacts whatsoever. However, driven by confirmation bias and a "correlation proves causation" theory, Plaintiffs filed this lawsuit. Never mind that Burnette's operation is fully permitted by EGLE, or that the irrigation fields are separated from any adjacent waterbodies (and therefore Spencer Creek and Elk Lake) by a five-foot berm (also required by EGLE).

As much as Burnette is prepared to defend its practices, this case should not come to that because none of this is within the narrow jurisdiction of the Clean Water Act ("CWA") to begin with. The undisputed facts show that Burnette sprays its wastewater onto a hay field that is clearly used for agricultural purposes, and not into any surface water. The CWA expressly exempts this

2

type of land application. But even if Burnette's land application were not exempt, Plaintiffs would still need to show a direct discharge (or the functional equivalent) into a "water of the United States" ("WOTUS"). Plaintiffs contend that the qualifying WOTUS is a nearby wetland, but that depends on the oft-dry drainage ditch known as "Spencer Creek" being a WOTUS in its own right. It surely is not. And even if the wetlands are WOTUS, Plaintiffs have not established that pollutants from Burnette's irrigation system actually enter WOTUS, instead hoping that their conjecture and simplistic logic carries the day. Burnette is entitled to summary judgment on Plaintiffs' CWA claim.

Plaintiffs also state a claim under the Michigan Environmental Protection Act ("MEPA"), but this state law claim should be dismissed for lack of jurisdiction (as explained in Burnette's contemporaneously filed motion to dismiss), or the Court should otherwise decline to exercise jurisdiction once the single federal claim in this case is dismissed.

## II. BACKGROUND

### A. AGRICULTURAL ACTIVITY AT THE SPRAY FIELDS AND BURNETTE'S OPERATIONS.

Prior to 1977, the Elk Rapids Packing Company ("ERPC") owned and operated a fruit-processing facility in Elk Rapids, Michigan. In 1977, Burnette acquired an equity interest in ERPC and, in 1985, ERPC merged into Burnette. Sherman Aff. ¶ 6, JX 57. ERPC's facility became Burnette's Elk Rapids' facility (the "Facility") *Id.*

When Burnette first became involved in ERPC in 1977, wastewater from the facility was stored in a lagoon approximately one mile south of the Facility. *Id.* at ¶ 7; Ex. A to Sherman Affidavit. Jack White, the farmer that owned the agricultural field adjacent to the lagoon, used ERPC's wastewater for irrigation because the wastewater "was rich in nutrients" and "[t]he availability of wastewater for irrigation obviated the need to install irrigation wells to extract

3

groundwater." *Id.* at ¶ 11-12.  Fruit-processing wastewater shares constituents with commercial fertilizers, such as nitrogen and phosphorus.  Farmer White "never expressed any concerns about the quality or quantity of the wastewater and acknowledged that his crops grew better because of the irrigation using [Burnette's] water." *Id.* at ¶ 12.

Farmer White farmed and irrigated his fields near the lagoon using Burnette's wastewater for more than fifteen years.  *Id.* at ¶ 10, 13.  In 1995, Burnette acquired title to these fields from Farmer White.  *Id.* at 13.  Farmer White's former fields are Burnette's current Spray Fields.  *Id.*

For more than 50 years, the Spray Fields have been used for agricultural purposes.  *Id.* at ¶ 14.  Currently, Burnette grows a hay mixture that is comprised of "20 percent alfalfa hay, 30 percent brome grass hay, 20 percent timothy and 30 percent orchard grass hay."  Kalchik Dep. 122:6-13, JX 14.  This hay mixture is a "perennial plant," which means that it re-grows each year without the need to replant after a harvest.  *Id.* at 122:14-123:5.  Burnette monitors the hay and, when the timing is right based on growth and precipitation events, mows the hay, allows it to cure and dry, and then bales it.  *Id.* at 124:22-125:17.  Based on records kept in the ordinary course of Burnette's business activities, the Spray Fields produce hundreds of hay bales each year:

| Year | Cumulative Number of Hay Bales | Citation – (JX 59) |
|------|-------------------------------|--------------------|
| 2022 | 181 | BFI20243 |
| 2023 | 266 | BFI20302 |
| 2024 | 146 | BFI20352 |

Burnette irrigates the Spray Fields using water from the processing activities at the Facility, where Burnette washes, cuts, cans, and otherwise processes fresh fruits such as cherries and blueberries.  *Id.* at 25:15-26:9.  At the end of this process, Burnette pumps resulting wastewater through approximately one mile of underground pipe to the Spray Fields.  *Id.* at 44:13-45:18.  The water then proceeds through a "booster pump house," where it is directed to one of the individual Fields.  *Id.* at 46:13-47:2.  Spray heads (i.e., sprinklers) propel the water into the air, allowing it to

fall onto the hay and thereby irrigate it. Discharge Management Plan, JX 2 at § 8.1. Through "plant uptake," the hay absorbs certain constituents within the wastewater, such as nitrogen and phosphorus, removing these pollutants from whatever excess water is absorbed into the ground. *Id.* at § 6.1 (The Spray Fields are "expected to remove up to 172 pounds of nitrogen and 26 pounds of phosphorus per acre per year.").

The Spray Fields thus perform two functions: (1) crop production; and (2) wastewater treatment. These functions are interrelated. Burnette discharges the water from the spray heads pursuant to a groundwater permit issued by the State of Michigan's Department of Environment, Great Lakes, and Energy ("EGLE") ("the Groundwater Permit"). Am. Compl. ¶ 54; Ex. 5 to Am Compl. (ECF No. 16-5), JX 1. The Groundwater Permit allows Burnette to discharge 425,000 gallons of wastewater per day and 15,000,000 gallons per year into the Spray Fields. (ECF No. 16-5). The Groundwater Permit also incorporates a "Discharge Management Plan," and Burnette's Plan requires crop production on the Spray Fields. DMP § 6.0, JX 2.

Like many regulated entities, Burnette has sometimes fallen short of its regulatory obligations. Over the years, EGLE has sent letters to Burnette regarding alleged violations of its Groundwater Permit. Am. Compl. ¶¶ 60, 70 (ECF No. 16, PageID.1632-633, 1635). However, to the extent these alleged violations can be established, they relate to Burnette's state-issued Groundwater Permit. Put differently, they implicate Burnette's application of water onto the ground at the Spray Fields. Burnette has worked with EGLE regarding these alleged violations. *See* Am. Compl. ¶¶ 72-76 (describing various EGLE investigations that occurred in or before 2021).

Despite Plaintiffs' implication that Burnette is in significant violation of its Groundwater Permit, it is generally in compliance. The vast majority of the alleged violations of discharge limits

5

set forth in the Groundwater Permit referenced by Plaintiffs are the result of discharges in excess of the limit for maximum discharges **in inches per day**. However, Burnette has only exceeded the daily discharge limit in inches per day a total of two times in the past two years. Spreadsheets, JX 58[1]. Moreover, those violations were not significant exceedances: they were only 1% and 6% higher than the permitted limits for each respective field at issue. It should also be noted that Burnette is generally in compliance with its daily total discharge limit of 425,000 gallons per day. Burnette only discharges approximately 33,000 gallons per day on average, and has only exceeded the daily maximum discharge limit twice in the last seven years (on August 15, 2019 and July 24, 2021). Burnette reasonably anticipates that even these few isolated violations noted above will be corrected upon the completion of the wastewater treatment system that is currently under construction.

## B.   PLAINTIFFS MANUFACTURE THIS LAWSUIT.

Plaintiffs are three entities that purport to have an interest in the environmental integrity of the general area around the Spray Fields. Plaintiff Grand Traverse Band of Ottawa and Chippewa Indians ("GTB") is a "federally-recognized Indian tribe . . . with a six-county primary service area" that includes the Spray Fields. Am. Compl. ¶ 10 (ECF No. 16, PageID.1620). Plaintiff Grand Traverse Bay Watershed Initiative, Inc., d/b/a The Watershed Center ("TWC") is a nonprofit organization that "protects water quality by advocating, educating, monitoring, and patrolling Grand Traverse Bay and its watershed." *Id.* at ¶ 11. (ECF No. 16, PageID.1620). Plaintiff Elk-Skegemog Lakes Association ("ESLA") is also a non-profit organization that "promotes an understanding and appreciation of the rights and responsibilities of riparian landowners and takes

---

[1] Due to the file size of the spreadsheets (JX 58), Burnette is filing a flash drive containing native versions of each sheet with the Court in the traditional manner.

6

necessary or desirable actions to protect and preserve the environment of the Elk-Skegemog watershed with a focus on water quality." *Id*. at ¶ 12. (ECF No. 16, PageID.1620-1621).

The genesis of this suit begins with ESLA, which represents homeowners on Elk Lake. As described in detail below, a hydrologic feature known as "Spencer Creek" sometimes connects Elk Lake to a nearby wetland system ("the Wetlands") through a series of underground culverts. Spencer Creek is not a permanent body of water; rather it is "intermittent," which means it is typically dry. Kogge Dep. 186, 187:10-18. 190: 16-18, ("[T]his is an intermittent stream."), JX 10.

Historically, discolored water and foam has sometimes flowed from the Wetlands, through Spencer Creek, and into Elk Lake. See., e.g., Gretel Dep. 30:1-31:2; 34:19-35:1, JX 8. The property owner closest to Spencer Creek (rightfully) attributes the discolored water to the Wetlands itself. *Id.* at 30:6-9 ("A: Well, the tannic water's coming across from the swamp, all the rotting leaves."); 31:12-14 ("**Q:** And you believe that to be the cause of the tannin color? A: Oh, correct"). It is generally accepted that discolored water and foam are the naturally occurring result of stormwater flowing through leaflitter and accumulated biological debris within a wetland or stream system. Kendall Dep. 239:7-10 ("**Q:** Do leaves stain water? A: Leaves do stain water, yes. **Q:** What color do leaves turn water? A: Brown to black, typically."), JX 11; Rediske Report 10 ("The refractory humic, fulvic, and tannic compounds will produce foam and impart a brown stain to the water and paired with iron, the color can appear red to orange. Iron bacteria will also grow on iron precipitates and from orange to reddish-orange mats on sediments and sheens on the water's surface (Brooks & Field, 2020)."), JX 13; *see also* EGLE, FOAM: A NATURALLY OCCURRING PHENOMENON, (available at https://www.michigan.gov/egle/about/organization/water-resources/glwarm/naturally-occurring-phenomena/foam) (last access April 23, 2025).

7

In other words, discolored effluent and foam are naturally occurring phenomena, routinely observed in wetlands and the waters into which they discharge.  These phenomena are common on Elk Lake itself.  For example, Google Earth clearly shows a plume of discolored water—fed by wetlands and an associated stream—discharging into another portion of Elk Lake approximately 5.5 miles south of the Spray Fields:



There is another creek-fed, wetland discharge of discolored water a little farther north:



Notably, those plumes emanate from creeks ("Battle Creek" and "Williamsburg Creek") and wetlands that are not adjoined by any spray fields, and yet they still exhibit even greater discoloration than what has been observed in any discharge from Spencer Creek.

ESLA's biologist, Samantha Ogle, nevertheless speculated that the discolored water near Spencer Creek has a different source. Since 2019, Ms. Ogle has monitored and sampled standing water near where the last underground culvert located within Spencer Creek meets Elk Lake. Ogle Dep. 24:2-4, JX 5; ESLA Reports, JX 43-48. Ms. Ogle's samples have indicated that certain constituents, such as *E. coli*, nitrogen, and phosphorus, are in this water.

Ms. Ogle and others at TWC ultimately decided that Burnette's irrigation system was the source of these constituents. Discovery confirmed that Ms. Ogle's hypothesis rests on three bases: (1) the proximity of Burnette's operation to Spencer Creek; (2) Burnette's history of regulatory issues and self-reporting of what she opines are high levels of certain pollutants; and (3) the idea that "water runs downhill." Ms. Ogle looked at EGLE's "MiEnviro Portal," which allows members

9

of the public to see EGLE's interactions with regulated entities including violation notices. Ogle Dep. 69:4-21, JX 5. She "noticed that Burnette Foods has a Groundwater Permit with many violations . . . which are consistent with that we've been finding and EGLE has also been finding." *Id.* at 69:17-21. She then reviewed "Wetland Delineation Reports," which indicated that "a handful" of Burnette's fields "are sloped towards the wetland." *Id.* at 70:1-2. Based solely on Burnette's history and geography, Ms. Ogle speculated that Burnette was the source of the constituents in Spencer Creek. *Id.* at 69:4-21.

According to Heather Smith, TWC's corporate representative:

> We looked upstream, we found, by looking at MiWaters, a groundwater discharge permit for Burnette Foods. We found a 20 year record of over-saturating the soils, ponding, direct discharge to the Wetland. The nature of the discharge sometimes is – exceeds numeric limits on pollutants. The data generated by EGLE, the data generated by Burnette at the EQ2. That was all consistent with the data that has been generated at Spencer Creek by the Watershed Center, by Sam, by the tribe. Therefore, it was logical – it was logical for us to conclude that Burnette's Food is polluting, impairing Spencer Creek.

Smith Dep. 62:8-16, JX 6. Similarly, Dan Mays, GTB's corporate representative, also confirmed that its conclusion that Burnette is the source of pollutants in Spencer Creek is based on Burnette's "close proximity" and because the pollution is "directly downstream from a known violator with thousands of violation notices." Mays Dep. 46:17-47:1, JX 7.

Plaintiffs did nothing to test Ms. Ogle's hypothesis that Burnette was the source of the alleged pollutants. No plaintiff performed any tracing studies, which would have tracked the pollutants to their actual source. *See* Ogle Dep. 86:8-10 ("**Q:** You haven't done anything to trace the *E. coli* from Spencer Creek back to the waste wastewater irrigation system, correct? A: No."), JX 5; Crissman Dep. 68:14-16 ("**Q:** Did [TWC] do any hydrogeologic investigation before filing the lawsuit? A: No."), JX 18; Mays Dep 46:17-19 ("We have not done any tracing studies."), JX 7. When GTB was asked why it had not done any direct tracing or source-specific scientific testing

10

to try to substantiate its belief that Burnette was polluting Spencer Creek, GTB responded that "[w]e did not think it was necessary." Mays Dep. 47:11-14, JX 7. During discovery, Ms. Ogle also inspected the Wetlands and observed "small pools" of water, but did not collect samples from this water to test for *E. coli* because she "didn't feel it was necessary." Ogle Dep. 82:4-15, JX 5.

Similarly, no plaintiff did anything to rule out any other potential sources besides Burnette, despite recognizing that other potential sources exist. Ms. Ogle acknowledged that other surrounding agricultural parcels (not owned by Burnette) slope toward the Wetlands, which could result in runoff during precipitation events. *Id.* at 98:2-25. Plaintiffs did not investigate any fertilizer use or other activities on these properties that could cause runoff because they "didn't feel it was necessary based off the history and violations that Burnettes [sic] has." *Id.* at 95:21-96:3; 96:18-22; Mays Dep. 47:11-14, JX 7. Plaintiffs did not do anything to rule out other potential sources of phosphorus, again because they "didn't feel it was necessary." *Id.* at 105:15-17. Plaintiffs did not conduct any investigation to determine whether arsenic found in Spencer Creek derives from the Spray Fields. *Id.* at 134:7-14. Plaintiffs did not do any investigation to determine if the *E. coli* present in Spencer Creek originated from Burnette, despite acknowledging that *E. coli* can be caused by septic systems, manure, animal carcasses, and animal feces and even naturally occurs in Wetlands like the one in which Spencer Creek originates. Ogle Dep. 86:21-91:8. 86:21-91:8, JX 5; Mays Dep. 49:3-20, JX 7. In fact, Plaintiffs did not even think "it was necessary" to determine whether *E. coli* could actually move underground at the Spray Fields and *survive long enough* to reemerge in the Wetlands or Spencer Creek. Crissman Dep. 63:14-19, JX 18; Mays Dep. 48:5-11 ("**Q:** One to two weeks was what you said the lifespan of *E. coli* was subsurface? A: Yes. **Q:** Is that long enough for *E. coli* to go into the groundwater at the irrigation

11

field and travel and reappear at Spencer Creek? A: I do not know the flow rates at the site."), JX 7.

Thus, discovery confirmed that Plaintiffs worked backwards: Burnette was nearby and had a history of permit violations, so it became the Plaintiffs' villain. Plaintiffs then set about reverse-engineering a theory of liability to support its confirmation bias.

## C.    PLAINTIFFS ADOPT AN UNTENABLE POLLUTANT-MIGRATION THEORY, THEN FAIL TO SUPPORT IT.

Plaintiffs believe that pollutants are migrating from Burnette's Spray Fields to Elk Lake. Discovery has confirmed the existence of several geographic and hydrologic features that make this trip impossible.[2]  First, two berms separate the Spray Fields from the Wetlands.  The main berm is approximately three feet tall. MacGregor Dep 155:14-18, JX 12; Kendall Dep. 72:5-14, JX 11. During an inspection of this berm during discovery, "[n]o evidence was observed indicating that surface water has or could over top this berm, and no breaks in the berm were observed." MacGregor Report 4, JX 26.[3]  The secondary berm is approximately two feet tall and forms a triangular shaped retention area outside of the Wetlands.  MacGregor Dep. 155:10-13, JX 12; MacGregor Report 3, Figure 6b, JX 26. Burnette constructed the secondary berm in 2021. Kalchik Dep. 100:11-25, JX 14.  Evidence adduced during discovery established that the height and consistency of the berms forecloses the possibility of surface sheet flow into the Wetlands. Rediske Dep. 125:22-126:1, JX 13.

---

[2] In addition to the following written description of the relevant geography, Burnette is filing a video clip (JX 61) in the traditional manner.

[3] Mr. MacGregor has submitted a sworn declaration, verifying the factual assertions made in his Report.  MacGregor Decl., JX 60.

The Wetlands are approximately 85 acres in total size and are comprised of cattail marshes, with areas of scrub-shrub and forested wetland habitat types. MacGregor Report 2, JX 26. There is no evidence of a stream, channelized surface water flow or permanent standing water in the Wetlands. *Id.* at 2, 4, 6.

A farm road bisects the Wetlands, and two equalization culverts are installed at the low point to prevent water from backing up on the upgradient side. *Id.* at 5. Discovery confirmed that there is "[n]o evidence of a stream or channelized flow . . . on either side of the equalization culverts indicating that there is no continuous surface water connection" under the farm road. *Id.*

At the far north end of the Wetlands, a culvert runs approximately 175 feet under Elk Lake Road and into a ravine area east of Elk Lake Road. *Id.* at 3. On the western, Wetlands-side of this culvert, there is a "man-made sump or roadside ditch" which contains some standing water. *Id.* at 6. "Landscape fabric has been installed along the bottom of the sump area," which explains why no plants are growing in the bottom of this ditch. *Id.*



*Id.* at 7. The presence of landscape fabric (or other similar material) can be observed in the photographs below:

13



Drainage Ditch Pictures, JX 64, BFI19424.



*Id.* at BFI19426.

14

"Photographic evidence indicates that there is frequently a gap between the bottom of this culvert and the water level in the sump/ditch" and, when the culvert was inspected during discovery, "[n]o flowing water was observed with in the culvert." MacGregor Report 7, JX 26.



*Id.* On the eastern, Elk-Lake-side of the culvert, "[n]o surface water was observed at the time of inspection other than a small pool at the base of the [culvert]" often described as a "plunge pool." *Id.*



15

Geographically, the culvert discharges into a ravine area, and "[t]he form of the ravine bottom indicates that ephemeral or intermittent surface water flow occurs after precipitation events." *Id.* Plaintiffs' expert opines that water in this plunge pool is "percolating down into the ground water and going subsurface[.]" Kogge Dep. 186:3-16, JX 10. Beyond the plunge pool, Spencer Creek is dry. *Id.* Plaintiffs' expert described Spencer Creek as "intermittent" between the plunge pool and Elk Lake because "that clearly wasn't flowing." *Id.* at 186:3-16, 187:10-18; 190:16-18 ("[T]his is an intermittent stream.").



MacGregor Report 8, JX 26. About 200 feet east from the Elk Lake Road culvert, another 20-foot-long culvert bisects Spencer Creek. *Id.* at 9. After this culvert, another 180-foot culvert runs under several cottages. *Id.* This culvert ends at Elk Lake. During the inspection during discovery, the culvert's outlet to Elk Lake "was observed to be almost completely blocked with sand." *Id.*

16



*Id.* at 10.

Accordingly, for any pollutant to migrate from Burnette's Spray Fields to Elk Lake, it would have to (1) not be absorbed by the Fields' crops; (2) infiltrate into the ground; (3) flow under the berms via groundwater; (4) travel through a large wetland that lacks any surface water flow; (5) travel under a "farm road" and through one of two culverts that lack any surface water flow; (6) flow through a smaller wetland area that lacks surface water flow; (7) flow under Elk Lake Road and through another culvert that lacks water flow; (8) flow through an intermittent/ephemeral stream that is often dry; and (9) flow through a third culvert into Elk Lake, which is blocked with sand.

17



MacGregor Report, Figure 6a, JX 26.  No evidence suggests that any pollutant actually overcomes all of these hurdles.[4]

## III.  LAW AND ARGUMENT

### A.    APPLICABLE LAW.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In resolving this motion, the court must consider the evidence and all reasonable inferences in favor of Plaintiffs. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).  Burnette has the initial

---

[4] In response, Plaintiffs may offer opinions from their expert witnesses.  Plaintiffs' experts didn't do any testing either, but rather made a series of speculative assumptions about Burnette's wastewater.  Such opinions are inadmissible and cannot create an issue of fact.  To that end, Burnette has filed motions to exclude the opinions of each of Plaintiffs' three expert witnesses.

burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). Burnette can satisfy this burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once Burnette demonstrates the absence of evidence to support an essential element of Plaintiff's claims, the burden then "shifts to [Plaintiffs], who must present some specific facts showing that there is a genuine issue for trial." *Id.*

"To establish a CWA violation, Plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States [("WOTUS")]; (4) from a point source; (5) without a NPDES permit." *See, e.g., Parkser v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). This case implicates the third and fourth elements: Plaintiffs have not, and cannot, establish that Burnette discharges "from a point source," nor can Plaintiffs establish that any pollutant is discharged into WOTUS.

**B.**    **PLAINTIFFS CANNOT PROVE A POINT-SOURCE DISCHARGE OR ITS FUNCTIONAL EQUIVALENT.**

The CWA defines a "point source" as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). This statutory definition specifically provides that "[t]his term does not include agricultural stormwater discharges and return flows from irrigated agriculture" ("the Irrigated-Agriculture Exception"). *Id.* Similarly, 40 C.F.R. § 122.3(f) explicitly and unequivocally states that "return flows from irrigated agriculture" are among the exempt sources that "do not require NPDES Permits."

19

Although a direct discharge from point source to a surface water is ordinarily necessary, the Supreme Court has recognized a limited exception to this requirement if there is "the functional equivalent of a direct discharge from the point source into the navigable waters." *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 186 (2020). *Maui* set forth seven factors that are relevant to whether something is the functional equivalent of a point-source discharge: 590 U.S. at 184-85. They can satisfy neither the definition of "point source" nor prove the functional equivalent under *Maui*.

### 1.   The Irrigated-Agriculture Exception Applies.

The Irrigated-Agriculture Exception derives from hydrologic and agricultural reality: almost all discharges will necessarily contain "pollutants" as defined by the CWA, because that definition is not limited to hazardous substances—it also includes innocuous materials such as sand, biological materials, and agricultural waste, *see* 33 U.S.C. § 1362(6)—and almost all agricultural operations will discharge water, *see Pacific Coast Fed. of Fisherman's Assoc. v. Glaser*, 945 F.3d 1076, 1084 (9th Cir. 2019). Thus, absent an exception, almost all agricultural operations in the United States would require a CWA permit. Congress enacted the Irrigated-Agriculture Exception to "alleviate the EPA's burden in having to issue permits for every agricultural point source" and to treat agricultural operations equally. *Id.* at 1084-85. Put differently, the Exception represents a policy decision by Congress whereby the introduction of "pollutants" into surface water is tolerated based on countervailing interests (i.e., the promotion of crop production). *See Courte Oreilles Lakes Assoc. v. Zawawistowski*, Case No. 24-cv-128, 2025 WL 993525, at *9, -- F. Supp. 3d -- (Feb. 7, 2025) ("By their own terms, [the Irrigated-Agriculture Exception] allow farmers to pollute navigable waters under some circumstances, and that cuts against the CWA's general purpose . . . [but] [r]egardless of whether it was wise to create an

20

exception for agricultural return flows, it was Congress's decision to make, so this court may not rewrite the statute to make it conform to the general purpose.").

The Exception's scope is "to be defined broadly and include discharges from all activities related to crop production." *Glaser*, 945 F.3d at 1084-85. It even extends to water that is not used for irrigation purposes such as frost protection, pest control, and harvesting. *Zawawistowski*, 2025 WL 993525, at *9. And it includes water that has been used in processing agricultural products that is then used for irrigation purposes. On this point, one case is on all fours with this one: in *Hiebenthal v. Meduri Farms*, the defendant operated two fruit processing plants, which generated wastewater. 242 F. Supp. 2d 885, 889 (D. Or. 2002). That wastewater was subsequently utilized to irrigate prune orchards and grass fields. There, the court dismissed the plaintiff's citizen suit, noting that "Plaintiffs may be able to show that defendant is discharging pollution into the navigable waters without an NPDES permit, but they cannot show defendant is doing so from a point source" because the defendants' use of wastewater for crop-production satisfied the Irrigated-Agriculture Exception. *Id.* at 887.

Here, application of water to the Spray Fields is an activity related to crop production, *Glaser*, 45 F.3d at 1084-85, so the conduct that Plaintiffs challenge falls within the Irrigated-Agriculture Exception and outside the CWA. As discovery confirmed, the Spray Fields and fruit-processing water (because of its nutrient-value) have been used for agricultural purposes since long before Burnette owned them. Sherman Aff. ¶ 14, JX 57. Agricultural use of the area that now comprises the Spray Fields can be observed in aerial photographs from the 1930s and 1950s. *See* Miscellaneous Photographs, JX 66, *e.g.* BFI20439, BFI20440. A recent photograph showing the production of crops at Burnette's Spray Fields is provided below:



Spray Field Photographs, JX 62, BFI9910.  Burnette produces hundreds of hay bales from the

Spray Fields each year. Hay Bales, JX 59; *see, generally,* Kalchik Dep.  122-24, JX 14.  A typical

harvest of hay on the Spray Fields is shown below:



Spray Field Photographs, JX 62, BFI9911. Accordingly, the Irrigated-Agriculture Exception applies.

While Plaintiffs prefer to describe Burnette's operations as industrial rather than agricultural, courts have rejected efforts to narrow the CWA's exception for agricultural activities, relying on the plain meaning of the word "agriculture." In *Waterkeeper Alliance, Inc. v. EPA*, the Second Circuit held that stormwater discharges from a Concentrated Animal Feeding Operation ("CAFO") were exempt from the CWA even though the plaintiffs argued CAFOs were more industrial than agricultural:

> **The Environmental Petitioners contend that CAFOs must be viewed as industrial, not agricultural**. We disagree. Dictionaries from the period in which the agricultural stormwater exemption was adopted define "agriculture" or "agricultural" in a way that can permissibly be construed to encompass CAFOs. For example, Webster's New World Dictionary defined the term "agriculture" to include, *inter alia*, "work of cultivating the soil, **producing crops**, and raising livestock. "WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 26 (3rd College Ed. 1988). The Oxford English Dictionary similarly defined agriculture to include, *inter alia*, "**cultivating the soil**," "including the allied pursuits of gathering in the crops and rearing livestock." THE OXFORD ENGLISH DICTIONARY 267 (2d Ed.1989).

399 F.3d 486, 509 (2d Cir. 2005) (emphasis added). Notably, the *Waterkeeper* decision focused on the definition of "agriculture" despite the plaintiffs' insistence that the CAFO was an industrial operation. Applying that same rationale here, the irrigation of water onto the Spray Fields would also constitute an agricultural use since, as *Waterkeeper* recognizes, this water is used to "produce crops."

Because Burnette's Spray Fields lack a "point source," as that phrase is defined under the CWA, Burnette is entitled to summary judgment.

## 2.    Plaintiffs Cannot Establish the Functional Equivalent of a Point-Source Discharge.

Even if the Irrigated-Agriculture Exception does not apply, Plaintiffs' CWA claim still fails.  There is no evidence that Burnette's Spray Heads discharge directly to any waterbody or the Wetlands.  Quite the contrary—the Spray Heads spray water onto the ground (which is separated from the Wetlands by a berm).  Accordingly, Plaintiffs' only hope is *Maui*.  However, Plaintiffs cannot meet their burden to establish that Burnette's application of water to the ground is the "functional equivalent" of a direct discharge to surface water.

### a.    *Maui's Background Principles.*

Three background principles from *Maui* and its progeny should inform the Court's analysis.  First, *Maui*'s functional-equivalence test is an exception, not a rule.  *Maui* itself recognized the general rule that groundwater discharges are regulated by the states, specifically noting that "the structure of the [CWA] indicates that, as to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States." *See, e.g.,* § 101(b), 86 Stat. 816 (stating Congress' purpose in this regard); *Maui*, 590 U.S. at 174.  The Court further stated that "Congress was fully aware of the need to address groundwater pollution, but it satisfied that need through a variety of state-specific controls. Congress left general groundwater regulatory authority to the States; its failure to include groundwater in the general EPA permitting provision was deliberate." *Id*. at 177.

The authority of the State of Michigan to regulate groundwater is not theoretical.  The state regulates groundwater pursuant to Part 31 of the Michigan Natural Resources and Environmental Protection Act at Mich. Comp. Laws § 324.3101 *et seq*. ("Part 31").  Moreover, pursuant to the authority granted to it under Part 31, EGLE has promulgated extensive "Groundwater Quality" regulations at Michigan Administrative Rule 323.2201 *et seq*. ("Part 22").  In fact, the Part 22

24

regulations require permits for groundwater discharges, including discharges of wastewater from irrigation systems. Here, EGLE has issued a permit to Burnette and is currently engaged in settlement discussions to establish long-term compliance with Part 22.

The fact that Burnette operates under a state-issued groundwater permit counsels against a functional-equivalence finding. In *Conservation Law Foundation, Inc. v. Town of Barnstable*, the court dismissed a CWA citizen suit similar to this one because the defendant "was fully permitted under the state law regime for groundwater discharges" and had already commenced a wastewater management plan to comply with regulations. 615 F. Supp. 3d 14, 26-27 (D. Mass. 2022). Similar to *Barnstable*, Burnette's discharges are permitted under state law. The relevant state agency (EGLE) is already involved and resolving the alleged violations. *See, generally*, Defendant's Brief in Support of Motion to Dismiss for Lack of Subject-Matter Jurisdiction. Finally, Burnette has already spent millions of dollars making improvements to its wastewater treatment to improve the quality of its discharge. Accordingly, any decision seeking to regulate Burnette's groundwater discharges under the CWA would undermine ongoing state regulation of groundwater—precisely the result that *Maui* cautions against.

Second, *Maui* can only apply to groundwater discharges that are the "functional equivalent" of a direct discharge into WOTUS such as an outfall pipe. Put differently, for *Maui* to provide CWA liability, the Court would have to decide that the migration of pollutants into the Wetlands through groundwater is the equivalent of discharging those same pollutants into the Wetlands through an actual point source (such as a pipe). A direct discharge results in **all** pollutants reaching the Wetlands without any material dilution or chemical change (e.g., no plant uptake, chemical breakdown in soil, further dilution from upgradient groundwater, etc.).

Third, Plaintiffs bear the burden to establish *all* relevant *Maui* factors—they cannot pick and choose the factors they like best, and courts must "hold[] [p]laintiffs accountable for failing to put on evidence of all the geology that would establish the functional equivalent of a direct discharge[.]" *Stone v. High Mountain*, 89 F.4th 1246, 1260 (10th Cir. 2024). If Plaintiffs fail to demonstrate, among other things, "how much the pollutant is diluted or chemically changed as it travels and the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source," they cannot establish the functional equivalent of a point source discharge. *Id*. at 1259.

Putting these together, it becomes clear that Plaintiffs' *Maui* theory is subject to a high bar, and one they cannot clear.

      **b.**     **_Discharges to the Spray Fields are not the Functional Equivalent of a Direct Discharge Under the Maui Factors._**

Even assuming for the sake of argument that the Wetlands at issue are WOTUS (which, as described below, they are not), Plaintiffs cannot establish the *Maui* factors: (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, and (7) the degree to which the pollution (at that point) has maintained its specific identity. *Maui*, 590 U.S. at 184-85.

      **i.**     **"Transit Time."**

Plaintiffs cannot establish the time that it takes for any pollutants to reach the Wetlands for at least three reasons. First, Plaintiffs' experts calculated the transit time of *groundwater* rather than the pollutants that are allegedly present in Burnette's water. Kendall Report 14, JX 22; Kendall Dep. at 242:18-22; 223:16-19 ("**Q:** Have you done any analysis relative to movement of

the wastewater constituents that get into Wetland Area 1 and whether they get to Spencer Creek or Elk Lake? A: I have not done any direct analysis."), JX 11.  Pollutants do not move at the same velocity as groundwater (Gagnon Report 9, JX 24), so the transit time of groundwater is completely irrelevant to a CWA claim.  Second, any pollutants contained in Burnette's wastewater are discharged and dispersed across a large area.  So, the distance travelled by pollutants will necessarily vary depending upon the location within the Spray Fields where such pollutant is discharged.  Third, the broad range in the estimated transit time (ranging from fewer than three weeks to over two-and-a-half years) advanced by Plaintiffs expert illustrates that they lack sufficient information to accurately determine the transit time.  *See* Kendall Dep. at 219:24-220:3 (providing a range "in the neighborhood of 142 to 212 days" for travel time of wastewater from a Spray Field to the Wetlands), JX 11; Kendall Report 12 (providing ranges for the three Spray Fields as low as 17.5 days and as high as 1000 days), JX 22.  Plaintiffs' expert admitted that he could not establish any definitive travel time.  Kendall Dep. at 208: 2-7.  ("**Q:** Have you been able to confirm whether, in fact, any of the constituents in the Burnette wastewater are actually present in Wetland Area 1?  A: I don't have sample data myself that—on what—so I can't—I can't comment on that.  I can't speak to it from a place of authority."), JX 11.  Accordingly, Plaintiffs cannot meet their burden to provide the Court with sufficient evidence to establish any reasonable idea of the pollutants' transit-time here, so there is no basis to apply this factor in their favor.

## ii.        **"Distance Travelled"**

Pollutants contained in Burnette's wastewater are discharged across a large and dispersed area. As a result, the distance travelled by pollutants will necessarily vary depending upon the location within the Spray Fields where such pollutant is discharged. Although Plaintiffs provide a range of distances travelled, Kendall Rebuttal Report 10, JX 22, it is not possible to determine

27

how the water (or the constituents contained within) flows under the Spray Fields without

conducting modelling. Without such data, Plaintiffs cannot apply other key *Maui* factors, such as

dilution or chemical change during travel, which are necessary to establish their claims. Plaintiffs

have failed to provide any modelling data or other information that might allow the Court to weigh

how the distance travelled might impact the amount of contamination reaching the Wetlands.

Kendall Dep. 172:11-173:14, JX 11.  Accordingly, this factor cannot be applied in their favor.

### iii.      "The Nature of the Material Through which the Pollutant Travels"

Plaintiffs face a similar issue with the third *Maui* factor.  The "nature of the material" factor

provides important context to the medium that contains the discharge and any associated

pollutants, and how they may be physically or chemically altered by such medium.  Plaintiffs have

admitted that they have failed to undertake the surveying and sampling necessary to establish with

specificity the composition of the soils lying beneath the Spray Fields and the Wetlands.  Kendall

Dep. at 200:14-19 (acknowledging that features under the Spray Fields "can possibly exist" that

would cause Kendall's conclusions regarding conductivity and flow conditions to be wrong), JX

11; *Id.* at 201:6-9 (admitting that there "maybe some stuff close to the surface" that displays

different conductivities from those assumed in Kendall's report, and that they "don't really know"

if that exists based on the data relied upon in the report).

This factor is critical for the present analysis because of how much the scenario at Spencer

Creek differs from that in *Maui*.  There, the Court analyzed the flow of the discharge through

volcanic rock with vastly different properties than the sandy, clayey soils of Northern Michigan.

On remand following the Supreme Court's decision, the district court identified the deepest reaches

of the injection wells as "fractured layers of Wailuku lava basalt" that form a "porous aquifer."

*Hawai'i Wildlife Fund v. Cnty. of Maui,* 550 F. Supp. 3d 871, 874 (D. Haw. 2021) (internal

quotations omitted).  Known colloquially as "lava tubes," the porosity of such geologic formations allows water to travel rapidly through them.  The geologic formations at issue in *Maui* create "large openings" that facilitate movement of water and other materials.  Sklash Dep. at 73:5-9, JX 15.  However, in Michigan, the "granular soils" of the region do not allow for such "pipe like flow," resulting in discharges that are more "distributed" than those in *Maui*.  *Id.* at 73:15-17.

By their own admission, Plaintiffs have identified gaps in their knowledge of the material at issue in this case.  Yet they have not done the work required to fill in such data gaps.  The third *Maui* factor therefore does not favor finding a functional equivalent.

### iv.    "The Extent to which the Pollutant is Diluted or Chemically Changed as it Travels"

The undisputed evidence in the record confirms that any pollutants in Burnette's water undergo significant dilution and chemical change.  First, some amount of pollutant evaporates.  Kendall Dep. 143:8-13, JX 11.  Crops then absorb nutrients from the water, including any phosphorus and nitrogen.  *Id.* at 161:7-162:5; 165:25-166:3.  To the extent that some pollutants, like BOD, make it past the crops, those pollutants are consumed by bacteria in the soil.  Rediske Dep. 246:18-247:11, JX 13.  Other pollutants, like *E. coli*, simply die in the soil.  *Id.* at 249:1-250:3.  Whatever is left is then diluted by tens of thousands of gallons of stormwater and an unknown amount of upgradient groundwater.  The idea that this process is the "functional equivalent" of Burnette directly piping and discharging undiluted and unaltered wastewater into the Wetlands is ridiculous.

Plaintiffs conveniently ignore these processes.  Obviously, any pollutants in groundwater within the Spray Fields will be diluted as they travel by both the stormwater falling on the Spray Fields and upgradient groundwater passing through the Spray Fields.  Yet Plaintiffs' initial expert report on hydrogeological factors failed to account for such dilution whatsoever and their rebuttal

report summarily dismisses dilution as a factor with minimal analysis.  Kendall Rebuttal Report 16, JX 23.

The dismissal of stormwater dilution as a significant factor is obviously erroneous.  In a typical year, the amount of stormwater deposited in the Spray Fields will be significantly greater than the amount of wastewater that is discharged through the irrigation system, which can be established based on available data.  Using calendar year 2022 as an example, Burnette's records show that it discharged approximately 16,817,284 gallons of wastewater in the Spray Fields.  JX 58 at BFI00018743.  Meanwhile, meteorological data from the local weather station indicates that approximately 28.63 inches of precipitation fell in the area in 2022.  *Id.* According to the U.S. Geological Survey, "[o]ne inch of rain falling on 1 acre of ground is equal to about 27,154 gallons."[5]  Therefore, the recorded local precipitation of 28.63 inches would have generated approximately 777,419 gallons of stormwater per acre/per year (28.63 inches x 27,154 gallons per inch = 777,419 gallons per acre).  Because the Spray Fields comprise an area of approximately 48.7 acres that would have resulted in a total stormwater volume of approximately 37,860,305 gallons in 2022 (777,419 gallons per acre x 48.7 acres = 37,860,305 gallons).[6]  While any such estimates are necessarily approximate, the total estimated stormwater volume is actually greater than the volume of water discharged through the irrigation system. Based on the foregoing it does not take a hydrogeologist to recognize that stormwater causes significant dilution of any pollutants that are discharged through the irrigation system.

---

[5] See USGS Rain and Precipitation Fact Sheet (https://www.usgs.gov/special-topics/water-science-school/science/rain-and-precipitation#:~:text=One%20inch%20of%20rain%20falling, about%202%2C715%20gallons%20of%20water.).

[6] Obviously some stormwater would be lost to evaporation within the Spray Fields but the same thing would be true of water discharged from the irrigation system.

The contribution of stormwater presents an even larger challenge for Plaintiffs' *Maui* claim because any discharge (or runoff) resulting from precipitation falling on the Spray Fields (where crops are grown) would necessarily constitute "agricultural stormwater discharge." The CWA's definition of a point source excludes "agricultural stormwater discharge." 33 U.S.C. § 1362(14); *see also* 40 C.F.R 122.3(f) (which explicitly and unequivocally states that "agricultural stormwater runoff" "does not require a NPDES Permit)". Therefore, all 37,860,305 gallons of stormwater, along with any pollutants resulting from the runoff of that stormwater, are categorically exempt from CWA regulation (and NPDES permitting requirements) pursuant to 33 U.S.C. § 1362 (14) and 40 C.F.R. 122.3(f).

Plaintiffs made no attempt to distinguish or account for the impact of agricultural stormwater discharge (or runoff) in its expert testimony or otherwise. Given that the volume of stormwater is significantly greater than the volume of any discharge from the irrigation systems at the Spray Fields, this oversight results in a significant error in any calculations provided by Plaintiffs or their experts. Moreover, given that the pollutants resulting from the agricultural stormwater discharge (runoff) are virtually identical to those produced by irrigation of wastewater (e.g., soil, biological materials, organic matter), Plaintiffs could not identify which source is responsible for any pollutants that might be present in groundwater at or migrating from the Spray Fields. If Plaintiffs cannot identify the source of pollutants, they cannot hope to apply the *Maui* factors to only pollutants that were discharged through irrigation.

Also relevant to this *Maui* factor, the pollutants discharged in the Spray Fields are chemically changed as they travel by, for example, crop uptake. Such processes reflect basic chemistry principles—as chemicals are exposed to new compounds, they will undergo various reactions, depending on the constituents involved. Despite this axiom, however, Plaintiffs failed

31

to do the proper analysis, instead assuming that the chemicals in Burnette's wastewater remain
totally inert during their lengthy journey. For instance, regarding BOD, Plaintiffs' expert admitted
that he had not done any specific study of the BOD in Burnette's wastewater. Kendall Dep. at
160:3-5, JX 11. He further admitted that he had done "no calculations or study" of how BOD
interacts with the soil at the site, and instead relied on his own assumptions, because he "[does not]
know how high BOD waters affect wetlands directly." *Id.* at 160:6-11 ("No, I have not—no. The
assumptions, based on the low DOC concentrations in the groundwater, is the extent of the BOD
analysis as such."); 225:21-226:1.

In addition to the chemical changes occurring due to the Wetlands' influence, the crops
growing on the Spray Fields also interact with the chemical constituents of the wastewater, by
design. Plaintiffs' expert agreed. *Id.* at 161:9-162:5 (explaining how plants at the Spray Fields
absorb nitrogen, phosphorous, and water out of the soil, which is how the wastewater application
system is designed to function). In fact, Plaintiffs' hydrogeology expert confirmed that, based on
the application rates of nitrogen and phosphorous at the Spray Fields, the amounts of nitrogen and
phosphorous are "within the ability of the crop to remove." *Id.* at 165:25-166:3.

Although Plaintiffs experts acknowledge that dilution and chemical change will occur, they
have not collected and cannot produce any downgradient groundwater sampling data establishing
the extent that pollutants have been diluted or chemically changed as they travel to the Wetland.
Additionally, Plaintiffs have admitted that there are chemical reactions, namely of phosphorous
and nitrogen, that do occur at the Spray Fields and show they are working as intended.

Ultimately, Plaintiffs cannot meet their burden to establish the extent of dilution or
chemical change because (1) they have not measured or accounted for dilution caused by
stormwater; (2) they have not measured or accounted for the extent of contribution of pollutants

32

in groundwater that were caused by agricultural stormwater discharges; and (3) they have not measured or accounted for the diminution of pollutants in groundwater caused by chemical change. As a result, this factor cannot weigh in their favor.

                        v.         **"The Amount of Pollutant Entering the Navigable Waters Relative to the Amount of the Pollutant that Leaves the Point Source"**

*Maui* unambiguously requires lower courts to consider a comparison of the "amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source" in any determination as to whether there is the functional equivalent of a direct discharge. To calculate the amount of pollutant entering navigable waters relative to the amount of pollutant that leaves the point source, Plaintiff would need to establish both: (1) the amount of any pollutants contained in the wastewater that was discharged onto the Spray Fields; and (2) the amount of any pollutants that are entering WOTUS.

Although Plaintiffs could have calculated the concentration of any pollutants in the wastewater by reference to Burnette's publicly available DMRs, they failed to make an attempt or offer information to that effect. Thus, they have not established the amount of pollutant that leaves the irrigation system.

In order for any pollutants discharged through the Spray Fields to enter navigable waters through groundwater, the groundwater containing those pollutants would necessarily have to discharge (or vent) into surface water.[7] Therefore, for any calculation of the volume of pollutants discharged from the irrigation systems that is entering surface waters, Plaintiffs would need to

---

[7] Groundwater is not, and cannot be WOTUS by definition, and therefore, any contamination that remains in groundwater is not "entering" WOTUS.

establish: (1) the concentration of each pollutant that is present in groundwater; and (2) the volume of groundwater that is entering surface water.

Plaintiffs have not collected and cannot produce groundwater sampling data that establishes the concentration of any pollutants from the point at which groundwater is alleged to enter the Wetlands (in this case the Wetlands adjoining the Spray Fields). Plaintiffs have never alleged or attempted to calculate the concentration of any pollutant that is present in the groundwater that is allegedly entering the Wetlands, much less the surface water in those Wetlands.

Plaintiffs have not collected and cannot produce groundwater sampling data that establishes the volume of any pollutants from the point at which groundwater is alleged to enter the Wetlands. In fact, Plaintiffs' expert admits that certain pollutants, including phosphorus and nitrogen, are completely consumed by crops in the Spray Fields. Kendall Dep. 161:7-162:5; 165:25-166:3, JX 11. Despite this, Plaintiffs simply assume that all wastewater from the Spray Fields discharges into WOTUS through surface water flow out of the Wetlands. This is clearly not the case, when surface water is not even present in the Wetlands and there is not a regular flow of surface water out of the Wetlands. Common sense dictates that if all the wastewater discharged at the Spray Fields actually discharged to surface waters in the Wetlands, then there would be an equal amount of surface water flowing out of the Wetlands. Burnette discharges thousands of gallons per day to the Spray Fields, and still there is no flow out of the Wetlands. Despite flow rates being crucial to understanding the dynamics of this water system, Plaintiffs simply chose to ignore this aspect of the analysis. Kendall Dep. at 232:10-12 ("**Q:** I mean, what's the flow—have you ever measured any flow in these Wetlands that are on Exhibit 42? A: No, I have not measured any flow."); 232:22-25 ("**Q:** Okay. And you literally have no data about any flow rates relative to

34

this—historically or otherwise, relative to these Wetlands?   A: I did not analyze any data."),  JX 11.

As described in detail below, it is undisputed that the stream flowing out the Wetland is intermittent or ephemeral (which means that it does not have regular flow).   Based on the foregoing, it is obvious that only a small fraction (if any) of the groundwater from the Spray Fields discharges into the Wetlands.   Moreover, only a fraction of the groundwater is comprised of wastewater that is discharged onto the Spray Fields.

Plaintiffs have inappropriately relied on surface water data collected *downstream* of both the Spray Fields and the Wetlands to support their claims that discharges from the irrigation system have resulted in pollution of the Wetlands and/or Spencer Creek.   The sampling locations selected by Plaintiffs identify stormwater draining from a number of properties owned and operated by other individuals or entities (including a county road, agricultural properties, and residential properties) as well as stormwater draining through or out of the Wetlands.   Miscellaneous Photographs, JX 66, BFI21029-BFI21041.   Plaintiffs cannot establish which pollutants, if any, may have been discharged into surface water from the Spray Fields without first conducting sampling at the point at which groundwater enters navigable waters (or WOTUS).   Any such approach not only lacks scientific rigor, but also conflicts with the instruction provided by the *Maui* Court, which makes it very clear that that the *Maui* factors are to be applied at the point at which pollutants first enter navigable waters.   *Maui*, 590 U.S. at 183-84 ("…an addition falls within the statutory requirement that it be 'from any point source' when a point source directly deposits pollutants into navigable waters, or when the discharge reaches the same result through roughly similar means.").   As previously noted, Plaintiffs have failed to conduct sampling at the point at which they allege that pollutants enter WOTUS (the Wetlands).   Without that basic information,

Plaintiffs can only offer a wild guess about what might be happening. They cannot meet their burden by selecting downstream sampling locations that include pollutants originating in the Wetlands or at other properties, which is precisely what they are attempting to do here.

The lack of evidence regarding the concentration of the alleged pollutants from the irrigation system that ultimately end up in the Wetlands is fatal to Plaintiffs' CWA claim. In *Maui*, the Court specifically noted that the District Court relied in part upon a detailed study of the discharges, finding that "a considerable amount of effluent from the wells ended up in the ocean (a navigable water)." 590 U.S. at 171. The facts from the underlying *Maui* proceedings make clear that a detailed study was conducted to determine the relative amount of pollutants entering WOTUS. *See Hawai'i Wildlife Fund, Non-Profit Corp. v. Cnty. of Maui*, 24 F. Supp. 3d 980, 984 (D. Haw. 2014) (describing "a study conducted jointly by the EPA, the Hawaii Department of Health ("DOH"), the U.S. Army Engineer Research and Development Center, and researchers at the University of Hawaii" that included tracer dyes and concluded that "64% of the treated wastewater injected into [the] wells currently discharges from the submarine spring areas" and into the ocean).

Unlike *Maui*, where the plaintiffs had <u>actual data</u> to establish that the majority of the pollutants contained in wastewater entered WOTUS, it is not clear that *any* pollutants enter WOTUS through groundwater here. And, even if some pollutants enter WOTUS, Plaintiffs have no idea how much, either by volume or as a percentage of the total discharge. Not only have Plaintiffs failed to produce a study or even calculations of the amount of pollutant entering navigable waters, they cannot produce the analytical data that would be necessary to support such a study. Plaintiffs clearly bear the burden of producing evidence necessary to allow for

36

consideration of each of the *Maui* factors—a burden which they have not met.  Accordingly, as a
matter of law, this factor cannot weigh in their favor.

### vi.    "The Manner By or Area in Which the Pollutant Enters the Navigable Waters"

Plaintiffs have failed to establish that any groundwater from the Spray Fields actually
enters the Wetlands.  In *Maui*, the Court considered a study utilizing tracer dye testing to establish
that wastewater discharged through injection wells actually entered the ocean at specific locations
identified as submarine seeps. *Maui*, 24 F. Supp.3d at 984.  In contrast, Plaintiffs here merely
speculate that such discharge must occur without utilizing the appropriate methodology.

The refusal of Plaintiffs' expert, Kendall, to conduct additional hydraulic conductivity
testing illustrates Plaintiffs' constant refusal to undertake the necessary analysis to support their
claims.  Despite acknowledging that the years-old slug tests for hydraulic conductivity *which he
relied on* "have a whole bunch of assumptions" and can be "fairly noisy" with "limited data," he
"didn't feel it was necessary" to conduct the same tests himself in the present day.  Kendall Dep.
at 47:21-48:9, JX 11. Moreover, although Kendall knew that the data he had was subpar, he refused
to conduct "better, more accurate tests" simply because they "seemed out of the scope of this
analysis." *Id.* at 48:10-12.  Kendall had similar excuses for why he failed to use the proper
equipment to determine the infiltration capacity of the soils at the Spray Fields, another critical
parameter for his analysis. *Id.* at 94:12-95:9.

Ultimately, Plaintiffs simply failed to collect objective, verifiable, or scientifically valid
information to support their theories.  Plaintiffs cannot rely on mere conjecture to satisfy this
factor.

### vii.    "The Degree to Which the Pollution (At that Point) has Maintained its Specific Identity"

To determine "the degree to which the pollution (at that point) has maintained its specific identity" Plaintiffs would have to sample the groundwater where they allege that it enters WOTUS (the Wetlands). Plaintiffs do not have that data. As a result, Plaintiffs cannot establish that the "pollution" discharged from the irrigation system has maintained its specific identity. And actually, Plaintiffs already know that the pollution does NOT maintain its specific identity because two constituents, nitrogen and phosphorus, are taken up by the hay crop and cannot ever enter the Wetland. Kendall Dep. 161:7-162:5; 165:25-166:3, JX 11.

This issue is compounded by the fact that many of the "pollutants" that Plaintiffs have identified as pollution are: (1) naturally occurring substances present in soils or groundwater (e.g., arsenic); (2) or biological organisms present in the environment (e.g., *E. coli*); and/or (3) result from naturally occurring chemical reactions in wetlands, soils or groundwater. Without groundwater sampling data from the point where groundwater enters the Wetlands, it is impossible to distinguish which pollutants are naturally occurring and which are caused by discharges from the Spray Fields. And therefore, Plaintiffs cannot meet their burden as to whether pollution from the Spray Fields has "maintained it specific identity."

### C.    THE WETLANDS ARE NOT WOTUS.

Even if Plaintiffs sidestep the Irrigated-Agriculture Exception and establish that groundwater flows from the Spray Fields is the "functional equivalent" of a direct discharge, they must still prove the discharge is into WOTUS. *See Maui*, 590 U.S. at 184 (holding that the addition of a pollutant under the CWA occurs "when a point source directly deposits pollutants into navigable waters, or when the discharge reaches the same result through a roughly similar means.").

38

Plaintiffs have identified the Wetlands adjoining the Spray Fields as the point at which "wastewater effluent" is discharged. *See* Am. Compl. at ¶ 107 (stating that discharges of wastewater effluent from the Spray Fields "enter into the Wetlands and flow into Spencer Creek."). As a result, in order to assert a CWA claim the Plaintiffs must establish that the Wetlands are "waters of the United States." They cannot.

In *Sackett v. EPA*, the Supreme Court established the two-part test that applies when a CWA plaintiff asserts that wetlands are WOTUS. Under *Sackett*, "the party asserting jurisdiction," must establish (1) "that the adjacent body of water constitutes 'waters of the United States' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters)"; and (2) "that the Wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." 598 U.S. 651, 679 (2023). Plaintiffs cannot satisfy either element.

### 1.    Plaintiffs Cannot Establish that Spencer Creek is a WOTUS.

In an attempt to satisfy their burden to establish that the Wetlands are adjacent to a body of water that constitutes as WOTUS, Plaintiffs point to Spencer Creek. *See* Am. Compl. ¶ 46, ¶ 105. At the pleading stage, Plaintiffs alleged that "Spencer Creek is a 'waters of the United States'" stating that it is a "relatively permanent bod[ies] of water connected to traditional interstate navigable waters." *See* Am. Compl. ¶ 104. As explained below, Plaintiffs' own expert disagreed.

For the purposes of the first element, *Sackett* incorporated earlier case law on what constitutes WOTUS:

> To make sense of Congress's choice to define 'navigable waters' as 'the waters of the United States,' the Court concludes that the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water "forming geographic[al] features" that are described in ordinary parlance as "streams, oceans, rivers, and lakes."' *Rapanos*, 547 U. S., at 739, 126 S. Ct. 2208, 165 L. Ed. 2d 159 (plurality opinion).

*Sackett*, 598 U.S. at 678 (citing *Rapanos v. United States*, 547 U.S. 715, 739 (2006)).  Later in its

opinion, the Supreme Court again adopted the *Rapanos* test:

> In *Rapanos*, the plurality spelled out clearly when adjacent Wetlands are part of covered waters. It explained that "waters" may fairly be read to include only those Wetlands that are "as a practical matter indistinguishable from waters of the United States," such that it is "difficult to determine where the 'water' ends and the 'Wetland' begins." 547 U. S., at 742, 755, 126 S. Ct. 2208, 165 L. Ed. 2d 159 (emphasis deleted).   That occurs when Wetlands have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and Wetlands." *Id.*, at 742, 126 S. Ct. 2208, 165 L. Ed. 2d 159; cf. 33 U. S. C. § 2802(5) (defining "coastal waters" to include Wetlands "having unimpaired connection with the open sea up to the head of tidal influence").  We agree with this formulation of when Wetlands are part of 'the waters of the United States.'

*Sackett*, 598 U.S. at 678.

The *Rapanos* test for determining WOTUS—as adopted by *Sackett*—excludes intermittent

and ephemeral streams from WOTUS's definition:

> In sum, on its only plausible interpretation, the phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes." See Webster's Second 2882. **The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall**.

*Rapanos*, 547 U.S. at 739 (emphasis added).  Intermittent and ephemeral streams are excluded

because, in the Supreme Court's words, considering these geographic features to be WOTUS is

"beyond parody."  *Id.* at 734 ("The plain language of the statute simply does not authorize this

'Land Is Waters' approach to federal jurisdiction.").

Applying *Sackett*, courts have refused to find CWA jurisdiction over wetlands adjacent to

intermittent or ephemeral streams.  For example, in *Ragsdale v. JLM Construction Services, Inc.*,

the court refused to find that evidence of flow after precipitation was sufficient to establish that a

40

creek was a "relatively permanent, standing or continuously flowing body of water" that could be "described in ordinary parlance as a 'stream' or 'river.'" 737 F. Supp. 3d 449, 465 (W.D. Tex. 2024) (citing *Sackett*, 598 U.S. at 671) "Instead, the creek was an 'ordinarily dry channel[] through which water occasionally or intermittently flows' and is not waters of the United States under the Clean Water Act." *Id.* (citing *Rapanos*, 547 U.S. at 733).  Relying on *Sackett*, the court specifically noted that intermittent or ephemeral streams were not relatively permanent bodies of water:

> This Court is bound by the *Sackett* decision, which defines waters of the United States as 'only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers and lakes.' 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739) (cleaned up).  **Relevant here, the definition "does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Rapanos*, 547 U.S. at 739.**

*Id.* at 461 (emphasis added).

Further, in *United States v. Sharfi*, the court granted summary judgment for defendants in a CWA action based in part on its determination that ditches with intermittent or ephemeral flow are not WOTUS:

> [T]he *Rapanos* plurality states more than once that channels with intermittent flow are not WOTUS. *See id.* at 733 ("All of these terms [such as 'streams' and 'rivers'] connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows."), 733-34 (WOTUS "exclude[s] channels carrying merely intermittent or ephemeral flow"), 739 (the phrase WOTUS "does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.").  **Here, the undisputed material evidence establishes that the area of ditches in this case closest to Defendants' Site are, at most, "intermittent" or "ephemeral" ditches or channels with seasonal flow. This does not meet the *Sackett* standard of "relatively permanent, standing or continuously flowing body of water" to qualify as WOTUS**.  *See Sackett*, 598 U.S. at 671; *Rapanos*, 547 U.S. at 739.

*United States v. Sharfi*, 2024 WL 4483354, at *12 (S.D. Fla. Sept. 21, 2024) (emphasis added).

41

Here, Plaintiffs' own expert testified that Spencer Creek (the adjacent body of water) is an intermittent stream.    Kogge Dep. 186, 187:10-18. 190:16-18 (**"[T]his is an intermittent stream**."), JX 10 (emphasis added); *see also* MacGregor Report 7, JX 26.   Mr. Kogge accurately describes how the absence of flow—a frequent occurrence in Spencer Creek—classifies the reach of Spencer Creek east of Elk Lake Road as, at best, intermittent:

> **Q:**    So, once you went beyond about the 25 feet of the plunge pool, the creek was dry?
>
> A:    Yes, downstream of that.  We would now call that intermittent, that clearly wasn't flowing….

Kogge Dep. 186:7-15, JX 10.  Mr. Kogge's testimony matches with his assessment in his expert report as well:

> At the time of GEI's assessment, there was no water in this defined water course and to which GEI would classify this reach from below the plunge pool below the culvert to be an intermittent stream, lacking a continuous flow of water to be classified as a perennial stream. Intermittent means the flow of water is not 365 days a year but only periodic.

Kogge Report 12, JX 20.  Further, Mr. Kogge also recognized that the section of creek east of Elk Lake Road also lacks other common indicators of a true stream:

> Moving further downstream the intermittent stream becomes less defined with the banks   and bed being very difficult to differentiate from one another but still present. Areas of obvious scour and deposition in the stream bed less than 50 feet upgradient are no  longer visible likely due in large part to a variety of factors, including but not limited to:  blockages in the culvert inlet that conveys water from this drainageway/stream to Elk Lake….

*Id.*  Plaintiffs' expert on the subject admitted numerous times that Spencer Creek is an intermittent stream—its flow is only "periodic."  This is also apparent based on photographs of the Creek. *See* Photographs of Spencer Creek, JX 65.

Two members of ESLA—Dennis Gretel and Brian Taylor—corroborated Mr. Kogge's expert opinion that water is only sometimes present in Spencer Creek.  In fact, these witnesses'

42

testimony established that Spencer Creek is certainly ephemeral, meaning that it is sustained entirely by rain. Kogge Dep. 176:8-11 (**"Q:** And according to your report streams which form and are only sustained by rainfall or are rain dependent, are classed by ephemeral?  A: Correct."), JX 10.

Mr. Gretel owns the property where the final portion of culvert disappears into leaves before running underground, beneath several rental cottages, and reemerging at Elk Lake.  The final culvert is totally obstructed by leaves, as is evident in the photograph below:



Spencer Creek Photographs, JX 65, BFI19487.

Mr. Gretel discussed the infrequent flow and rain-dependent nature of Spencer Creek:

**Q:**  How often is there actually water flowing out of that pipe?

A:  Oh again, it depends on what the weather—what the weather is going to do. You know, it flows in the springtime, and then it depends how much rain

43

we get through early summer. And usually, July comes and things get a little drier. Then it just slows down to hardly anything.

Gretel Dep. at 21:25-22:8, JX 8. Mr. Gretel confirmed that Spencer Creek routinely runs dry for months at a time. *Id.* at 23:6-11 ("**Q:** So, are there periods of time where you might go months without any flow out of the pipe? A: Yeah. Like this year, yeah. There has been nothing flowing. I couldn't tell you the last—when the last big rain, which I think was back early July."). Mr. Gretel's testimony is consistent with the photographs below, which show the outlet of the pipe (what Plaintiffs refer to as a "creek") has no flow into Elk Lake, and is completely plugged with sand:



Spencer Creek Photographs, JX 65, BFI19510.

44



*Id.*, BFI19511.

Mr. Taylor, another Elk Lake and Spencer Creek riparian, provided testimony that

corroborated Mr. Gretel's assessment:

**Q:**   Do you recall last year when the creek was dry and when it started flowing
again?

A:   Pretty much around the same timeframe.

**Q:**   Which is what timeframe?

A:   Late June, early July through the period extending into August, sometimes
through September. Again, it depends a lot upon the natural precipitation
events. If we get heavy rainfall, water will flow through the creek. If we
don't get much rain, it stays dry.

Taylor Dep. at 37:16-24, JX 9.  There is no dispute that Spencer Creek is at most an intermittent stream, but more likely an ephemeral one.  Such intermittent flow fails the *Sackett* test.  *Ragsdale*, 737 F. Supp.3d at 461.[8]

### 2.    Plaintiffs Cannot Establish a Continuous Surface Connection to a WOTUS, Such That It Is Difficult to Distinguish the Wetlands from the WOTUS.

As set forth above, Spencer Creek is clearly not WOTUS.  But even if it were, Plaintiffs still cannot establish that there is a continuous surface connection between the Wetlands and Spencer Creek such that it is difficult to tell where the Wetland begins and the WOTUS ends.  Under *Sackett*, "the CWA extends to only those wetlands that are as a practical matter indistinguishable from waters of the United States." *Sackett*, 598 U.S. at 679 (emphasis added).  Accordingly, Plaintiffs must establish that the Wetlands have a continuous surface connection with an adjacent body of water that constitutes as WOTUS in its own right, making it difficult to determine where the "water" ends and the "Wetland" begins.  *Sackett*, 598 U.S. at 651.

Plaintiffs cannot meet their burden because it is easy to tell where Spencer Creek ends and the Wetlands begin.  The parties both agree that the Wetlands end at the mouth of the culvert underlying Elk Lake Road.  *See* MacGregor Report at 6, JX 26 ("At the northern end of Wetland Area 2 intermittent surface water flows into a culvert under Elk Lake Road."); *see also* JX 26, Figures 5 and 6a; Kogge Rebuttal Report at 3, JX 21 ("The Wetlands extend all the way to Elk Lake Road, as shown in Figures 5 and 6a.").  Even assuming that Spencer Creek begins in a culvert

---

[8] Moreover, even if Plaintiffs' expert had not already acknowledged that Spencer Creek is ephemeral or intermittent (as discussed above), Plaintiffs would still need to establish that Spencer Creek is a relatively permanent, standing or continuously flowing body of water connected to a traditionally navigable water under the test set forth in the *Sackett* and the *Rapanos* plurality decisions.  Plaintiffs have not produced any objective measures or data, such as surface water elevations or flow measurements from Spencer Creek to show how often standing water or flow are actually present in Spencer Creek.

(which seems ridiculous on its face), it is easy to distinguish a culvert from Wetlands. Therefore, it is easy to tell where the Wetlands end and Spencer Creek begins.

In accordance with comparable cases, the ability to distinguish Spencer Creek from the Wetlands supports the conclusion that there is no continuous surface connection. In *Lewis v. United States*, 88 F.4th 1073, 1076 (5th Cir. 2023) the Fifth Circuit found that wetlands were not subject to federal jurisdiction based on its determination that "the nearest relatively permanent body of water is removed miles away from the Lewis property by <u>roadside ditches</u>, a <u>culvert</u>, and a <u>non-relatively permanent tributary</u>." *Lewis*, 88 F.4th at 1078. The Lewis Court also premised its decision in part on "photographs of the property" which depicted that "there is no 'continuous surface connection' between any plausible wetlands on the Lewis tracts and a 'relatively permanent body of water connected to traditional interstate navigable waters.'" *Id.* Based on these photos, the Fifth Circuit ruled out a continuous surface connection:

> In sum, it is not difficult to determine where the 'water' ends and any 'Wetlands' on Lewis's property begin—there is simply no connection whatsoever. <u>There is no factual basis as a matter of law for federal Clean Water Act regulation of these tracts. The district court erred in denying Lewis's motion for summary judgment</u>.

*Id.* Burnette notes the factual similarities between its case and those in *Lewis*—the Wetlands adjacent to the Spray Fields are separated from navigable waters by a <u>roadside ditch</u>, <u>multiple culverts</u> and a <u>non-relatively permanent tributary</u>. As in *Lewis*, there is no basis for a CWA claim here.

Moreover, the lack of surface water within the Wetlands on a regular basis, in and of itself, establishes the lack of a continuous surface water connection between the Wetlands and any adjacent body of water. On this point, *Sharfi* is instructive because there the court granted summary judgment on a CWA claim based in part on the lack of surface water in the wetland. The *Sharfi* court first dismissed the idea that the presence of surface water is not necessary to establish

a "continuous surface connection" under *Sackett* so long as the wetland abutted an adjacent body

of water:

> It is true that the *Sacket* majority never uses the phrase 'continuous surface water
> connection,' but Plaintiff's argument ignores the latter half of the second part of the
> *Sackett* test, which requires that the continuous surface connection be one which
> *makes it difficult to determine where the 'water' ends and the 'Wetland' begins. Id.*
> at 678-79 (quoting *Rapanos*, 547 U.S. at 742, 755) (emphasis added). *Sackett*
> plainly held that 'the CWA extends only to those Wetlands that are "as a practical
> matter *indistinguishable* from waters of the United States.'" *Sackett*, 598 U.S. at
> 678 . . . Plaintiff ignores this indistinguishability requirement, which becomes
> meaningless if abutment alone establishes a 'continuous surface connection.'

*Id*. at *16 (citations omitted).  The court further explained that wetlands and adjacent bodies cannot

be "indistinguishable" when no surface water is present:

> In proper context, then, a qualifying continuous surface connection must render the
> two things being connected—in this case, Wetlands and adjacent regulated
> WOTUS—indistinguishable from one another except for *temporary* disturbances,
> which plainly and necessarily requires a surface connection involving water.

*Id*. at *17 (footnote omitted).  As in *Sharfi,* the Wetlands at issue in the present case are generally

lacking in surface water.  *See, e.g.,* Ogle Dep.82:16-17 ("[T]he wetlands were fairly dry."), JX 5;

Mays Dep. 34:19-24, JX 7; *see* Wetland Photos, JX 63.  As result, Plaintiffs cannot establish that

there is a continuous surface water connection between the Wetland and Spencer Creek (much less

Elk Lake).  Furthermore, because Plaintiffs have failed to produce evidence establishing the

regular presence of surface water in the Wetlands, they have not met their burden to establish a

continuous surface connection as required by *Sackett*.

    As a result, Defendants are entitled to summary judgment.

### D.  IF THE COURT GRANTS SUMMARY JUDGMENT ON PLAINTIFFS' CWA CLAIM, IT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' MEPA CLAIM

    When a party brings a federal claim, this Court has supplemental jurisdiction over related

state-law claims if they are "so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Court's exercise of supplemental jurisdiction is discretionary; it may decline jurisdiction over related state-law claim under certain enumerated circumstances. *Id.* at § 1367(c)(1)-(4). One of these circumstances is if "the district court has dismissed all claims over which it has original jurisdiction." *Id.* at 28 U.S.C. § 1367(c)(3). Courts routinely exercise their discretion to dismiss state-law claims when they have already dismissed all federal claims. *See Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.").

If the Court grants summary judgment on Plaintiffs' CWA claim for any of the reasons described above, it should decline to exercise supplemental jurisdiction over Plaintiffs MEPA claim.[9] The MEPA claim arises solely under state law and concerns Burnette's compliance with a state-issued permit. The Court should not allow itself to be turned into a bona fide state regulatory agency that decides disputes among Michigan citizens.

## IV. CONCLUSION

For these reasons, Burnette respectfully requests that this Court enter summary judgment in Burnette's favor on Plaintiffs' CWA claim and, if appropriate, decline to exercise supplemental jurisdiction over Plaintiffs' MEPA claim.

---

[9] This argument is raised in the alternative to Burnette's Motion to Dismiss for Lack of Subject Matter Jurisdiction, which argues that the MEPA claim should be dismissed for lack of Article III standing and based on Michigan's bar on pre-enforcement review.

**VARNUM LLP**
*Attorneys for Defendant*

Dated:  April 25, 2025

By: */s/Neil E. Youngdahl*
    Aaron M. Phelps (P64790)
    Matthew B. Eugster (P63402)
    Neil E. Youngdahl (P82452)
    P.O. Box 352
    Grand Rapids, MI 49501-0352
    (616) 336-6000
    amphelps@varnumlaw.com
    mbeugster@varnumlaw.com
    neyoungdahl@varnumlaw.com

27235788.3

50

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2025, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to all counsel of

record.

/s/ Neil E. Youngdahl
Neil E. Youngdahl (P82452)