UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRAND TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS, et al.,

     Plaintiffs,

v.

BURNETTE FOODS, INCORPORATED,

     Defendant.

_____/

Case No. 1:23-cv-589

HON. JANE M. BECKERING

## OPINION AND ORDER

In June 2023, Plaintiffs initiated this citizen suit against Defendant Burnette Foods, Incorporated, a fruit processor, with the filing of a Complaint alleging that Defendant is discharging its fruit processing wastewater in violation of both federal and state environmental laws. In August 2023, after Plaintiffs amended their Complaint, this Court dismissed Defendant's first motion to dismiss as moot. In April 2024, this Court denied Defendant's second motion to dismiss, which concerned the quality of Plaintiffs' pre-suit notice. Now pending before the Court is Defendant's third motion to dismiss (ECF No. 90), presenting three subject-matter jurisdiction challenges, including a challenge to Plaintiffs' standing to pursue this suit. For the following reasons, the Court denies the motion.

## I.  BACKGROUND

### A.  Factual Background

Three Plaintiffs initiated this action: (1) the Grand Traverse Band of Ottawa and Chippewa Indians (GTB), a federally recognized Indian tribe headquartered in Leelanau County, Michigan; (2) the Grand Traverse Bay Watershed Initiative, Inc., d/b/a The Watershed Center Grand Traverse

Bay (TWC), a Michigan nonprofit corporation advocating for clean water in Grand Traverse Bay; and (3) the Elk-Skegemog Lakes Association (ESLA), also a Michigan nonprofit corporation that "promotes an understanding and appreciation of the rights and responsibilities of riparian landowners and takes necessary or desirable actions to protect and preserve the environment of the Elk-Skegemog watershed with a focus on water quality" (Am. Compl. [ECF No. 16] ¶¶ 10–12).

Defendant Burnette Foods, Incorporated is a Michigan corporation that produces and distributes locally and nationally sourced fruits and vegetables and has production facilities throughout Michigan (*id.* ¶ 13).  Defendant owns and operates a fruit processing facility in Elk Rapids, Antrim County, Michigan (the "Facility") (*id.*).  At the Facility, Defendant washes, processes, and cans fruit (*id.* ¶ 47).  Defendant's fruit processing generates millions of gallons of wastewater each year (*id.*).

According to Plaintiffs, Defendant's "fruit processing wastewater contains elevated concentrations of numerous pollutants" such as "phosphorus, biological oxygen demand (BOD), and total suspended solids (TSS)," which have "serious environmental impacts" because they are or contain oxygen-consuming materials (*id.* ¶¶ 48 & 50).  Plaintiffs allege that the pollutants can also create disturbing qualities in natural waters such as "unnatural foaming, foul odors, algae blooms, and discoloration" (*id.* ¶ 50).

Defendant pipes its wastewater approximately one mile south of the Facility, where it discharges the wastewater onto a 40- to 50-acre parcel of land in Elk Lake Township, Michigan, which the parties refer to as the "Spray Fields" (and sometimes the "Irrigation Fields") (*id.* ¶¶ 13, 52, & 54).  The Spray Fields are adjacent to a wetland complex ("the Wetlands") (*id.* ¶ 46).  Indeed, the Spray Fields are sloped toward the Wetlands, and Plaintiffs allege that hydrology reports show that both the surface water runoff from the Spray Fields and any shallow groundwater underlying

2

the Spray Fields flow into the Wetlands (*id.* ¶ 61).  A "farm road" runs through the Wetlands, and an "equalization culvert" runs under the farm road (*id.* ¶¶ 63–64).[1]  The "equalization culvert" has an 18-inch diameter and is buried approximately 3.6 inches below surface grade (*id.* ¶ 64).

The Wetlands are headwaters for Spencer Creek (*id.* ¶ 46).  Spencer Creek originates on Defendant's property at an "indistinguishable point" in the Wetlands, flowing approximately 3,000 feet before "out-falling" into Spencer Bay in Elk Lake (*id.* ¶¶ 16, 25, & 62), as depicted below:



---

[1] Defendant labels the area of the Wetlands north of the farm road as "Wetland Area 2" and the area south of the farm road as "Wetland Area 1" (ECF No. 21 at PageID.3550).  Plaintiffs did not use these labels in their Amended Complaint but instead describe the Wetlands as a *single* wetland complex.  *See, e.g.*, Am. Compl. ¶ 105.  According to Plaintiffs, regulators have "long recognized" the Wetlands as a single wetland complex (ECF No. 24 at PageID.3621–3622).

(ECF No. 21 at PageID.3550).  Elk Lake, in turn, flows into Grand Traverse Bay and then out to Lake Michigan (Am. Compl. ¶¶ 20, 27, & 103).

Defendant does not have a National Pollution Discharge Elimination System (NPDES) permit for the discharge of its fruit processing wastewater to its Spray Fields (*id.* ¶¶ 53 & 94), although the Environmental Protection Agency (EPA) has promulgated effluent limitations for fruit processing wastewater (*id.* ¶ 34, citing, in relevant part, 40 C.F.R. § 407.20 (Apple products subcategory)).

Defendant has a state-issued groundwater permit that authorizes discharges of the wastewater onto the Spray Fields as part of a "land treatment system," subject to maximum daily and yearly volume limits (Am. Compl. ¶ 54, citing Groundwater Permit, Ex. 5 to Am. Compl. [ECF No. 16-5]).  The State of Michigan requires the Spray Fields to have plants that are specifically capable of absorbing the wastewater pollutants (March 2019 EGLE Discharge Mgmt. Plan, Ex. 6 to Am. Compl., ECF No. 16-6 at PageID.1717 (describing the design of the system and specifically delineating the crops "selected for this facility" due to their "nutrient uptake characteristics")).  According to Plaintiffs, for "over three decades," Defendant has been "frequently spraying excessive amounts of its wastewater as well as wastewater with excessive levels of pollutants, in violation of its Groundwater Permit, onto the Spray Fields to the extent that the 'slow rate land treatment system' is overwhelmed and unable to absorb the wastewater effluent and the pollutants therein before they reach the Wetlands [and] contaminat[e] the Wetlands, Spencer Creek, and Elk Lake" (Am. Compl. ¶ 60, citing 2019, 2020, & 2021 EGLE Violation Notices [ECF Nos. 16-10, 16-11, & 16-12]).  Plaintiffs allege that the pollutants are discharged "through surface water migrations and the groundwater underlying the Spray Fields" (*id.* ¶ 15).

4

**B.  Procedural Posture**

Following the submission of their "Clean Water Act Notice of Intent to Sue/60-day Notice Letter," Plaintiffs initiated this case in June 2023 with the filing of a Complaint (ECF No. 1).  In lieu of filing an answer to Plaintiffs' Complaint, Defendant filed a Motion to Dismiss (ECF No. 10).  This Court, without addressing the merits of Defendant's motion, permitted Plaintiffs to file an amended complaint (Order, ECF No. 13).  On August 25, 2023, Plaintiffs filed an Amended Complaint, alleging violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (Count I); and the Michigan Environmental Protection Act (MEPA), MICH. COMP. LAWS § 324.1701 *et seq.,* which is Part 17 of Michigan's Natural Resources and Environmental Protection Act (NREPA), MICH. COMP. LAWS § 324.101 *et seq.* (Count II) (ECF No. 16).  Plaintiffs seek declaratory and injunctive relief, as well as civil penalties and their costs (*id.* at PageID.1644–1645).

As noted, this Court dismissed Defendant's first motion to dismiss as moot (ECF No. 17) and denied Defendant's second motion to dismiss (Op. & Order, ECF No. 26).  Defendant filed an Answer (ECF No. 27) and subsequently filed the motion to dismiss at bar (ECF No. 90).  Plaintiffs filed a response in opposition to the motion to dismiss (ECF No. 110), and Defendant filed a reply to the response (ECF No. 119).  On October 13, 2025, Defendant filed a Notice of Supplemental Authority relevant to its current motion to dismiss (ECF No. 124), Plaintiffs filed a response (ECF No. 126), and Defendant, on leave granted, filed a reply (ECF No. 131).  The parties have also filed cross-motions for summary judgment (ECF Nos. 89 & 95), which the Court will decide in a separate opinion.

Having considered the parties' submissions relevant to the motion to dismiss, the Court concludes that oral argument is unnecessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standard

Defendant's current motion to dismiss is filed pursuant to Federal Rule of Civil Procedure 12(b)(1).  Rule 12(b)(1) authorizes the court to dismiss a claim for relief in any pleading if the court "lack[s] subject-matter jurisdiction."  FED. R. CIV. P. 12(b)(1).  It is well settled that challenges to a court's subject-matter jurisdiction "may be raised at any time."  *Georgia-Pac. Consumer Prods. LP v. NCR Corp.*, 40 F.4th 481, 484 (6th Cir. 2022) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)).  *See also* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  The plaintiff bears the burden of proving jurisdiction in order to survive the motion.  *Houchens v. Beshear*, 850 F. App'x 340, 342 (6th Cir. 2021).

A defendant can challenge subject-matter jurisdiction in one of two ways: a facial attack or a factual attack.  *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861 (6th Cir. 2022).  "In a facial attack, a 'movant accepts the alleged jurisdictional facts as true and 'questions merely the sufficiency of the pleading' to invoke federal jurisdiction.'"  *Polselli v. United States Dep't of the Treasury–Internal Revenue Serv.*, 23 F.4th 616, 621 (6th Cir.) (citation omitted), aff'd sub nom. *Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023).  "A factual attack, by contrast, is advanced when the movant contests the alleged jurisdictional facts by introducing evidence outside the pleadings."  *Enriquez-Perdomo*, *supra* (citation omitted).  "In such a case, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts, and the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction."  *Id.*

6

Defendant's motion presents a factual attack (ECF No. 91 at PageID.4318), and in their motion papers, the parties reference a collection of 87 joint exhibits (ECF No. 99).[2]  However, the Court engages in a factual inquiry regarding the allegations in the Amended Complaint "only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 443 (6th Cir. 2012) (quoting *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)).  In other words, "the district court is prohibited from making factual findings with respect to a jurisdictional issue when such a finding would adversely affect the merits of the plaintiff's case." *Id.* at 443–44.

## B.  Discussion

Congress enacted the Clean Water Act (CWA) to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *South Side Quarry, LLC v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 28 F.4th 684, 689 (6th Cir. 2022) (quoting, in pertinent part, 33 U.S.C. § 1251).  The goal of the CWA is to achieve "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(2).  To reach this goal, the CWA encompasses a "comprehensive statutory system for controlling water pollution." *South Side Quarry, supra.*  The "cornerstone" of this system is the NPDES permit program.  *Id.* (citing, in pertinent part, 33 U.S.C. § 1342).  With an NPDES permit, a person may discharge pollutants so long as he stays within the permit's limits; however, without a permit, a "discharge ... [is] unlawful."  *Id.* (quoting 33 U.S.C. § 1311(a)).

The CWA's permit program relies on "cooperative federalism" to manage the nation's water resources.  *Id.* at 690 (citation omitted).  States "typically control the NPDES permitting

---

[2] The exhibits were also filed in support of the parties' cross-motions for summary judgment.

programs as they apply to waters within their borders, subject to EPA approval." *Id.* (citing, in pertinent part, 33 U.S.C. §§ 1314(i)(2), 1342(b)–(c)).  The CWA also preserves states' "primary responsibilities and rights" to "allocate quantities of water within [their] jurisdiction."  33 U.S.C. § 1251(b), (g).

In Michigan, the Department of Environment, Great Lakes, and Energy ("the EGLE"), formerly known as the Department of Environmental Quality (DEQ), issues permits for waters within the State pursuant to Part 31 of the MEPA.  Together, the NPDES and EGLE permits create a "patchwork of 'effluent limitations'" that limit the discharge of pollutants. *South Side Quarry*, 28 F.4th at 690 (citing 33 U.S.C. § 1362(11) (defining "effluent limitation" as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance")). Effluent limitations "restrict the quantities, rates, and concentrations" of pollutants discharged by a permit holder. *Id.* (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (citing 33 U.S.C. §§ 1311, 1314)).  "If a person discharging a pollutant fails to meet an effluent limitation or standard found in a regulation or permit—or fails to get a permit—he violates the CWA." *Id.*

When violations occur, the EPA and the states form the first line of defense. *Id.*  The federal and state agencies retain the "primary" power to "enforce[ ]" the CWA. *Id.* (citation omitted).  However, in "limited circumstances," the CWA also permits private citizen suits. *Id.* (citing 33 U.S.C. § 1365).  Such suits serve as "backup, 'permitting citizens to abate pollution when the government cannot or will not command compliance.'" *Id.* (quoting, in pertinent part, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987)).  The Sixth Circuit has observed that citizen suits "provide a second level of enforcement and can serve as a

check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations." *Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007).

Defendant's current motion to dismiss presents three challenges to this Court's jurisdiction over the subject matter of this case: Plaintiffs' standing to pursue their claims, the applicability of the MEPA's pre-enforcement bar as to Count II, and the applicability of administrative exhaustion requirements. The Court considers the parties' arguments on these three topics, in turn.

### 1.   <u>Plaintiffs Have Standing to Bring their Claims</u>

The Sixth Circuit distinguishes between Article III standing and statutory standing. *See generally United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342, 348–49 (6th Cir. 2017). Defendant argues that Plaintiffs lack both types.

#### a.     **Article III Standing**

As in any federal suit, a claimant must have Article III standing. Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts extends only to "Cases" and "Controversies." "'[S]tanding,' by itself, traditionally has referred to whether a plaintiff can satisfy Article III's case-or-controversy requirement[.]" *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979)). Whether a party has Article III standing is properly an issue of a court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017); *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013); *Roberts*, 655 F.3d at 580–81. The doctrine of standing requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). Standing "ensure[s] that

federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016).

Where there are "multiple plaintiffs," "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *see also Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 304 (6th Cir. 2019) (relying on *Town* for the proposition that "[w]e may not decide the merits of a claim for relief unless some party pressing the claim has standing to bring it"). Accordingly, the Court examines each Plaintiff's stake in this outcome to determine whether some party has standing.

### (1)  GTB

Defendant argues that GTB, which asserts organizational standing based on its treaty rights, lacks such standing where GTB's inland policy biologist and corporate representative, Dan Mays, confirmed that no treaty rights extend to Spencer Creek because the creek runs through private property (ECF No. 91 at PageID.4323, citing Mays Dep. [Jt. Ex. 7, ECF No. 99-7] at 9, 11). Defendant represents that Mays also testified that no treaty-protected resource has been degraded because of Defendant's spray operations and that no tribal member has been precluded from hunting or fishing or gathering on Elk Lake because of Defendant's activities (*id.* at PageID.4323–4324).

In response, Plaintiffs argue that GTB has standing because Defendant's "unpermitted wastewater discharges may impair the usufructuary rights of GTB to hunt, fish, and gather within the 1836 Treaty-ceded territory, including Elk Lake, where GTB members can and do fish" (ECF No. 110 at PageID.6864–6867). Plaintiffs argue that Defendant has mischaracterized the record and that unrefuted evidence in the record instead shows discoloration observed by the state

regulator and documented by Defendant in effluent and ponded wastewater upstream of the wetlands and consistent discoloration observed downstream in both Spencer Creek and Elk Lake (*id.* at PageID.6877).

Defendant's argument lacks merit.

"An organization can satisfy Article III's standing requirements by suing on its own behalf, called 'organizational standing,' or by suing on behalf of its members, called 'associational' or 'representative' standing." *Children's Health Def. v. United States Food & Drug Admin.*, No. 21-6203, 2022 WL 2704554, at *2 (6th Cir. July 12, 2022) (citing *Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021); *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) ("AAPS")).  GTB alleges the former— organizational standing—based on its treaty rights.  *See* Am. Compl. ¶¶ 20, 27.

An organization may have standing to sue on its own to challenge action that causes it direct injury, and the inquiry is "the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).  Specifically, the United States Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  The plaintiff must have suffered "[1] an injury in fact, [2] fairly traceable to the defendant's conduct, [3] that is likely to be redressed by a favorable decision from the court." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014).

Here, GTB is signatory to the Treaty of Washington executed on March 28, 1836.  7 Stat. 491 ("the 1836 Treaty").  In the 1836 Treaty, as explained by Mays during his deposition, GTB reserved off-reservation fishing rights (i.e., usufructuary rights) in the Great Lakes and usufructuary fishing, hunting, trapping, and gathering rights in inland portions of the cession, including the waters of Elk Lake (Mays Dep. at 9, 17, 26).  *See generally United States v.*

*Michigan*, 471 F. Supp. 192 (W.D. Mich. 1979) (describing tribal rights and specifically the 1836 Treaty), aff'd 653 F.2d 277 (6th Cir. 1981).

GTB's claimed injuries are not limited to Spencer Creek.  Rather, Plaintiffs allege that Defendant's violations of the Clean Water Act, its Groundwater Permit, and the Michigan Environmental Protection Act affect not only Spencer Creek but also the Wetlands, Elk Lake, and its connecting waters, as well as adjacent Lake Michigan waters (Am. Compl. ¶ 20).  Mays testified that GTB has 4,000 members, that 800 members live around Elk Lake, and that approximately 25 percent of its membership receives "hunting, fishing, trapping, and gathering IDs" (Mays Dep. at 13).  While Mays could not identify the name of a tribal member who could not "hunt and fish or gather on Elk Lake … because of Burnette Foods," Mays estimated that 200 members accessed Elk Lake (*id.* at 13–14, 16).  Mays emphasized that GTB simply did not keep "data" to answer Defendant's specific question (*id.* at 14–15).

The general injury claimed by GTB was found sufficient for purposes of organizational standing in *Courte Oreilles Lakes Association Inc. v. Zawistowski*, 769 F. Supp. 3d 864, 870 (W.D. Wis. 2025), where the district court agreed that the Lac Court Oreilles Band, citing treaty rights to hunt, fish, and gather within Lac Court Oreilles, had standing to bring a CWA suit against a cranberry producer for phosphorus discharges into the lake.  The district court reasoned that while the "[p]laintiffs do not explain how increased phosphorus in the lake has affected any specific member's ability to exercise treaty rights," it was "reasonable to infer that the increased phosphorus leads to fewer fish in the lake, and fewer fish impairs the tribe [sic] treaty rights because it makes harvesting fish more difficult and less productive."  *Id.  See also Fond du Lac Band of Lake Superior Chippewa v. Cummins*, 657 F. Supp. 3d 1202, 1211 (D. Minn. 2023) (pointing out that the Supreme Court has "repeatedly rejected the argument that treaty usufructuary

rights give no greater rights than those enjoyed by the general public" and holding that it has Article III jurisdiction to consider the injury claimed by the plaintiff-Band to the scope of its treaty usufructuary rights).

In summary, the Court concludes that Defendant's arguments in this case likewise fail. Plaintiffs have borne their burden of establishing GTB's organizational standing to protect its treaty-reserved rights from Defendant's actual or threatened polluting discharges.

### (2) TWC

Defendant argues that TWC's claims of diversion-of-resources and harm to its mission statement are bases for organizational standing that the Supreme Court has foreclosed (ECF No. 91 at PageID.4322–4323). Defendant argues that TWC has also failed to identify a member with any concrete particularized injury sufficient for that theoretical member to have associational (or representative) standing (*id.*).

In response, Plaintiffs do not claim that TWC has organizational standing but argue that TWC instead has associational standing to sue on behalf of its members, including Samantha Ogle (ECF No. 110 at PageID.6859–6864). According to Plaintiffs, people who are part of TWC's Leadership Circle, including Ogle, are the "functional equivalent" of members for purposes of associational standing (*id.* at PageID.6860).

In reply, Defendant argues that TWC's Leadership Circle does not satisfy the indicia-of-membership test established by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 344–45 (1977), and applied by the Sixth Circuit in *Nestle Ice Cream Co. v. NLRB*, 46 F.3d 578, 586 (6th Cir. 1995) (ECF No. 119 at PageID.7905–7906).

Defendant's argument lacks merit.

"[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Dayton Area Chamber of Com. v. Kennedy*, 147 F.4th 626, 632 (6th Cir. 2025) (quoting *Int'l Union, UAW v. Brock*, 477 U.S. 274, 290 (1986)).  Under this doctrine, "[a]n association may sue on behalf of its members if '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Dayton Area Chamber of Com. v. Kennedy*, 147 F.4th 626, 632 (6th Cir. 2025) (quoting *Hunt*, 432 U.S. at 343).  *See also Warth*, 422 U.S. at 511 ("The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.") (emphasis added).  In other words, an "[a]ssociation must show that one of its named members '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Spokeo, supra*).  *Cf. Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 537–42 (6th Cir. 2021) (discussing the origins and inherent tensions of the associational standing doctrine).

Here, per TWC Executive Director Christine Crissman, TWC's mission is "to advocate for clean water in Grand Traverse Bay and act to protect/preserve its waters" (Crissman Dep. [Jt. Ex. 18, ECF No. 99-18] at 16).  There is no serious question that the litigation at bar is germane to TWC's organizational purpose and that the relief requested does not require participation by individual members.  Rather, relying on *Hunt* and *Nestle*, Defendant more generally questions

whether TWC may properly assert the claims of its constituency, including Ogle, where TWC is not a traditional voluntary membership organization.

The 1977 decision in *Hunt* involved the Washington State Apple Advertising Commission, a state agency whose purpose was to protect the local apple industry. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 200 (2023). The Commission brought suit to challenge a North Carolina statute that imposed a labeling requirement on containers of apples sold in that State. *Id.* The Commission argued that it had standing to challenge the requirement on behalf of Washington's entire apple industry. *Id.* The Supreme Court recognized, however, that as a state agency, "the Commission [wa]s not a traditional voluntary membership organization ..., for it ha[d] no members at all." *Id.* (quoting *Hunt*, 432 U.S. at 342). The Court nevertheless concluded that the Commission had standing because "the apple growers and dealers it represented were effectively members of the Commission." *Id.* The Court observed that the growers and dealers "alone elect[ed] the members of the Commission," "alone ... serve[d] on the Commission," and "alone finance[d] its activities"—they possessed, in other words, "all of the indicia of membership." *Id.* (quoting *Hunt*, 432 U.S. at 344). The Court concluded that the Commission was therefore a genuine membership organization in substance, if not in form. *Id.* at 200–01 (quoting *Hunt*, 432 U.S. at 343).

Nearly twenty years later, in *Nestle Ice Cream Co. v. NLRB*, 46 F.3d 578 (6th Cir. 1995), to assess whether a union had standing to sue on behalf of nonunion employees, the Sixth Circuit referenced *Hunt* and indicated that "for the purpose of an associational standing inquiry, 'indicia of membership' may suffice." *Id.* at 586. The Sixth Circuit ultimately concluded that where the nonunion employees had no power to elect union officials and did not finance the union, the union did not have associational standing to bring the suit. *Id.*

15

Defendant now baldly asserts that the Supreme Court's decision in "*Hunt* … defines 'all of the indicia of membership in an organization' that may suffice" (ECF No. 119 at PageID.7905). However, the Supreme Court, more specifically, merely concluded that "the apple growers and dealers … possess all of the indicia of membership in an organization."  432 U.S. at 344.  The Supreme Court in *Hunt* did not claim to have set forth an exhaustive or exclusive "test."  *See Flyers Rts. Educ. Fund, Inc. v. United States Dep't of Transportation*, 957 F.3d 1359, 1362 (D.C. Cir. 2020) (opining that it was "quite doubtful" that the list of "indicia" identified in *Hunt* was meant to be exhaustive).

Applied to the nonunion employees in *Nestle*, the absence of the "indicia" identified in *Hunt* was outcome determinative.  But where an organization does not necessarily possess all three indicia of membership considered in *Hunt*, other circuits have reasonably concluded that the organization may nonetheless be "sufficiently identified with and subject to the influence of those it seeks to represent" that it may assert associational standing.  *See*, *e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 315–16 (1st Cir. 2024) (holding that while the organization's source of its funding was not clear, "the absence of this one indicum is not outcome-determinative," and ultimately concluding that "the municipalities are 'for all practical purposes' represented by [the organization] as if they were themselves its members"); *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (holding that for the purpose of determining whether the OAC had standing to sue on behalf of incapacitated criminal defendants, the OAC is the "functional equivalent of a voluntary membership organization" even though the OAC is funded primarily by the federal government and its constituents are not the only ones who choose its leadership and serve on its leadership bodies); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (holding that while the federally authorized protection and advocacy organization was not a

traditional membership organization, the organization had standing to bring suit on behalf of its constituents to challenge a state statute limiting access to mental health records where the organization was established to represent a specialized segment of the community that is the primary beneficiary of its activities and where its constituents have means to influence the priorities and activities of the organization).

Here, Crissman testified that TWC is not a traditional voluntary membership organization but a "director-based" organization that offers membership in a "Leadership Circle" (Crissman Dep. at 8–9). Defendant emphasizes that the Leadership Circle does not elect board members, the Leadership Circle is not the sole pool of prospective board members, and that assessments are not levied against the Leadership Circle to fund TWC's operations (ECF No. 119 at PageID.7905). However, as Crissman further explained, members of the Leadership Circle are nominated by TWC's board development committee, directly influence the "policies and procedures and strategic direction" of TWC, can nominate board members, and have made financial contributions to support TWC's advocacy efforts (Crissman Dep. at 8–9, 11–13). In summary, unlike the nonunion employees in *Nestle* who lacked any indicia of membership in the plaintiff–union, the indicia in this case support the conclusion that members of the Leadership Circle, including Ogle, are well positioned to direct and influence TWC. Hence, applying current associational-standing case law, the Court concludes that Plaintiffs have borne their burden of establishing TWC's standing to pursue the claims at bar.

### (3) ESLA

Last, Defendant argues that (1) ESLA has likewise identified only "harms" that the United States Supreme Court has ruled insufficient for organizational standing, such as a generalized desire to "protect the water"; and (2) the deposition testimony of ESLA members Dennis Gretel

and Brian Taylor did not offer any evidence of any concrete, particularized injury in fact, traceable to Defendant that would alternatively support associational standing (ECF No. 91 at PageID.4324–4326).

In response, Plaintiffs argue that ESLA, a membership organization, has associational standing to represent the interests of its member, including Taylor, who owns property traversed by Spencer Creek and on Elk Lake and who testified about his concerns about the overall condition and health of the creek and lake (ECF No. 110 at PageID.6867–6870).  Plaintiffs opine that Defendant mischaracterized and minimized Gretel's deposition testimony, but Plaintiffs argue that his testimony is ultimately "not critical to ESLA standing" in light of Taylor's testimony (*id.* at PageID.6871–6876).

ESLA, which conducts periodic scientific water quality tests of the watershed, exists to promote an understanding and appreciation of the rights and responsibilities of riparian landowners and takes necessary or desirable actions to protect and preserve the environment of the Elk-Skegemog watershed (Am. Compl. ¶ 12).  ESLA "aims to solve problems involving lake levels, water safety, greenbelts, and water pollution that could lead to the deterioration of water quality" (*id.*).  Accordingly, there is no serious question that the litigation at bar is germane to ESLA's organizational purpose and that the relief requested does not require participation by its individual members.  Defendant's challenge focuses on the record evidence of any concrete, particularized injury in fact, traceable to Defendant that would support ESLA's associational standing.

In this regard, ESLA member Taylor testified about experiencing a "reddish" or "crimson" discoloration of the water (Taylor Dep. [Jt. Ex. 9, ECF No. 99-9] at 47–53, 60–61).  Specifically, Taylor testified that "in years where the discoloration is very severe, … years where I didn't have enough concern about the situation to raise the boat completely out of the water, the outdrives of

my inboard/outboard pleasure boat were in the red water of the lake for several days, and I noted that when I raised the boat out of the water, the paint on the outdrive had been affected, taken off" (*id.* at 53).  Taylor estimated that the reddish-colored water "would typically last four to five days, [d]epending on the direction of the wind and what the weather was like" (*id.* at 54).  He indicated that he "never let the outdrive remain in the water during those events" again (*id.* at 55, 58).

Taylor sufficiently described a judicially cognizable form of immediate or threatened injury.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–84 (2000) (examining the affidavits and testimony expressing concerns about the effects of the defendant's discharges affecting the affiants' "recreational, aesthetic, and economic interests," and holding that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity"); *Sierra Club v. U.S. E.P.A.*, 793 F.3d 656, 663 (6th Cir. 2015) (finding sufficient for standing purposes the declaration asserting aesthetic, recreational and potential physical injury from "regional haze"); *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 543 (6th Cir. 2004) (finding the alleged injury was fairly traceable to the defendants' actions based on the affidavit noting that the river appeared "dark and oily and smelled like petroleum products").  Therefore, Defendant's argument fails.  Plaintiffs have borne their burden of establishing ESLA's standing to pursue the claims at bar.

In sum, each Plaintiff has satisfactorily demonstrated Article III standing.

b.    **Statutory Standing**

Specific to Count I, Defendant also argues that Plaintiffs lack standing under the CWA because the statute does not permit citizens' suits for violations that were "wholly in the past" (ECF No. 91 at PageID.4332–4334, quoting *Ward v. Stucke*, No. 21-3911, 2022 WL 1467652

("*Ward II*"), at *3 (6th Cir. May 10, 2022) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987)).  Defendant argues that Plaintiffs' unsupported allegation of a "good faith" belief that there are continuing violations of the CWA is not sufficient to establish standing at this stage in the litigation (*id.* at PageID.4333).

In response, Plaintiffs argue that while the legal foundation for Defendant's statutory standing argument is sound—CWA citizens suits require "either continuous or intermittent violation" after filing—Defendant's argument lacks any factual basis because Defendant's "offending discharges since June 2023 have not changed in quality or quantity, nor has local hydrology" (ECF No. 110 at PageID.6881–6882).

Defendant's argument lacks merit.

In *Ward II*, the Sixth Circuit dismissed a CWA citizen suit for lack of standing based on its determination that the plaintiffs had failed "to carry their burden of setting forth specific facts showing that there was a genuine dispute for trial regarding whether the alleged violation(s) are wholly past." 2022 WL 1467652, at *2.  According to Defendant, Plaintiffs have likewise failed to produce any evidence of an actual or alleged violation of the CWA after the date that this lawsuit was filed or any evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.

Plaintiffs argue that *Ward II* is factually inapposite because Ward alleged that the defendant's pre-litigation unpermitted wetland filling caused post-litigation flooding, but Ward did not allege post-litigation dredging, filling, or pollutant discharging.  According to Plaintiffs, Defendant's unpermitted discharges "transcend June 2023" (ECF No. 110 at PageID.6882). Specifically, Plaintiffs point to—

- Defendant's wastewater BOD levels, which continue to range from an average of 4,560 mg/L to a high around 15,046 mg/L, whereas EGLE determined the proposed

level to protect surface waters would be 30 mg/L, significantly below current discharges;

- Defendant's three self-reported violations of its permitted sodium limit since June 2023;

- Defendant's two self-reported violations of the application rates in its discharge permit since June 2023;

- Defendant's failure to identify "no operational or discharge modifications since it installed fixed sprayers in 2020 and the dune-berm in 2021," modifications that did not resolve the violations but merely shrunk and concentrated discharge acreage or, at best, temporarily delayed inevitable wastewater-to-wetlands infiltration;

- Sampling in Spencer Creek since June 2023 that show continued pollution consistent with Defendant's BOD- and sodium-laden discharges, to wit: low Dissolved Oxygen and high conductivity; and

- Defendant's efforts to remedy leaky village wastewater infiltrating its wastewater (potentially the E. coli source), which post-date the filing of the Complaint.

(ECF No. 110 at PageID.6881–6882).

As the above evidentiary claims reveal, the basis of federal jurisdiction is intertwined with the merits of Plaintiffs' claim.  Accordingly, being cognizant of the parties' pending cross-motions for summary judgment and because Plaintiffs' claims are clearly not "wholly unsubstantiated" or "frivolous," the Court will assume from these submissions that jurisdiction over the CWA claim exists. *See generally Gentek*, 491 F.3d at 330–32 (instructing that where the factual issue regarding subject-matter jurisdiction is "intertwined with the merits, the factual attack to jurisdiction would instead be treated as an attack on the merits, with the district court having jurisdiction").

**2.    Pre-Enforcement Review Does Not Preclude Plaintiffs' Claim in Count II**

Next, Defendant argues that even if Plaintiffs had standing, the MEPA's bar on pre-enforcement judicial review forecloses their citizen suit because the EGLE has already chosen a "response activity" to address the underlying environmental concern, to wit:  EGLE has ordered Defendant to undertake a hydrogeological evaluation of the Spray Fields (ECF No. 91 at

PageID.4306, 4334–4336).  According to Defendant, Plaintiffs are "literally asking for additional forms of injunctive relief, which is expressly prohibited" (*id.* at PageID.4336).  Defendant opines that "Plaintiffs cannot perform an end-run around [] the bar on pre-enforcement judicial [review] simply by advancing a MEPA claim" (ECF No. 119 at PageID.7913).

In response, Plaintiffs argue that there is no precedent for Defendant's "wielding of the Part 201 pre-enforcement bar to foreclose subject matter jurisdiction over Plaintiffs' MEPA claim" (ECF No. 110 at PageID.6884–6888).  Plaintiffs explain that Defendant wrongly asserts that EGLE's hydrogeological evaluation, which is prompted under Part 31 (Michigan's Water Resources Protection Act ("WRPA")) and its corresponding agency rules, Mich. Admin. Code R. 323.2201 *et seq.* (the "Part 22 Groundwater Regulations"), is the equivalent of a Part 201 response activity (*id.* at PageID.6884).

In its Notice of Supplemental Authority, Defendant additionally points to a September 25, 2025 Part 201 Facility Notification that EGLE transmitted to Burnette (ECF No. 124).  The Notification requires Defendant to develop a work plan to "define the nature and extent of groundwater contamination" (9/25/25 Notification, ECF No. 124-1).  Defendant argues that the Notification "removes any doubt that EGLE has selected a response activity" (ECF No. 124 at PageID.8004).

In their response to Defendant's Notice of Supplemental Authority, Plaintiffs point out that while the Notice does *not* indicate EGLE has actually "selected or approved" a Part 201 remedial action, it makes no difference to the Court's exercise of jurisdiction over the subject matter of Count II because Plaintiffs' MEPA claim is "not a challenge to any remedial action of the hazardous substances in the groundwater, whether selected, approved, or aspirational" (ECF No. 126 at PageID.8015).

Defendant's argument lacks merit.

By enacting NREPA in 1994, the Michigan Legislature reorganized, without fundamentally altering, a scattered array of numerous existing Michigan statutes governing environmental protection and natural resource management in "one all-inclusive statute." *Howell Twp. v. Rooto Corp.*, 670 N.W.2d 713, 718 (Mich. Ct. App. 2003).  Several parts are relevant to resolution of the parties' argument here.

First, NREPA Part 17 (MEPA) broadly defines who can sue to protect the environment as "[t]he attorney general" or "any person."  Mich. Comp. Laws § 324.1701(1) ("The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction[.]").  *See also* Mich. Comp. Laws § 324.301(h) (defining "[p]erson" as "an individual, partnership, corporation, association, governmental entity, or other legal entity").  *See*, *e.g.*, *Zanke-Jodway v. City of Boyne City*, No. 1:08-cv-930, 2009 WL 3205969, at *18 (W.D. Mich. Sept. 28, 2009) (holding that "the NREPA (MEPA) expressly authorizes private citizens to sue to enforce the Act through declaratory and equitable relief").

Under NREPA Part 31, the state environmental agency has "broad powers to regulate the discharge of pollutants into the waters of the state, to set standards concerning water pollution, to issue permits regarding the discharge or potential discharge of pollutants into Michigan's waters, and to compel compliance with those permits[.]" *Michigan Farm Bureau v. Dep't of Env't Quality*, 807 N.W.2d 866, 885 (Mich. Ct. App. 2011).

23

Last, NREPA Part 201 governs civil clean-up response actions commenced by the attorney general.  MICH. COMP. LAWS § 324.20137(1).  *See generally Genesco, Inc. v. Michigan Dep't of Env't Quality*, 645 N.W.2d 319, 323 (Mich. Ct. App. 2002) (indicating that Part 201 was modeled after the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)).  Under Part 201, "[t]he owner or operator of a facility [is liable] if the owner or operator is responsible for an activity causing a release or threat of release." MICH. COMP. LAWS § 324.20126(1)(a).  "Release" includes, but is not limited to, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a hazardous substance into the environment[.]"  MICH. COMP. LAWS § 324.20101(pp).

Both Parts 17 and 201 have a common goal of protecting the environment; however, the approach of Part 17 is to preserve the environment through the obtaining of declaratory and injunctive relief in court, while Part 201 encourages the prompt cleanup of contaminated sites through administrative or private action and assignment of financial liability.  *Genesco*, 645 N.W.2d at 322.  Part 201 includes a bar on pre-enforcement judicial review of response activity. The relevant statutory provision instructs that "[a] state court does not have jurisdiction to review challenges to a response activity selected or approved by the department under this part or to review an administrative order issued under this part in any action except an action that is … (d) [a]n action pursuant to section 20135 challenging a response activity selected or approved by the department, if the action is filed after the completion of the response activity."  MICH. COMP. LAWS § 324.20137(6).  "Response activity" is defined as "evaluation, interim response activity, remedial action, demolition, providing an alternative water supply, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment or the natural resources."  MICH. COMP. LAWS § 324.20101(vv).

The Michigan Court of Appeals has held that Parts 17 and 201 must be read together and that "claims under part 17 may not be brought where the underlying controversy is over a 'response activity' as defined in part 201" and that "judicial review" of EGLE's response is instead "delayed until after response activity is completed." *Genesco*, 645 N.W.2d at 324–25, 326–27 (ultimately concluding that the circuit court was barred from reviewing the plaintiff-leather tannery operator's challenge to the department's response to its environmental remedial action plan as such fell within Part 201's definition of "response activity"). *See* MICH. COMP. LAWS § 324.1706 ("This part is supplementary to existing administrative and regulatory procedures provided by law.").

For example, in *Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341, 1343 (W.D. Mich. 2011), the state environmental agency had entered into an Administrative Consent Order ("ACO") requiring Coca–Cola to phase out land application of wastewater from its Minute Maid Facility. The plaintiffs nonetheless sought injunctive and declaratory relief under MEPA, arguing they were not challenging the agency's decisions but "merely seeking additional response activities under MEPA." *Id.* at 1347. The Court determined that the pre-enforcement bar extended to petitions for injunctive relief that would require additional remedial actions. *Id.*

Here, in contrast, Plaintiffs' Count II does not challenge a response activity under Part 201 by EGLE and, indeed, no such response activity has yet occurred. Defendant's state-issued Groundwater Permit that authorizes discharges of its wastewater onto the Spray Fields is issued under the Part 22 Groundwater Regulations. Under those regulations, EGLE conducted inspections in 2019 and 2020 to determine Defendant's compliance with Part 31 and issued violation notices of the Permit in both years (2019 Violation Notice, Jt. Ex. 49, ECF No. 99-49; 2020 Violation Notice, Jt. Ex. 50, ECF No. 99-50). In 2019, EGLE indicated that its inspector "observed runoff from the south center irrigation site entering into the wetland area" and that the

25

observed "discharge of wastewater effluent into surface waters (i.e., wetland) … is a violation of the Permit and Part 31 of the NREPA" (ECF No. 99-49 at PageID.5991). EGLE required a written response with a corrective action plan that, at a minimum, would require Defendant to "[e]valuate the impact of the discharge" (*id.* at PageID.5991). In 2020, EGLE indicated that the earlier identified violations are "continuing" and noted that the water treatment additives being added to the effluent for odor control and bacterial augmentation were "not approved by EGLE" (ECF No. 99-50 at PageID.5992, 5992). EGLE required "immediate action" by Defendant, including "a sampling plan with an implementation schedule to evaluate the impact of the discharge on the adjacent wetland and creek" (*id.* at PageID.5997).

Similarly, EGLE again recently formally notified Defendant that the groundwater at the Spray Fields is contaminated with hazardous substances at levels exceeding applicable Part 201 standards for drinking water, the ground/surface water interface, or both; however, the Notification does not indicate that EGLE has "selected or approved" a Part 201 remedial action, instead requiring Defendant to halt its "release" and submit a "Work Plan for a Remedial Investigation" pursuant to "the requirements of Section 20114(1)(a) of Part 201" (9/25/25 Notification, ECF No. 124-1 at PageID.8008–8009). The current task required by EGLE falls under "determin[ing] the nature and extent of the release at the facility," MICH. COMP. LAWS § 324.20114(1)(a), i.e., a precursor to "[i]nitiat[ing] a remedial action that is necessary and feasible to address unacceptable risks associated with [pollutants]," § 20114(1)(f). As Plaintiff aptly points out, "not every state-ordered evaluation … is a Part 201 'response activity'" (ECF No. 110 at PageID.6885).

In sum, § 20137(6) currently provides no basis to limit this Court's jurisdiction over Plaintiffs' MEPA claim. Defendant's request for dismissal on this basis is properly denied.

26

3.    **Exhaustion is Irrelevant to Plaintiffs' Claim under MEPA**

Last, Defendant argues that pursuant to the Michigan Administrative Procedures Act (MAPA), this Court also lacks jurisdiction to award any relief that adds to, or modifies, the parameters of the permit that Defendant possesses under state law (ECF No. 91 at PageID.4306, 4336–4338).  Specifically, Defendants assert that because Plaintiffs failed to exhaust their administrative remedies by requesting a contested case within 60 days of the issuance of the Groundwater Permit and are not aggrieved by a final decision or order from a contested case, they are precluded from seeking to challenge the terms and conditions of the permit pursuant to MAPA (*id.* at PageID.4337, citing Mich. Comp. Laws § 324.3112(5), and *Lakeshore Grp. v. State*, No. 341310, 2018 WL 6624870 (Mich. Ct. App. Dec. 18, 2018)).  Defendant opines that "Plaintiffs' MEPA claim is nothing more than a thinly-veiled permit challenge" (ECF No. 119 at PageID.7916).

In response, Plaintiffs argue that a plaintiff can challenge a permit holder's "actual conduct" in a separate lawsuit without having to go through administrative review and that this Court therefore has jurisdiction to provide declaratory and equitable relief under MEPA (ECF No. 110 at PageID.6888–6890, citing Mich. Comp. Laws § 324.1701).

Defendant's argument lacks merit.

Under MAPA, any challenge to the terms of an existing permit is not subject to judicial review until such time as the challenging party (1) has exhausted all administrative remedies; and (2) is aggrieved by a final decision or order in a contested case.  Mich. Comp. Laws § 24.301. EGLE renewed Defendant's Groundwater Permit on June 1, 2017 pursuant to Part 31 of MEPA. Michigan law provides that "[a] person who is aggrieved . . . by the reissuance, modification, suspension, or revocation of an existing permit of the department executed pursuant to this section

27

may file a sworn petition . . . requesting a contested case hearing on the matter pursuant to the administrative procedures act of 1969, 1969 PA 306, MICH. COMP. LAWS § 24.201 to § 24.328" within 60 days after the issuance of the permit.  MICH. COMP. LAWS § 324.3112(5).

Unlike the plaintiffs in *Lakeshore* who challenged the state environmental department's permitting decision, Plaintiffs at bar are not challenging EGLE's decision to renew Defendant's Groundwater Permit.  Rather, Plaintiffs have sued Defendant for its alleged polluting conduct. Albeit in an unpublished decision,[3] the Michigan Court of Appeals confirmed in *Lakeshore* that this is the right approach:  "A plaintiff can also challenge the permit holder's actual conduct in a separate lawsuit without having to go through any administrative review. MICH. COMP. LAWS § 324.1701."  *Lakeshore*, 2018 WL 6624870, at *3.  In short, exhaustion of administrative remedies is not relevant to Plaintiffs' MEPA claim, and Defendant's request for dismissal on this basis is properly denied.

### III. CONCLUSION

For these reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (ECF No. 90) is DENIED.

Dated:  November 4, 2025              /s/ Jane M. Beckering
                                                        JANE M. BECKERING
                                                        United States District Judge

---

[3] Michigan Court Rules disfavor reliance on unpublished opinions.  *See* MICH. CT. R. 7.215(C)(1) ("An unpublished opinion is not precedentially binding under the rule of stare decisis.")