UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRAND TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS, et al.,

     Plaintiffs,                                                    Case No. 1:23-cv-589

v.                                                                           HON. JANE M. BECKERING

BURNETTE FOODS, INCORPORATED,

     Defendant.

_____/

## OPINION AND ORDER

In June 2023, Plaintiffs initiated this citizen suit against Defendant Burnette Foods, Incorporated, a fruit processor, with the filing of a Complaint alleging that Defendant is discharging its fruit processing wastewater in violation of both federal and state environmental laws.  Having resolved Defendant's motions to dismiss, the Court now turns to the parties' cross-motions for summary judgment (ECF Nos. 89 & 95).  For the following reasons, the Court concludes that Plaintiffs are entitled to summary judgment on the issue of Defendant's liability. Accordingly, the Court grants Plaintiffs' motion and denies Defendant's motion.

### I.  BACKGROUND

### A.  Factual Background

**1.  The Parties**

Three Plaintiffs initiated this action:  (1) the Grand Traverse Band of Ottawa and Chippewa Indians (GTB), a federally recognized Indian tribe headquartered in Leelanau County, Michigan; (2) the Grand Traverse Bay Watershed Initiative, Inc., d/b/a The Watershed Center Grand Traverse Bay (TWC), a Michigan nonprofit corporation advocating for clean water in Grand Traverse Bay;

and (3) the Elk-Skegemog Lakes Association (ESLA), also a Michigan nonprofit corporation that "promotes an understanding and appreciation of the rights and responsibilities of riparian landowners and takes necessary or desirable actions to protect and preserve the environment of the Elk-Skegemog watershed with a focus on water quality" (Am. Compl. [ECF No. 16] ¶¶ 10–12).

Defendant Burnette Foods, Incorporated is a Michigan corporation that produces and distributes locally and nationally sourced fruits and vegetables and has production facilities throughout Michigan (*id.* ¶ 13). Defendant owns and operates a fruit processing facility in Elk Rapids, Antrim County, Michigan (the "Facility") (*id.*). At the Facility, Defendant processes and preserves raw locally- and nationally-sourced fruit and vegetables, which annually generates millions of gallons of process wastewater (JSMF[1] ¶ 1). Cherry processing in July and August generates relatively more wastewater than other operations (*id.*).

"[C]anned and preserved fruits and vegetables processing" facilities are expressly included within the list of industries regulated by the Administrator of the Environmental Protection Agency as "sources" "from which there is or may be the discharge of pollutants." 33 U.S.C. § 1316(b)(1)(A). The EPA has promulgated effluent limitations applicable to the pollutants in fruit processing wastewater. *See*, *e.g.*, 40 C.F.R. § 407.20 (Apple products subcategory). Defendant does not have a National Pollutant Discharge Elimination System (NPDES) permit for the discharge of its fruit processing wastewater.

**2.     2017:  Defendant's State Permit to Discharge Wastewater to Spray Fields**

Defendant holds a Groundwater Discharge Permit (GWDP or "the Permit")— GW1810211—issued on June 1, 2017, by the state environmental regulator, now the Department

---

[1] Unless otherwise noted, and for purposes of resolving only the motions at bar, the Court derives the factual background from the parties' Joint Statement of Material Facts (ECF No. 98).

of Environment, Great Lakes, and Energy (EGLE) (JSMF ¶ 2, referencing Permit, Jt. Ex. 1, ECF No. 99-1).  Defendant continues to operate under the 2017 GWDP, which expired June 1, 2020, because Defendant submitted a timely renewal application before December 3, 2019 (*id.*).  Defendant is obligated to operate in accordance with its GWDP (*id.*).  The GWDP authorizes Defendant to discharge wastewater to the groundwater through spray irrigation of a maximum of 425,000 gallons daily and 15,000,000 gallons annually of process wastewater to fields located south of the Facility (*id.* ¶ 3).  The GWDP imposes various limits on the wastewater application rate and certain parameters in effluent and groundwater, as well as other limitations and requirements related to Defendant's spray irrigation of wastewater (*id.*).

It is undisputed that the GWDP requires Defendant to monitor the irrigation fields on a daily basis during discharge to prevent surface pooling, ponding of water discharged from the irrigation system, and surface runoff (*id.* ¶ 10).  The GWDP does not authorize *any* discharge to surface waters (*id.* ¶ 11).  Defendant files monthly reports with EGLE that document its discharge application flow, rate, sampling results, and other information through monthly Discharge Monitoring Reports ("DMRs") (*id.* ¶ 12).  Defendant also compiles quarterly reports that document the results of its groundwater, soil, and surface water measurements and sampling for the spray irrigation fields, called Site Status Reports or Groundwater Monitoring Reports (*id.* ¶ 13).

Defendant developed a Discharge Management Plan (DMP) in March 2019, and any and all discharges from the Facility are required to comply with the conditions, limits, practices, and procedures set forth in the DMP (*id.* ¶ 4, referencing DMP, Jt. Ex. 1, ECF No. 99-2).  Per the DMP, Defendant spray irrigates up to 48.7 acres, divided into 4 fields (collectively, "the Spray Fields"):

1. "North Site," which is an 8-acre spray field labelled IRR-38;

2. "South Site," which is divided into three 10-acre spray fields labelled IRR-36 SE, IRR-36 SC, and IRR-36 SW;

3.  "Field #37," is a 6.7-acre spray field labelled IRR-37; and

4.  "Field #39," which is a 4-acre spray field labelled IRR-39

(*id.*).  The aerial photograph below depicts the approximate location of the property boundary, Spray Fields, and EGLE's Monitoring Wells (MWs):



(Gagnon Report, Jt. Ex. 24, ECF No. 99-24 at PageID.5207, citing Lakeshore Environmental, Inc. as the photo source).

The DMP contemplates that crops will be grown on the Spray Fields (JSMF ¶ 5).  *See* 2019 EGLE Discharge Mgmt. Plan, Ex. 6 to Compl., ECF No. 16-6 at PageID.1717 (describing the

design of the system and specifically delineating the crops "selected for this facility" due to their "nutrient uptake characteristics").  The Spray Fields are intended to provide slow rate land application as a means of wastewater treatment and discharge (JSMF ¶ 8).  Wastewater treatment is accomplished by mechanical spray irrigation and nutrient uptake by vegetation and soil adsorption, with an eventual groundwater discharge of excess water not utilized by harvested crops and natural vegetation (*id.*).

Defendant's Spray Fields generally slope to the north and west toward a low-lying wetland area (MacGregor Report, Jt. Ex. 26, ECF No. 99-26 at PageID.5314).  *See also* EGLE 2020 Inspection Report, Jt. Ex. 78, ECF No. 99-78 at PageID.6396 ("ponded effluent [] runs down the slope and collects in this low area").  For many years, a farm road ran through the wetland complex, and, historically, there was a single culvert under the farm road (JSMF ¶ 15).  The parties agree that "[w]ater that flows out of the northern reaches of the wetland complex, flows into a culvert that starts on the west side of Elk Lake Road, runs beneath Elk Lake Road and a garage structure, then outfalls into a plunge pool on private property east of Elk Lake Road" (*id.* ¶ 16).  The stream or drain continues along through private property before passing under a driveway through another culvert, and then into another culvert that discharges into Elk Lake (*id.*).  The stream or drain is referred to as Spencer Creek or, occasionally, as Gretel Creek (*id.*).  "The wetland and Gretel Creek are protected for warmwater fish species, other indigenous aquatic life and wildlife, agriculture, navigation, industrial water supply, public water supply at the point of intake, partial body contact recreation, total body contact recreation from May 1 to October 31, and fish consumption" (2/8/2021 EGLE Memo., Jt. Ex. 68, ECF No. 99-68 at PageID.6305).

The waterways are depicted below:



(Def. Br. Supporting 9/29/2023 Motion to Dismiss, ECF No. 21 at PageID.3550).  It is not disputed

that Elk Lake, in turn, flows into Grand Traverse Bay and then out to Lake Michigan.

**3.      August 2019:  Oversaturation of Spray Fields**

In August 2019, following a complaint alleging that discharge from Defendant's spray

irrigation system may be impacting the surface water in the creek downstream, specifically,

concerns about "foam with staining" and E. coli bacteria, EGLE issued Defendant a "Violation

Notice" of its Permit (EGLE 2019 Violation Notice, Jt. Ex. 49, ECF No. 99-49 at PageID.5987).

The EGLE inspector indicated that he had observed runoff from the irrigation site entering the

wetland area, i.e., a violation of Defendant's Permit, and he included three pages delineating Defendant's violations of the Permit's effluent, application rate, groundwater monitoring requirements per EGLE's Monitoring Wells, as well as Defendant's "non-reporting violations" and failure to develop an Operation and Maintenance (O&M) Manual (*id.* at PageID.5987–5990).

Defendant subsequently developed an O&M Manual (JSMF ¶ 6, referencing O&M Manual, Jt. Ex. 3, ECF No. 99-3). The O&M Manual provides additional details regarding Defendant's equipment, facilities operations and maintenance, and its land application of wastewater (*id.*). Per the O&M Manual, before Defendant applies the process water to the Spray Fields, the wastewater passes through bar screens and hydro-sieves to collect large solids and is impounded in impoundment cells at the Facility (*id.* ¶ 7).

4.    **November–December 2020:  Continued Oversaturation & Ponding**

On November 6, 2020, EGLE issued Defendant a "Second Violation Notice," indicating that "[t]he Facility ha[d] not returned to compliance" since the issuance of the August 2019 Violation Notice and that the identified violations were "continuing" and additional violations had been identified, to wit: "ponded effluent and saturated soils along the northern edge of field 36" and "dark brown effluent … in the wetland adjacent to field 36" (EGLE 2020 Violation Notice, Jt. Ex. 50, ECF No. 99-50 at PageID.5992). EGLE again delineated Defendant's numerous violations of the Permit's effluent, application rate, groundwater monitoring requirements, as well as "non-reporting violations" (*id.* at PageID.5993–5997). *See also* EGLE 8/12/2020 Site Inspection Report, Jt. Ex. 78, ECF No. 99-78 at PageID.6396 (documenting observations).

That same month, Lakeshore Environmental, Inc. (LEI), an environmental engineering and consulting firm, prepared a "Wetland Delineation Report" for Defendant, recommending that all of the Spray Fields be upgraded, including the installation of underground drip irrigation on IRR-

37 and IRR-38 as the "best application method for these locations" (11/2020 LEI Report, Jt. Ex. 36, ECF No. 99-36 at PageID.5823); *see also id.* at PageID.5618 (noting "inundation" of the wetland soil). Defendant contemplated installing drip irrigation, and it is not disputed that its DMP would allow for the installation of a drip irrigation system; however, Defendant has not, to date, installed drip irrigation (JSMF ¶ 9). According to LEI, a berm was "created to provide a barrier preventing sprayed wastewater from entering via surface water" (JSMF ¶ 14; 11/2020 LEI Report, Jt. Ex. 36, ECF No. 99-36 at PageID.5618).

Stuart Kogge, a Professional Wetland Scientist (PWS) who has been interpreting aerial photographs for evaluating wetlands for over 38 years, examined the aerial photography from 2019 and 2020, and concluded that the photographs, coupled with LEI's 2020 report, "show a continuum between Field 36 and the southern end of the wetland complex despite the construction of a berm in 2008, and further supports a connection via groundwater and/or surface water into the wetlands with the spray discharge fields" (Kogge Report, Jt. Ex. 20, ECF No. 99-20 at PageID.5086).[2] PWS Kogge further concluded that there was "a strong correlation between the time periods that [Defendant] was spraying their fields and exceeding their application rates and permitted levels of discharge (of various elements and compounds associated with their wastewater) with [Plaintiffs'] monitoring data showing elevated levels of those same elements and compounds" (*id.* at PageID.5095). *See also* Kendall Report, Jt. Ex. 22, ECF No. 99-22 at PageID.5145–5150 (identifying standing water in aerial images and opining that "a substantial portion of untreated wastewater … flows overland …within just 75 feet of the edge of the wetland").

In December 2020, EGLE initiated formal enforcement action against Defendant, which remains unresolved (JSMF ¶ 17).

---

[2] The Aerial Imagery is Appendix C to Kogge's Report.

**5.      2021–22:  Rising BOD Levels**

Biochemical Oxygen Demand (BOD) is the measure of oxygen required for bacteria to remove organic matter from water.  In general, "[h]igh BOD levels mean there is less oxygen in the water for aquatic biota (e.g., fish and macroinvertebrates) and which can lead to stress and death" (Kogge Report, Jt. Ex. 20, ECF No. 99-20 at PageID.5095).

In February 2021, an EGLE interoffice communication addressed the potential surface water impact of Defendant's Facility, indicating that the Facility was discharging its food processing wastewater "within 100 feet of a wetland adjacent to Gretel Creek" (2/8/2021 EGLE Memo. re. "Potential Surface Water Impacts," Jt. Ex. 68, ECF No. 99-68 at PageID.6288, 6305). Specifically regarding BOD, EGLE found that the data summary indicated that—

> the average groundwater dissolved oxygen concentration in the groundwater is 1.9 mg/l and that there are anoxic conditions present at certain times. Venting groundwater with low dissolved oxygen levels can have a negative impact on the receiving water, especially when the flow of the groundwater is significant compared to the background flow. Since the maximum average effluent five-day biochemical oxygen demand (BOD) is greater than 15,000 mg/l to the field it can reasonably be assumed that the loading of high strength wastewater is the cause of the low groundwater dissolved oxygen. A minimum groundwater dissolved oxygen concentration of 3.0 mg/l would be necessary at the groundwater-surface water interface to prevent acute toxicity.
>
> A Streeter-Phelps model was used to determine limits on oxygen-demanding wastewater at the groundwater-surface water interface to protect the dissolved oxygen standard in Gretel Creek… Typically, BOD venting to surface water from groundwater is not a concern from wastewater discharges to groundwater. *However, in this case the combination of high strength wastewater, the short distance to the surface water, and the extended period of discharge combine to create a potential concern that the discharge may impact the creek.*

(*id.* at PageID.6305–6306) (emphasis added).

Later in the year, on November 15, 2021, EGLE issued a third Violation Notice to Defendant (EGLE 2021 Violation Notice, Jt. Ex. 52, ECF No. 99-52).  EGLE indicated that it had taken samples in July 2021 from two monitoring points and two locations in the wetlands,

including extra sample bottles at all sampling locations that EGLE provided to Defendant for its own analysis (*id.* at PageID.6002).   EGLE reported that while the result for final effluent (total inorganic nitrogen, sodium, chloride, and phosphorus) taken from a monitoring point was within the Permit's limits, the concentration of arsenic in the "inner wetland" was above groundwater and surface water standards (*id.* at PageID.6002–6005).   EGLE explained that "[o]verapplication of high strength wastewater (i.e., BOD) at the discharge site appears to have mobilized arsenic in the groundwater and has resulted in venting of impacted groundwater to the nearby wetland resulting in an exceedance of arsenic in surface waters" (*id.* at PageID.6005).   EGLE further indicated that

> [b]ased on the runoff and ponding observed at the north end of field 36 in conjunction with what appeared to be dark brown effluent in the outer wetland adjacent to field 36, it is likely that the discharge of wastewater to surface waters may be continuing as identified in [the August 2019] Violation Notice[.] In addition, the sample result from the outer wetland had an unnaturally high BOD concentration of 1,910 mg/I. Please be advised that any discharge of wastewater effluent from the irrigation site to surface waters (i.e., wetland) is prohibited by the Permit and would be a violation of the Permit and Part 31. It was noted that a small berm was installed since the last inspection between the spray field and the outer wetland. The berm does not appear to be effective at eliminating all wastewater discharges to the wetland and does not address the long term issue of overapplication, ponding and saturated soils during high discharge periods[.]

(*id.*).  EGLE also, again, delineated Defendant's numerous violations of the Permit's effluent and application rate violations (*id.* at PageID.6003–6004).

While Defendant's screens and hydro-sieves were removing large particles, a 2022 Technical Report prepared for Defendant confirmed that they "cannot treat dissolved oxygen-demanding chemistry commonly known as BOD, a primary driver of wastewater regulation" (Tech. Memo., Jt. Ex. 41, ECF No. 99-41 at PageID.5832).  The author of the report indicated that Defendant's wastewater has "high concentrations of BOD and Total Suspended Solids (TSS)" (*id.*).  The author further cautioned Defendant that the Spray Fields are "nearing both hydraulic and nutrient capacity," noting that EGLE has been "enforcing change through permit renewals

providing more and more restrictive limits on discharge values" (*id.*).  The author recommended that Defendant install new technology to treat wastewater and expressly did "*not* recommend [Defendant] continue without implementing any changes to their system" (*id.* at PageID.5836–5837) (emphasis added).

In 2022, with permission from EGLE to engage in activity in the protected wetlands area, Defendant replaced the single culvert under the farm road with two culverts (*id.*, referencing EGLE 2022 Authorized Activity Permit, Jt. Ex. 4, ECF No. 99-4).  Kevin Kalchik, Defendant's corporate representative and Certified Operator of the Facility, explained that Defendant sought the permission as it appeared to Defendant that "there was wetland on either side of that service road" (Kalchik Dep., Jt. Ex. 14, ECF No. 99-14 at PageID.4884).  And Kalchik admitted that LEI in fact determined that there was a surface water connection through the culvert (*id.* at PageID.4885).

**6.    2023–25:  Conditions Lead to Creation of a Clean-Up Facility**

On August 2, 2023, EGLE issued a fourth Violation Notice to Defendant (EGLE 2023 Violation Notice, Jt. Ex. 53, ECF No. 99-53).  EGLE indicated that its sampling indicated compliance with the permitted effluent and groundwater parameters, but "there were issues with some of the other parameters," to wit: (1) levels of arsenic, iron, and manganese above NREPA criteria, which "indicate a significant impact to the groundwater and are a violation of Rule 2204 of Part 22 which states that the discharge shall not be or not likely to become injurious"; and (2) "Escherichia coli (E. Coli) bacteria was found in the effluent at monitoring point (EQ-1) in violation of the Permit," which "may indicate potential impacts from sanitary sewage in the discharge" (*id.* at PageID.6016–6017). EGLE also, again, delineated Defendant's numerous violations of the Permit's effluent and application rate violations (*id.*).

A December 1, 2023 Site Status Report by Defendant's consultant, Mackinac Environmental Technology, Inc. (MET), likewise reported arsenic at 25 ug/L and 13 ug/L in Monitoring Wells 10 and 11 respectively, i.e., above the 10 ug/L standard (12/1/2023 MET Site Status Report, Jt. Ex. 33, ECF No. 99-33, at PageID.5550).  *See* MICH. ADMIN. CODE R. 299.44 (Table 1) (Generic groundwater cleanup criteria).

In April 2024, when Defendant applied for reissuance of its Permit, EGLE added several new groundwater monitoring recommendations that were not in the previous version of Defendant's permit, including Dissolved Oxygen, arsenic, iron, and manganese, which were identified as parameters or contaminants of concern (4/6/2024 EGLE Geologist Recommendation, Jt. Ex. 69, ECF No. 99-69 at PageID.6316–6320).  The authoring geologist reiterated that elevated arsenic, iron, and manganese in groundwater is the result of the over-application of high-strength wastewater (*id.* at PageID.6320).  Per EGLE's May 2024 Soil Review, Defendant's wastewater is a "high strength wastewater, and the organic loading that is being shown would greatly stress the site soil's ability to effectively treat the waste over time" (5/21/2024 Soil Review, Jt. Ex. 67, ECF No. 99-67 at PageID.6286).

Overall, according to Defendant's self-reported DMRs between January 2018 and July 2024, Defendant violated both the daily and weekly application depth limits more than 100 times (Summary of GWDP Violations, Jt. Ex. 81, ECF No. 99-81 at PageID.6420–6425).[3]  Defendant concomitantly violated the annual 15-million-gallon application limit in 2019, 2020, 2021, and 2022 (*id.*).  And Defendant's DMRs document 78 violations of its permitted wastewater and

---

[3] As Plaintiffs point out (ECF No. 118 at PageID.7818), the contents of EGLE inspection reports and violation notices are non-hearsay inasmuch as they are public records containing factual findings from legally authorized investigations.  FED. R. EVID. 803(8); *Miller v. Field*, 35 F.3d 1088, 1090–91 (6th Cir. 1994).

groundwater limits during this time frame (Summary of GWDP Violations, Jt. Ex. 81, ECF No. 99-81 at PageID.6426–6427).  Specifically, EGLE's compilation of historic data from Monitoring Wells showed that iron, arsenic, and manganese levels consistently exceeded Part 201 standards (4/6/2024 EGLE Geologist Recommendation, Jt. Ex. 69, ECF No. 99-69 at PageID.6333–6337).  Plaintiffs' expert, who reviewed the DMRs for this time frame and others, characterized the frequency of the Permit violations as Defendant's "regular operational procedure" (Kendall Report, Jt. Ex. 22, ECF No. 99-22 at PageID.5140, 5144).

On September 25, 2025, EGLE issued Defendant a "Part 201 Facility Notification" (9/25/2025 Part 201 Facility Notification, ECF No. 124-1).  According to EGLE, review of Defendant's recent groundwater data from the Monitoring Wells located at or near the Spray Fields indicated that the groundwater is contaminated above the applicable criteria of Part 201, Environmental Remediation, of the NREPA, meaning that Defendant was in violation of its Permit and that the Facility was deemed a clean-up "facility" as that term is defined in NREPA (*id.* at PageID.8008).  EGLE instructed Defendant to submit a "Work Plan for a Remedial Investigation" (*id.* at PageID.8008–8010).

### B.  Procedural Posture

Following the submission of their "Clean Water Act Notice of Intent to Sue/60-day Notice Letter," Plaintiffs initiated this case in June 2023 with the filing of a Complaint (ECF No. 1).  In lieu of filing an answer to Plaintiffs' Complaint, Defendant filed a Motion to Dismiss (ECF No. 10).  This Court, without addressing the merits of Defendant's motion, permitted Plaintiffs to file an amended complaint (Order, ECF No. 13).  On August 25, 2023, Plaintiffs filed an Amended Complaint (ECF No. 16).  In Count I, under this Court's federal-question jurisdiction, 28 U.S.C. § 1331, Plaintiffs allege violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*  In Count II,

under this Court's supplemental jurisdiction, 28 U.S.C. § 1367, Plaintiff alleges violations of the Michigan Environmental Protection Act (MEPA), MICH. COMP. LAWS § 324.1701 *et seq.,* which is Part 17 of Michigan's Natural Resources and Environmental Protection Act (NREPA), MICH. COMP. LAWS § 324.101 *et seq.* Plaintiffs seek declaratory and injunctive relief, as well as civil penalties and their costs (ECF No. 16 at PageID.1644–1645).

This Court dismissed Defendant's first motion to dismiss as moot (ECF No. 17), denied Defendant's second motion to dismiss (Op. & Order, ECF No. 26), and recently denied Defendant's third motion to dismiss (Op. & Order, ECF No. 132). Following discovery, Plaintiffs filed a Motion for Summary Judgment (ECF No. 89), to which Defendant filed a response in opposition (ECF No. 108), and Plaintiffs filed a reply (ECF No. 118). Defendant subsequently filed its own Motion for Partial Summary Judgment (ECF No. 95), to which Plaintiffs filed a response in opposition (ECF No. 117), and Defendant filed a reply (ECF No. 121). Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standard

The parties' motions are filed pursuant to Federal Rule of Civil Procedure 56. A party may move for summary judgment, identifying each claim on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020). "[W]here the moving party has the burden [of proof] ... his showing must be sufficient for the court

to hold that no reasonable trier of fact could find other than for the moving party." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488–89 (6th Cir. 2024) (citation omitted).  Stated differently, the record must contain evidence satisfying the burden of persuasion that is "so powerful that no reasonable jury would be free to disbelieve it." *Id.* at 489 (citation omitted).  If the movant so discharges its burden, then "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial" to avoid summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"When the moving party does *not* have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial," which can be done by identifying the absence of evidence.  *Trs. of Iron Workers*, 115 F.4th at 488–89 (emphasis added).  *See also Harris v. City of Saginaw, Mich.*, 62 F.4th 1028, 1032–33 (6th Cir. 2023) (describing the "hat switch courts perform when evaluating cross-motions for summary judgment"); *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir. 2003) ("[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate").

At this juncture, the function of the court is not "'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## B.  Discussion

Plaintiffs seek summary judgment as to Defendant's liability on both their federal and state-law claims, specifically their claims that (1) Defendant "discharges pollutants from its Elk Rapids facility to waters of the United States from a point source without a proper permit, in violation of

Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a)"; and (2) Defendant "has polluted and impaired groundwater beneath its Spray Fields and surface water connected to and downstream from its Spray Fields, in violation of Section 1701 of the Michigan Natural Resources and Environmental Protection Act (MEPA), MICH. COMP. LAWS § 324.1701" (ECF No. 89 at PageID.4243). According to Plaintiffs, Defendant is liable for violations of both the CWA and MEPA, and Plaintiffs are entitled to judgment as a matter of law on both claims (*id.* at PageID.4253). Plaintiffs request an opportunity to address the relief to which they are entitled upon the Court's finding that Defendant is liable for the alleged violations (*id.* at PageID.4243).

Defendant seeks summary judgment in its favor on Count I and requests that the Court decline to exercise supplemental jurisdiction over Plaintiffs' state-law claim in Count II (ECF No. 95 at PageID.4347). According to Defendant, Plaintiffs do not have evidence to support certain elements of their CWA claim (ECF No. 96 at PageID.4372).

Hence, the parties' cross-motions necessarily present overlapping arguments, and the Court has examined their arguments within the context of each Act and the associated statutory elements of, and rules associated with, a claim seeking damages for its violation.[4] The Court concludes that no reasonable trier of fact could find other than for Plaintiffs as to Defendant's liability for Counts I (CWA) and II (MEPA) of Plaintiffs' First Amended Complaint.

## 1.    **Plaintiffs' CWA Claim** (Count I)

Congress enacted the Clean Water Act (CWA) to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *South Side Quarry, LLC v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 28 F.4th 684, 689 (6th Cir. 2022) (quoting, in pertinent part,

---

[4] The Court has not revisited the jurisdictional bars that Defendant presented in its third motion to dismiss and repeats in its motion papers here. *See* ECF No. 108 at PageID.6746–6750.

33 U.S.C. § 1251).  The goal of the CWA is to achieve "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(2).  The CWA prohibits the "discharge of any pollutant," 33 U.S.C § 1311(a), a phrase that is defined to mean "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12).  The Sixth Circuit has held that a CWA claim has the following five elements: "(1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) *a point source*." *Tennessee Clean Water Network v. Tenn. Valley Auth.*, 905 F.3d 436, 439 (6th Cir. 2018) (emphases in original).

Again, it is not disputed that Defendant does not have a national permit (an NPDES) for the discharge of its fruit processing wastewater to its Spray Fields.  The first element of Plaintiffs' CWA claim is also undisputed—Defendant's wastewater contains "pollutants," which include biological materials and industrial and agricultural waste.  33 U.S.C. § 1362(6).  Fruit processing wastewater is an industrial waste pollutant.  33 U.S.C. § 1316(b)(1)(A); 40 C.F.R. §§ 407.2– 407.27, 407.6–407.67.  The parties' briefing indicates that the remaining elements are the disputed elements on which Plaintiffs' CWA claim turns.  The Court examines the elements in reverse order.

### a.    From a Point Source

Plaintiffs argue that Defendant discharges its wastewater through spray heads, which is each a "point source," i.e., a "discernible, confined, and discrete conveyance . . . from which pollutants are or may be discharged" (ECF No. 89 at PageID.4269, quoting 33 U.S.C. § 1362(14)).

Defendant argues that Plaintiffs cannot meet their burden to establish that there was a "point source" discharge of pollutants into the wetlands because return flows from irrigated agriculture are excluded from the definition of a point source (ECF No. 108 at PageID.6725–6726;

ECF No. 96 at PageID.4372–4376).  Defendant argues that even if surface water runoff from the Spray Fields is not categorically excluded, the CWA still does not apply because Plaintiffs ignore that Defendant's spray heads discharge "onto the ground" of the Spray Fields—not into the wetlands—and Plaintiffs' assertion that ponded wastewater "occasionally flows into the wetlands via surface overflow" is unsupported by the evidence and amounts to mere conjecture (ECF No. 108 at PageID.6726–6729; ECF No. 96 at PageID.4377).

Plaintiffs' argument has merit.

Under the CWA, a "point source" is "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  "Courts routinely find that land application systems, spray head sprinklers, and trucks constitute point sources when used to spread treated wastewater and manure on land."  *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1322 (N.D. Ga. 2022) (collecting cases).  *See, e.g.*, *Peconic Baykeeper, Inc. v. Suffolk Cnty.*, 600 F.3d 180, 188–89 (2d Cir. 2010) (spray applicators are point source).

Defendant's assertion that the CWA point source must discharge "directly" into waters of the United States misconstrues the CWA, which broadly defines point source as a discernable conveyance "from which" pollutants are or may be discharged.  The statute "does not say 'directly' from or 'immediately' from."  *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165, 182 (2020) (approving the statutory construction adopted by the plurality in *Rapanos v. United States*, 547 U.S. 715, 743 (2006) (opinion of Scalia, J.)).  *See also United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 309 (3d Cir. 1997) ("Congress intended a broad definition of 'point source'") (citing *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979)); *United States v. Lucas*, 516 F.3d 316, 332–34 (5th Cir. 2008) (collecting cases, including *Rapanos*,

supporting the proposition that a point source need only convey a pollutant to navigable waters).

In short, as Plaintiffs accurately state, "[t]he spray heads do not become non-point sources by

virtue of subsequent conveyances" (ECF No. 118 at PageID.7814).

There is also no merit in Defendant's argument that the CWA's exclusion for agricultural

return flows applies to Defendant's activity.   Congress expressly excluded from the statutory

definition of a "point source" "agricultural stormwater discharges and return flows from irrigated

agriculture." 33 U.S.C. § 1362(14).   The Act provides that no NPDES permit is required for

"discharges composed *entirely* of return flows from irrigated agriculture." 33 U.S.C. § 1342(l)(1)

(emphasis added).   The relevant regulation likewise excludes from the NPDES permit requirement

"[a]ny introduction of pollutants from *nonpoint-source* agricultural and silvicultural activities,

including storm water runoff from orchards, cultivated crops, pastures, range lands, and forest

lands." 40 C.F.R. § 122.3 (Exclusions) (emphasis added).   *See, e.g.*, *Pacific Coast Fed'n of*

*Fishermen's Associations v. Glaser*, 945 F.3d 1076, 1085 (9th Cir. 2019) (holding that the text of

33 U.S.C. § 1342(l)(1) "demonstrates that Congress intended for discharges that include return

flows from activities unrelated to crop production to be excluded from the statutory exception,

thus requiring an NPDES permit for such discharges").

Defendant's irrigation activities do not concern water obtained from a natural source to

irrigate crops that is then "returned" to its source.   Instead, the activities at bar concern industrial

wastewater effluent sprayed from a spray irrigation system pointed at a state-mandated and state-

designed land treatment vegetation system.   The Court is persuaded that the intentional drainage

of industrial wastewater does not fall within the purview of the agricultural return-flows exclusion.

As Plaintiffs aptly stated in opposing an earlier dispositive motion from Defendant, "[t]he Spray

Fields exist to treat the wastewater; the wastewater doesn't exist to irrigate the vegetation" (ECF

No. 24 at PageID.3638).  *See also* Def. Resp. to Inter. 6, ECF No. 117-1 at PageID.7643 ("There is no purchaser/buyer of Burnette's crop.").  The CWA's exclusion for agricultural return flows is inapplicable to Defendant's operations.

In sum, the Court concludes that Plaintiffs have met their burden to satisfy the "point source" element of their CWA claim and that Defendant has not identified a genuine issue of material fact for trial.

      **b.**    **Navigable Waters**

Turning to the third element, "navigable waters" are broadly defined in the CWA as "waters of the United States." 33 U.S.C. § 1362(7).  (The parties use the acronym "WOTUS" to reference this phrase, an acronym that the Court will likewise employ.)  In relevant part, WOTUS include "[i]nterstate waters," 40 C.F.R § 120.2(a)(1)(*iii*); tributaries of interstate waters that are "relatively permanent, standing or continuously flowing bodies of water," *id.* § 120.2(a)(3); and "wetlands adjacent" thereto, *id.* § 120.2(a)(4).  Defendant's Spray Fields are adjacent to a wetland complex that drains into Spencer Creek, which flows into Elk Lake.  The parties agree that Elk Lake is a "waters of the United States" as defined by 40 C.F.R. § 120.2(a) (JSMF ¶ 18).  At issue is whether Spencer Creek and the wetlands are WOTUS subject to the CWA, in satisfaction of the third element of Plaintiffs' CWA claim.

      (1)    *Spencer Creek*

The Court turns first to Spencer Creek.  Plaintiffs argue that Spencer Creek is a tributary of Elk Lake and that the wetlands adjoining Defendant's Spray Fields connect to Elk Lake through Spencer Creek (ECF No. 89 at PageID.4270; ECF No. 117 at PageID.7621–7629).  Plaintiffs concede that parts of Spencer Creek dry up seasonally (usually around July and August) in some years (including 2024) but conclude that, based on several "years of observations," Spencer Creek

is "plainly a relatively permanent waterbody" that maintains continuous flow at least three months annually and year-round flow some years (ECF No. 89 at PageID.4271–4273; ECF No. 117 at PageID.7629).

Defendant argues that discovery, including testimony from Plaintiffs' own expert witness and local residents, confirmed that Spencer Creek is, at most, an "intermittent stream" and therefore does not qualify as a relatively permanent body of water that can be considered WOTUS (ECF No. 108 at PageID.6735–6745; ECF No. 96 at PageID.4395–4399).  By way of comparison, Defendant points to the "wet-weather creek" in Texas and "ephemeral ditches" in Florida that the trial courts determined failed the WOTUS description because the records showed that they carried water only a few times a year after substantial rain events (ECF No. 96 at PageID.4393–4399, citing *Ragsdale v. JLM Constr. Servs., Inc.*, 737 F. Supp. 3d 449, 465–66 (W.D. Tex. 2024), and *United States v. Sharfi*, No. 21-CV-14205, 2024 WL 4483354, at *12 (S.D. Fla. Sept. 21, 2024), report and recommendation adopted, No. 21-14205-CIV, 2024 WL 5244351 (S.D. Fla. Dec. 30, 2024)).

Plaintiffs' argument has merit.

In *Rapanos*, a plurality of the Supreme Court held that "'the waters of the United States' include only relatively permanent, standing or flowing bodies of water," 547 U.S. at 732, but the Court noted that in describing "waters" as "relatively permanent," it was "not necessarily exclud[ing] …*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months," *id.* at 732, n.5 (emphasis in original).  The Supreme Court held that, for purposes of the case before the Court, it was sufficient that "channels containing permanent flow are plainly within the definition" and that "'intermittent' or 'ephemeral' streams … 'existing only, or no longer than, a day' … are not."  *Id.*

21

Spencer Creek forms at some undefined point in the northern reaches of the wetlands east of Elk Lake Road, flows under Elk Lake Road through a culvert, then flows through a ravine until discharging into Elk Lake through a culvert under an old railroad grade—a distance of about 800 feet from the wetlands to the lake (Figures 3–5, ECF No. 89 at PageID.4262–4263, citing MacGregor Dep., Jt. Ex. 12, ECF No. 99-12 at PageID.4789–4787; 7/18/2024 Wetlands Video, Jt. Ex. 85, ECF Nos. 99-85 & 101; Creek Bed Video, Jt. Ex. 61, ECF Nos. 99-61 & 100).

Plaintiffs presented a plethora of evidence demonstrating that Spencer Creek is relatively permanent and generally maintains consistent flow for about 10 months annually.  First, numerous photographs taken from different times of the year and of different stretches of the creek through the years plainly depict flowing water (Photos, Jt. Ex. 82, ECF No. 99-82).  Likewise, a video taken from different times of the year and of different stretches of the creek through the years plainly depicts flowing water, including stretches with small fish swimming (June 2019–June 2024 Spencer Creek Video, Jt. Ex. 86, ECF Nos. 99-86 & 101).

Second, written observations, samplings, and undisputed records gathered during site visits over the years likewise establish the absence of a triable dispute over whether there is a continual presence of water through the creek:

- Water samples taken at the culvert under Elk Lake Road ("EQ2") (2020–24 MET Site Status Reports, Jt. Exs. 30–35, ECF Nos. 99-30 through 99-35);

- ESLA 2019–24 Creek Sampling Reports, Jt. Exs. 43–48, ECF Nos. 99-43 through 99-48;

- Weekly flow measurements taken between July 14 and October 7, 2021, and continuous flow observed for every date, with a noted flow increase in July and August "independent of rainfall events" (ESLA 2021 Report, Jt. Ex. 45, ECF No. 99-45 at 5879, 5896–5897);

- EGLE collection of water sample bottles at EQ2/"Grettel's Creek" (EGLE Violation Notices 2021 & 2022, Jts. Exs. 52 & 53, ECF Nos. 99-52 & 99-53);

22

- EGLE Emails re. 2023 Spencer Creek sampling, Jt. Ex. 74, ECF No. 99-74;

- 2/8/2021 EGLE Memo. re. "Potential Surface Water Impacts," Jt. Ex. 68, ECF No. 99-68 at PageID.6288, 6305) ("Gretel Creek [is] protected for warmwater fish species[.]");

- 4/6/2024 EGLE Geologist Recommendation, Jt. Ex. 69, ECF No. 99-69 at PageID.6316–6320) (identifying three surface water bodies, the "Wetland connected to Spencer Creek, [and] Elk Lake," with potential to be affected by groundwater impacted by Defendant's discharge);

- Ogle's 2020 Field Notes, Jt. Ex. 76, ECF No. 99-76; and

- ESLA Summary of Surface Water Sampling Results from 2022–24, Jt. Ex. 80, ECF No. 99-80.

Last, the testimony of local residents likewise indicates that Spencer Creek has continual flow most months of the year except during the driest months like July and August.  *See* Ogle Dep., Jt. Ex. 5, ECF No. 99-5 at PageID.4487 ("So anytime from January to maybe early to mid-May the creek is clear, and come the end of May to probably September the creek has a very obvious color change in the water… rang[ing] in color from brown to red"), PageID.4512–4513 (agreeing that Spencer Creek has had "no" or "low" flow in July and August), PageID.4536–4537 (indicating that she has "always" seen water in the culvert); Dennis Gretel Dep., Jt. Ex. 8, ECF No. 99-8 at PageID.4594 ("[I]t flows in the springtime, and then it depends how much rain we get through early summer. And usually July comes and things get a little drier.  Then it just slows down to hardly anything."), PageID.4595 ("[N]ormally there would be some little bit of flow of some kind coming out of that pipe."); Taylor Dep., Jt. Ex. 9, ECF No. 99-9 at PageID.4612 ("It's, historically, in my 44 years there, a creek that dries up in July, so I would say from the month of May when we arrive until early in July there's water flowing through the creek and then again later in the fall in years before we started to leave in September, there would be water once again flowing in the creek in the months of September until we left.").

Based on the photographs, videos, observations, samplings, records, and testimony, the Court concludes that Plaintiffs have satisfied their burden of persuasion. In contrast, Defendant emphasizes the fact that Dr. Kendall once used the word "intermittent" to describe Spencer Creek, and Defendant emphasizes the statements by residents about the predictable effect that rain has on a small tributary. Defendant's evidence is not inconsistent with the Supreme Court's discussion in *Rapanos*, describing qualifying "waters" as "relatively permanent," including seasonal rivers that have "no flow during dry months." Accordingly, the Court concludes that Defendant's evidence does not reveal a genuine issue of material fact for trial. Plaintiffs' evidence is sufficiently convincing that no reasonable trier of fact could find other than that Spencer Creek is a tributary of Elk Lake that constitutes WOTUS.

(2)    *The Wetlands*

Examination of the wetlands specifically implicates the United States Supreme Court's decision and two-part adjacency test in *Sackett v. EPA*, 598 U.S. 651 (2023). The plaintiffs in *Sackett* were private property owners who, in preparation for building their home on their small lot near a lake, "began backfilling their property with dirt and rocks." 598 U.S. at 662. The EPA sent the Sacketts a compliance order informing them that their backfilling violated the CWA because their property contained protected wetlands. *Id.* The Supreme Court, which opined that the "outer boundaries" of the CWA's geographical reach had been "uncertain from the start," expressly sought to resolve the CWA's applicability to wetlands. *Id.* at 658, 663. The Supreme Court ultimately held that "some wetlands qualify as 'waters of the United States'" but "only those wetlands that are as a practical matter indistinguishable from waters of the United States." *Id.* at 678. According to the Supreme Court, a party asserting jurisdiction over adjacent wetlands is required to establish "first, that the adjacent body of water constitutes 'waters of the United States,'

(i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 678–79.

Plaintiffs argue that the wetlands adjacent to Defendant's Spray Fields are WOTUS under the two-part adjacency test established in *Sackett* because (1) Spencer Creek is a relatively permanent tributary of Elk Lake, and (2) Spencer Creek forms directly out of the wetlands at an indistinguishable point west of Elk Lake Road (ECF No. 89 at PageID.4273–4274; ECF No. 117 at PageID.7629–7636). Plaintiffs point out that Defendant's own consultant concluded the wetland area in the northern stretches just upstream of Spencer Creek "is part of a larger wetland connected through a culvert to Elk Lake" (ECF No. 89 at PageID.4274).

Defendant argues that Plaintiffs have failed to demonstrate a continuous surface connection between Spencer Creek and the wetlands, i.e., a connection that makes it difficult to determine "where the 'water' ends and the 'wetland' begins" (ECF No. 108 at PageID.6745–6746; ECF No. 96 at PageID.4399–4401).

Plaintiffs' argument has merit.

From the undisputed evidence in this case, the wetlands adjacent to Defendant's Spray Fields qualify as waters of the United States. First, PWS Kogge confirmed that Spencer Creek forms "defined banks, bed, and obvious occurrences of flow" for a stretch of about 16 feet out of the emergent wetland complex before entering the road culvert (Kogge Report, Jt. Ex. 20, ECF No. 99-20 at PageID.5092). *See also* Creek Bed Video, Jt. Ex. 61, ECF Nos. 99-61 & 100). Likewise, Defendant's expert, Matthew MacGregor, confirmed that he twice observed a surface water feature no more than 20 feet long with a "scoured bed" caused by water movement and banks surrounded by vegetation within the wetland's northern reaches. MacGregor Dep., Jt. Ex.

12, ECF No. 99-12 at PageID.4785–4787.  He opined that, as evidenced by cattails growing up the slope, hydric soils, and hydrology, the wetlands continue to the road and up its slope with entrance to the road culvert inside the wetlands.  *Id.* at 4788–4789.  *See also* Kogge Rebuttal Report, Jt. Ex. 21, ECF No. 99-21 at PageID.5123 (pointing out that MacGregor acknowledges the presence of a banked and scoured—albeit "limited"—water feature west of the Elk Lake Road culvert).

Second, the wetland has a continuous surface connection with that water, making it difficult to determine where the water ends and the wetland begins.  As acknowledged by Facility Operator Kalchik, the LEI engineers drafting a report for Defendant in November 2020 determined that the wetland "eventually goes through a culvert, flows into a stream and empties into Spencer Bay of Elk River" (Kalchik Dep., Jt. Ex. 14, ECF No. 99-14 at PageID.4884–4885, referencing 11/2020 LEI Wetland Delineation Report, Jt. Ex. 36, ECF No. 99-36 at PageID.5621).

The Court concludes that Plaintiffs have satisfied their burden of persuasion to meet the navigable-waters element and that Defendant has not identified a genuine issue of material fact for trial.  No reasonable trier of fact could find other than that the wetlands in this case are inextricably connected with a relatively permanent tributary of Elk Lake, a water of the United States.

### c.    Additions

The remaining element of Plaintiffs' CWA claim is whether Defendant's polluted wastewater is an "addition" to WOTUS.  The requirement that pollutants be added to WOTUS from a point source derives from § 1362, which defines the "discharge of a pollutant" in pertinent part as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).  The Act does not further define "addition."  Plaintiffs argue that Defendant's

wastewater pollutants are added to WOTUS (a) commonly through groundwater discharges and (b) occasionally through surface runoff (ECF No. 89 at PageID.4276–4278).

(1)    *Groundwater Addition*

Plaintiffs' groundwater addition claim implicates the Supreme Court's decision in *Maui*, 590 U.S. at 171, where the Supreme Court examined whether—or how—the CWA applied to a pollutant that reaches navigable waters only after it leaves a "point source" and then travels through groundwater before reaching navigable waters.  *Maui* was initiated by several environmental groups against the County of Maui, which operated a wastewater reclamation facility on the island of Maui, Hawaii.  *Id.*  The wastewater reclamation facility collected sewage from the surrounding area, partially treated it, and pumped the treated water through four wells hundreds of feet underground.  *Id.*  The effluent, amounting to about 4 million gallons each day, then travelled another half mile or so, through groundwater, to the ocean.  *Id.*  The environmental groups claimed that the County of Maui was "discharg[ing]" a "pollutant" to "navigable waters," namely, the Pacific Ocean, without the permit required by the Clean Water Act.  *Id.* The specific legal issue was whether "pollution that reaches navigable waters only through groundwater pollution is 'from' a point source," i.e., does the Clean Water Act require a permit "when pollutants originate from a point source but are conveyed to navigable waters by a nonpoint source," here, 'groundwater.'" *Id.* at 172, 170.

The Supreme Court acknowledged that the structure of the CWA indicates that, "as to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States," which have developed methods of regulating nonpoint

source pollution through water quality standards, and otherwise.  *Id.* at 174–75. Indeed, the Supreme Court observed that the CWA "envisions EPA's role in managing nonpoint source pollution and groundwater pollution as limited to studying the issue, sharing information with and collecting information from the States, and issuing monetary grants."  *Id.* at 175.

The Supreme Court nonetheless ultimately concluded that the CWA requires a permit not only "when there is a direct discharge from a point source into navigable waters" but also when there is the "*functional equivalent* of a direct discharge."  *Id.* at 183 (emphasis added).  That is, according to the Supreme Court in *Maui*, "an addition falls within the statutory requirement that it be 'from any point source' when a point source directly deposits pollutants into navigable waters, or when the discharge reaches the same result through roughly similar means."  *Id.* at 183–84.  *Cf. Rapanos*, 547 U.S. at 743 (Scalia, J.) (observing that "from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between"), *id.* (explaining that "[t]he Act does not forbid the 'addition of any pollutant directly to navigable waters from any point source,' but rather the 'addition of any pollutant to navigable waters'") (quoting 33 U.S.C. § 1362(12)(A)).

The *Maui* Court identified the following seven factors that may be relevant, "depending upon the circumstances of a particular case," in determining whether there is the "functional equivalent" of a direct discharge into navigable waters: "(1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or

28

area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity." *Id.* at 184–85. The Court indicated that "[t]ime and distance will be the most important factors in most cases[.]" 590 U.S. at 185.

Plaintiffs argue that the two "most important" *Maui* factors—distance and time—confirm that Defendant's wastewater is reaching the wetlands as the "functional equivalent" of a direct discharge (ECF No. 89 at PageID.4284). *See also* ECF No. 117 at PageID.7603–7620, thoroughly analyzing the *Maui* factors. According to Defendants, Plaintiffs cannot "pick and choose" among the *Maui* factors, and Defendants opine that Plaintiffs have not met their burden of establishing the functional equivalent of a direct discharge (ECF No. 108 at PageID.6730–6735; ECF No. 96 at PageID.4377–4391).

Plaintiffs' argument has merit.

Applying the *Maui* factors to the record evidence here, the Court determines that Plaintiffs have met their burden of persuasion and that Defendant has not identified a genuine issue of material fact for trial.

Beginning with "distance travelled," per Plaintiffs' expert, environmental geoscientist Anthony D. Kendall, Ph.D., the wetlands are immediately adjacent to wastewater infiltration points and the range of distances for all of the wastewater to reach the wetlands is from 70 to under 1,000 feet (Kendall Report, Jt. Ex. 22, ECF No. 99-22 at PageID.5138, 5163; Kendall Rebuttal Report, Jt. Ex. 23, ECF No. 99-23 at PageID.5194) (indicating that the distances traveled range from "under 100 feet in the case of the ponded runoff within the retention basin in Field #36 … and the retention basin in Field #37, … to no more than 1000 feet from those waters recharged at the southern end of that field"). Defendant asserts that the distances pollutants travel will depend upon the location in the Spray Fields and opines that Plaintiffs have not presented sufficient evidence to

apply this factor in their favor (ECF No. 96 at PageID.4380).[5]  But Defendant's assertion is unavailing.  It is unnecessary to pinpoint an exact distance.  The *Maui* court recognized this basic principle on remand, observing that the distance range was 0.3 to 1.5 miles.  *Hawai'i Wildlife Fund v Cnty. of Maui*, 550 F. Supp. 3d 871, 888 (D. Haw. 2021).

Turning then to "transit times" from the Spray Fields to the wetlands, Dr. Kendall calculated the transit times to the wetlands to be as little as 17.5 days with a central estimate of 128–200 days (Kendall Report, Jt. Ex. 22, ECF No. 99-22 at PageID.5138–5140).  Defendant asserts that pollutants do not move at the same velocity as groundwater (ECF No. 96 at PageID.4380).  But Defendant's expert, Joel Gagnon, Ph.D., a geologist/geochemist, while ultimately concluding that "the transit time of individual chemical constituents … cannot be reasonably estimated using currently available information" (Gagnon Report, Jt. Ex. 24, ECF No. 99-24 at PageID.5215–5216)[6], nonetheless admitted during his deposition that calculated groundwater transit time *is* a good estimate for pollutants, particularly conservative pollutants such as chloride, which flow freely along with the groundwater (Gagnon Dep., Jt. Ex. 16, ECF No. 99-16 at PageID.4987).  Again, it is unnecessary to pinpoint an amount of time to determine functional equivalency.  *See Maui*, 550 F. Supp. 3d at 878 (observing that the minimum travel time for pollutants in that case was 84 days with an average travel time of 14 to 16 months).

---

[5] Defendant's experts did not identify any distance in contradiction to Dr. Kendall.  *See* Gagnon Report, Jt. Ex. 24, ECF No. 99-24 at PageID.5216 (opining that the "the distance traveled by individual chemical constituents … would vary depending on the spray field under consideration" and its determination was "complicated"); Sklash Report, Jt. Ex. 25, ECF No. 99-25 at PageID.5281 ("[T]he distance travelled may be longer than suggested by Kendall (2024) and is indeterminate.").

[6] Dr. Sklash likewise indicated that there are "not sufficient data to accurately estimate transit time for purposes of analyzing [this] *Maui* factor" (Sklash Report, Jt. Ex. 25, ECF No. 99-25 at PageID.5280).

Third, regarding the "nature of the material through which the pollutant travels," Dr. Kendall stated the general nature of the materials under the site consists largely of "coarse-textured glacial till," "including sands and … layers of finer textured materials" (Kendall Report, Jt. Ex. 22, ECF No. 99-22 at PageID.5130).  Dr. Kendall adopted the 2009 site porosity value (35%) produced by Defendant's consultant, Mackinac Environmental Technology, which was drawn from published porosity values for silty sand (*id.*, referencing MET 2009 Hydrogeological Report, Jt. Ex. 39, ECF No. 99-39, at PageID.5702–5703).  Defendant's expert, Michael Sklash, Ph.D., a hydrogeologist, confirmed that obtaining porosity from soil descriptions and literature is common practice (Sklash Report, Jt. Ex. 25, ECF No. 99-25 at PageID.5280) (otherwise discussing that the "pipe-like groundwater flow" in *Maui* is "uncommon to rare" in the soils of Michigan and the site at issue).  *See also* Kendall Rebuttal Report, Jt. Ex. 23, ECF No. 99-23 at PageID.5193) (indicating that his computed velocities are "much more likely to be a low-end estimate" and that "[g]roundwater is likely flowing more quickly than [he] conservatively estimated").[7]

The fourth *Maui* factor is the extent to which the pollutant is diluted or chemically changed as it travels.  Dr. Gagnon opined that "it is not currently possible to demonstrate the extent to which the chemical constituents may be diluted or otherwise chemically changed during their transport" (Gagnon Report, Jt. Ex. 24, ECF No. 99-24 at PageID.5219).  Dr. Sklash likewise determined that "there are no site-specific data that address hydrodynamic dispersion," although Dr. Sklash nonetheless indicated that he would "expect to observe hydrodynamic dispersion at the Site" (Sklash Report, Jt. Ex. 25, ECF No. 99-25 at PageID.5285).  In briefing, Defendant opines that the

---

[7] Dr. Gagnon merely indicated that "[p]hysicochemical conditions in the peat and muck can be variable" and that the "role of the wetland in influencing surface and groundwater quality in the area must be characterized before the potential role of this hydrostratigraphic unit in the fate and transport of the constituents present in wastewater at the Site can be determined" (Gagnon Report, Jt. Ex. 24, ECF No. 99-24 at PageID.5218).

31

pollutants in its discharge undergo "significant dilution and chemical change" that Plaintiffs have "conveniently ignore[d]" (ECF No. 96 at PageID.4382–4386).  For their part, Plaintiffs opine in response that Defendant's extreme characterization—that "functional equivalent" means a groundwater discharge must be the exact replica of a pipe discharge and "all" pollutants must reach WOTUS without "any" dilution or chemical change—misstates *Maui* and would mean that this factor would be "dispositive of every case, regardless of the time and travel distance" (ECF No. 117 at PageID.7606).  Plaintiffs again accurately point out that on remand in *Maui*, the discharge was determined to be the functional equivalent despite *some* constituent pollutants appreciably decreasing before reaching the ocean.  *Maui*, 550 F. Supp. 3d at 889.

The fifth *Maui* factor is the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source.  Dr. Kendall testified that "essentially all" sodium and chloride in the wastewater reaches the wetlands (Kendall Dep., Jt. Ex. 11, ECF No. 99-11 at PageID.4726).  Defendant asserts that Plaintiffs have relied only on data *downstream* from the Spray Fields (ECF No. 96 at PageID.4386–4390).  However, Dr. Sklash agreed that factors such as dilution, dispersion, and diffusion would prevent little, if any, of the chloride and other "conservative" pollutants from entering the wetlands if the wastewater reached the wetlands (Sklash Dep., Jt. Ex. 15, ECF No 99-15 at PageID.4953–4954 ("The amount of chloride would be the same, [although] you can see that it's elongated in the flow direction [and] covers a larger area than it did day 1 and that's really the definition of dispersion.")).[8]  While Dr. Gagnon opined that "it is not possible to reasonably estimate the concentrations or mass of chemical constituents (i.e., 'pollutants') entering navigable waters" (Gagnon Report, Jt. Ex. 24, ECF No. 99-24 at

---

[8] Like Dr. Gagnon, Dr. Sklash concluded in his report that the comparison for the fifth *Maui* factor "cannot be determined" (Sklash Report, Jt. Ex. 25, ECF No. 99-25 at PageID.5280).

PageID.5220), he likewise admitted at his deposition that the evaporation and transpiration rates in Dr. Kendall's data "seemed reasonable" and were derived from a "reliable source" (Gagnon Dep., Jt. Ex. 16, ECF No. 99-16 at PageID.4992).

Sixth, regarding the manner by or area in which the pollutant enters the navigable waters, Dr. Kendall considered numerous lines of evidence that he concluded individually and collectively demonstrate that the wetland is "groundwater-fed" (Kendall Rebuttal Report, Jt. Ex. 23, ECF No. 99-23 at PageID.5187–5191 (Evidence for Groundwater Inputs to the Wetland)).  For example, Dr. Kendall compared the average local precipitation to the evaporation and transpiration of wetlands and concluded that the "deficit of 3.4 inches per month must be supplied from some other water source" to "maintain a semipermanent wetland in this area" (*id.* at PageID.5187).  Dr. Kendall ultimately concluded that there was "no credible doubt that the wetland is a major recipient of groundwater flows from its watershed," noting that "if there are parts of the watershed that do not contribute to the wetland via groundwater, they are those furthest away toward the watershed's edge" (*id.* at PageID.5188). Defendant claims that Plaintiffs rely on "mere conjecture" to satisfy this factor (ECF No. 96 at PageID.4390).  But, again, Dr. Sklash corroborated Dr. Kendall's conclusion, testifying that the discharge would be "from the edge of the wetland perhaps to the middle of the wetland" (Sklash Dep., Jt. Ex. 15, ECF No 99-15 at PageID.4934).

The last *Maui* factor is the degree to which the pollution (at that point) has maintained its specific identity.  Defendant claims that Plaintiffs lack data to satisfy this factor (ECF No. 96 at PageID.4391). However, Defendant's groundwater monitoring data show the sodium/chloride ratio of the groundwater near the wetlands is, on average, similar to the wastewater at the point of discharge from the spray heads, as both Drs. Kendall and Sklash observed (Kendall Rebuttal Report, Jt. Ex. 23, ECF No. 99-23 at PageID.5200; Sklash Report, Jt. Ex. 25, ECF 99-25 at

PageID.5286).  As previously noted, EGLE staff also consistently concluded that Defendant's polluted wastewater discharged to the spray fields reaches the wetlands still polluted (2/8/2021 EGLE Memo. re. "Potential Surface Water Impacts," Jt. Ex. 68, ECF No. 99-68 at PageID.6305–6306; 4/6/2024 EGLE Geologist Recommendation, Jt. Ex. 69, ECF No. 99-69 at PageID.6316–6320).

In sum, in *Maui*, the Supreme Court indicated that the above seven factors are "just some of the factors that may prove relevant (depending upon the circumstances of a particular case)." 590 U.S. at 184–85.  The Supreme Court emphasized that "[t]he object in a given scenario will be to advance, in a manner consistent with the statute's language, the statutory purposes that Congress sought to achieve."  *Id.* at 184.  The Court concludes that Plaintiffs have satisfied their burden of persuasion, convincingly demonstrating that application of the factors, on balance, supports functional equivalence, consistent with the purposes of the CWA to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.  *South Side Quarry*, 28 F.4th at 689 (quoting, in pertinent part, 33 U.S.C. § 1251).  Conversely, Defendant has not identified a genuine issue of material fact for trial.  Indeed, the opinions of Defendant's experts were mostly noncommittal and, where noted above, were consistent with the opinions of Plaintiffs' experts.

(2)  *Surface Water Addition*

Plaintiffs argue that on occasion, Defendant's discharges also enter the wetlands as a surface water addition when ponded wastewater overtops the main berm between the basin and wetlands (ECF No. 89 at PageID.4284–4286).  Plaintiffs point out that Dr. Kendall concluded that the application rates combined with substantial rain events likely occur annually, if not multiple times per year, whereas Defendant offered no evidence refuting Dr. Kendall's conclusion (*id.* at PageID.4285).  Indeed, as Plaintiffs point out (ECF No. 117 at PageID.7599), Defendant did not

34

offer any meaningful argument in briefing disputing that its wastewater occasionally discharges to the wetlands through surface overflows.

Plaintiffs' argument has merit.

The record contains the undisputed observations by EGLE inspectors over the years documenting Defendant's effluent flowing across the fields into the wetlands. *See* EGLE 2019, 2020, 2021, & 2023 Violation Notices, Jt. Exs. 49, 50, 52, & 53, ECF Nos. 99-49, 99-50, 99-52, & 99-53. Moreover, as documented by LEI, Defendant's consultant, "[m]uch of the berm has become wetland" (11/2020 LEI Report, Jt. Ex. 36, ECF No. 99-36 at PageID.5618). *See also id.* at PageID.5621 ("[T]he created berm that separates them has become wetland"). Compellingly, within days after an EGLE inspector in 2021 documented wastewater in the wetlands, video footage taken on July 30, 2021 shows a very large dark brown/reddish murky plume in Elk Lake extending from the Spencer Creek outfall (Elk Lake Video, Jt. Ex. 84, ECF Nos. 99-84 & 101). Plaintiff points out that Defendant's wastewater was overapplied to various fields on July 24, 25, 26, 27, 30, and 31, 2021 (ECF No. 89 at PageID.4286, referencing EGLE 2021 Violation Notice, Jt. Ex. 52, ECF No. 99-52 at PageID.6004 (delineating daily application rate violations). The Court concludes that Plaintiffs have also borne their burden of demonstrating surface water additions to WOTUS and that Defendant has not identified a genuine issue of material fact for trial.

In sum, Plaintiffs are entitled to summary judgment on their CWA claim in Count I that Defendant discharges pollutants from its Facility to waters of the United States from a point source without a proper permit, in violation of 33 U.S.C. § 1311(a).

2.      **Plaintiffs' MEPA Claim** (Count II)

The Court therefore exercises its supplemental jurisdiction to consider Plaintiffs' state-law claim.  Reflecting Michigan's "paramount public concern" for conservation of natural resources, MICH. CONST. Art. 4, § 52 (West), the MEPA confers a private right of action to seek declaratory and equitable relief for "violations" that have caused or are likely to cause harm to Michigan's air, water, and other natural resources from "pollution, impairment, or destruction."  MICH. COMP. LAWS § 324.1701(1).  "[I]f there is a standard for pollution or for an antipollution device or procedure, fixed by rule or otherwise, by the state or an instrumentality, agency, or political subdivision of the state, the court may … [d]etermine the validity, applicability, and reasonableness of the standard."  *Id.* § 324.1701(2).  "[E]ach alleged MEPA violation must be evaluated by the trial court using the pollution control standard appropriate to the particular alleged violation."  *Nemeth v. Abonmarche Development, Inc.*, 576 N.W.2d 641, 650 (Mich. 1998).

The Michigan Supreme Court explained that in establishing environmental rights, the MEPA "did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment."  *Ray v. Mason Cnty. Drain Comm'r*, 224 N.W.2d 883, 888 (Mich. 1975).  Rather, the Michigan Legislature "spoke as precisely as the subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality."  *Id.* According to the Michigan Supreme Court, the MEPA allows courts "to fashion standards in the context of actual problems as they arise in individual cases and to take into consideration changes in technology which the Legislature at the time of the Act's passage could not hope to foresee." *Id.*

The MEPA sets forth a shifting burden of proof.  A plaintiff must first make a "prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources, or the public trust in these resources[.]"  MICH. COMP. LAWS § 324.1703(1)).  If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to either provide (1) a rebuttal defense by the submission of "contrary evidence"; or (2) an affirmative defense demonstrating that there was "no feasible and prudent alternative" to its conduct and its conduct was "consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources[.]"  *Id.*

For example, in *Nemeth*, 576 N.W.2d at 648, the Michigan Supreme Court held that a violation of the soil erosion and sedimentation control act (SESCA), MICH. COMP. LAWS § 324.9101 *et seq.*, could establish the plaintiff's prima facie showing under MEPA because the SESCA contains a pollution control standard.  *See also Her Majesty the Queen v. Detroit*, 874 F.2d 332, 337 (6th Cir. 1989) (indicating that the MEPA is "supplementary to existing administrative and regulatory procedures provided by law").

Here, Plaintiffs argue that they have established their prima facie case based principally on the limits associated with Defendant's GWDP but also on the actual evidence of pollution and that Defendant, in contrast, has offered "no evidence to support a rebuttal or affirmative defense" (ECF No. 89 at PageID.4291–4295).

In response, Defendant argues that Plaintiffs cannot use a violation of a *groundwater* pollution control standard to make a prima facie case of impairment to *surface* waters (ECF No. 108 at PageID.6750).  Defendant argues that even assuming Plaintiffs could establish a prima facie MEPA claim based on Part 22 violations, Defendant can rebut a prima facie case by showing that

the natural resources that Plaintiffs claim are impaired "merely display naturally occurring conditions intrinsic to wetlands and their appurtenant streams and groundwater" (*id.* at PageID.6750–6754).   According to Defendant, high levels of E. coli naturally occur in wetlands, and increased metals concentrations and low DO concentrations are both a common result of mobilization of naturally occurring elements in soils caused by the breakdown of organic matter in the wetlands (*id.*).   Defendant concludes that because Plaintiffs' claims of impacts to surface water and groundwater emanating from the wetlands are "indistinguishable from the inherent characteristics of those wetlands," judicial intervention under MEPA is not warranted (*id.* at PageID.6755–6757).

Plaintiffs' argument has merit.

Again, MEPA plaintiffs may establish their MEPA prima facie case by showing a violation of a legislatively or administratively enacted pollution control standard—or a different standard if that standard falls short of MEPA's requirements.  *Nemeth*, 576 N.W.2d at 646–48 (discussing *Ray*, *supra*); MICH. COMP. LAWS § 324.1701(2).  The Court agrees that the limits associated with Defendant's GWDP are the relevant "standards for pollution."  Part 31 of NREPA requires EGLE to "establish pollution standards for lakes, rivers, streams, and other waters of the state" and allows the issuance of permits "that will assure compliance with state standards to regulate municipal, industrial, and commercial discharges or storage of any substance that may affect the quality of the waters of the state." MICH. COMP. LAWS § 324.3106; MICH. COMP. LAWS § 324.3101(aa) ("waters of the state" includes groundwater). *See also* MICH. COMP. LAWS § 324.3109(1) (prohibiting discharges of a substance that is or may become injurious to various interests in and uses of natural resources); MICH. COMP. LAWS § 324.3109(6) ("[a] violation of this section is prima facie evidence of the existence of a public nuisance . . ."). The express purpose of the Part 31

permit is to establish wastewater requirements and conditions EGLE "considers necessary to prevent unlawful pollution." MICH. COMP. LAWS § 324.3112(3). EGLE issues groundwater discharge permits that establish wastewater and pollution limits necessary to ensure any discharge will not be injurious to the environment, not cause runoff, ponding, erosion, or nuisance conditions, and not create a Part 201 facility. MICH. ADMIN. CODE R. 323.2204(2). And Defendant's GWDP expressly incorporates these standards and imposes numeric wastewater, groundwater, and land application limits subject to time, volume, and pollutant restrictions (JSMF ¶ 3).

When, as here, a defendant violates a pollution control permit, such a violation is "sufficient to constitute a prima facie case that the defendant's conduct 'has, or is likely to pollute, impair, or destroy the air, water or other natural resources.'" *Dwyer v. City of Ann Arbor*, 261 N.W.2d 231, 236 (Mich. Ct. App. 1977), rev'd on other grounds, 387 N.W.2d 926 (Mich. 1978). Defendant's mostly self-reported history of exceeding the Permit's application and pollutant limitations is undisputed, and the Court concludes that Plaintiffs have convincingly satisfied their prima facie case.

Defendant's attempt to discredit Plaintiffs' prima facie case by cabining its violations to groundwater pollution control standards does not compel a different conclusion. Plaintiffs' MEPA claim is based on Defendant's polluted wastewater impacting both groundwater and surface water. And, as expressly reflected in Defendant's Permit, the regulation authorizing groundwater permits specifically incorporates surface water quality standards and specific permit provisions to protect surface waters. *See* MICH. ADMIN. CODE R. 323.2218(1) (groundwater discharge permit to meet Rule 323.2204); MICH. ADMIN. CODE R. 323.2204(2)(e) (requiring discharge be "consistent with" Rules 323.1041 to 323.1117, Michigan's "Water Quality Standards"); GWDP Part I §§ 8(a) (b), 9(2), 10(a)(1), Jt. Ex. 1, ECF No. 99-1 at PageID.4425–4426 (instructing that the permitted

discharge "shall not be, or not be likely to become, injurious to the protected uses of the waters of the state," "shall not cause runoff," and must be "absorbed and held within the effective rooting zone" of the Spray Field vegetation).

While Plaintiffs satisfied their prima facie case, Defendant's response is limited to general observations about the E.coli and metal that are common in wetlands, observations that fail to specifically identify a genuine issue of material fact for trial.  Consequently, Plaintiffs are entitled to summary judgment on their MEPA claim in Count II that Defendant has polluted and impaired groundwater beneath its Spray Fields and surface water connected to and downstream from its Spray Fields, in violation of MICH. COMP. LAWS § 324.1701.

### III.  CONCLUSION

For these reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 89) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Summary Judgment (ECF No. 95) is DENIED.

Dated:  November 12, 2025                       /s/ Jane M. Beckering
                                                JANE M. BECKERING
                                                United States District Judge